## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| ANGE SAMMA<br>PSC 400, Box #4278<br>APO AP 96273,<br><br>ABNER BOUOMO<br>166 Lakeview Circle #H<br>Wahiawa, HI 96787,<br><br>AHMAD ISIAKA,<br>15002 Rainy Morning Drive<br>Humble, TX 77346,<br><br>MICHAEL PEREZ<br>702 Quartermaster Road, Box #500<br>Joint Base Elmendorf-Richardson, AK 99505,<br><br>SUMIN PARK<br>702 Quartermaster Road, Box #3012<br>Joint Base Elmendorf-Richardson, AK 99505,<br><br>YU MIN LEE<br>95-797 Wikao St. #B201<br>Mililani, HI 96789,<br><br>on behalf of themselves and others similarly<br>situated,<br><br>        Plaintiffs,<br><br>   v.<br><br>UNITED STATES DEPARTMENT OF<br>DEFENSE<br>1000 Defense Pentagon<br>Washington, DC 20301,<br><br>MARK ESPER, in his official capacity as<br>Secretary of Defense<br>1000 Defense Pentagon<br>Washington, DC 20301,<br><br>        Defendants. | Civil Action No. _____ |

**CLASS ACTION COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**
(Unlawful deprivation of honorable service certifications from non-citizen service members)

## INTRODUCTION

1.      Plaintiffs are non-citizens serving in the United States Armed Forces who seek to naturalize as United States citizens. They, along with thousands of other non-citizen service members, are presently serving this country across the Armed Forces at myriad bases domestically and abroad. Many are long-time residents of the United States who enlisted in the military to serve and give back to their adopted country. They have a statutory right to apply to naturalize due to their honorable service during a period of armed conflict under 8 U.S.C. § 1440, but the Department of Defense ("DoD") and Secretary of Defense Mark Esper (together, "Defendants") have blocked them from doing so. Defendants have adopted an unlawful policy of withholding certifications of Plaintiffs' honorable service, which they require to apply to naturalize based on their ongoing military service. As a result, Defendants are denying thousands of men and women in uniform the U.S. citizenship that Congress has long promised to non-citizens serving in our military.

2.      Non-citizens have served in the U.S. military in large numbers since the founding of the Republic. For more than 200 years, Congress has recognized the vital role non-citizens play in the nation's military through the passage of laws promising expedited citizenship to individuals that enlist and serve honorably during periods of armed conflict. From the War of 1812 to World War II, U.S. laws enacted during periods of armed conflict have permitted non-citizens to naturalize almost immediately upon entering service and prior to deployment.

3.      In 1952, Congress passed the expedited military naturalization statute that is in effect today. The Immigration and Nationality Act ("INA"), 8 U.S.C. § 1440, provides that any non-citizen who has served honorably in the military during wartime may naturalize, regardless

of immigration status or length of residence or physical presence in the United States. By waiving the typical requirements for naturalization, the statute allows non-citizens to apply to naturalize almost immediately upon entering service. The legislative history of the statute confirms that its purpose is to ensure that non-citizens serving during wartime may naturalize prior to their deployment.

4.      8 U.S.C. § 1440 expressly delineates a narrow, non-discretionary, and ministerial role for DoD in the expedited naturalization process. It mandates that DoD provide service members with a "duly authenticated certification . . . which shall state whether the applicant served honorably" during wartime so that they may apply for naturalization pursuant to section 1440.

5.      To satisfy this requirement, U.S. Citizenship and Immigration Services ("USCIS"), a component of the Department of Homeland Security ("DHS") responsible for processing and adjudicating naturalization applications, requires DoD to certify honorable service using USCIS Form N-426 ("N-426"). Service members must submit a completed N-426 to USCIS with their naturalization applications. USCIS will not consider a military naturalization application that does not include a completed N-426.

6.      Until October 2017, DoD's longstanding practice was to issue N-426 certifications of honorable service to non-citizens who had served honorably without regard to any additional criteria, including a minimum service duration requirement. Moreover, a broad range of military personnel with access to an individual's service records could certify the N-426, and would typically do so within days of receiving it.

7.      In a dramatic departure from prior practice, on October 13, 2017, DoD adopted a new policy ("N-426 Policy") requiring that the military withhold N-426 certifications of

honorable service from service members until they meet several new criteria and follow a new process. The new criteria require service members to complete additional DoD background screening; pass a "military service suitability determination," which purports to determine a service member's security risk to the military; and serve for a minimum of 180 days for active duty service members and one year for service members in the Selected Reserve of the Ready Reserve ("Selected Reserve"), before they may obtain their N-426 certification. The new process also requires the Secretary of the applicable service, or a commissioned officer of at least a particular pay grade designated by the Secretary, to certify the N-426. The addition of new criteria and the new process in the N-426 Policy have significantly prolonged the period service members must wait before they may obtain an N-426 certification and apply for naturalization pursuant to 8 U.S.C. § 1440.

8.      The N-426 Policy obstructs 8 U.S.C. § 1440 and the intent of Congress, and makes it difficult, if not impossible, for service members to benefit from expedited naturalization.

9.      DoD's subversion of the statutory scheme is so significant that it is now harder for many service members to naturalize through the expedited process than through the ordinary civilian process. Many service members who are lawful permanent residents have waited so long for their N-426 certification that they could have obtained naturalization faster through the civilian process. Similarly, veterans can still benefit from expedited naturalization under section 1440 because they do not have to abide by the new criteria or policy set forth in the N-426 Policy.

10.     USCIS statistics demonstrate the impact of the N-426 Policy on military naturalizations. In fiscal year 2018, which commenced in October 2017, when Defendants

4

implemented the N-426 Policy, USCIS reported a 72-percent drop in military naturalization applications from pre-N-426 Policy levels.

11.    Through the N-426 Policy, Defendants have unlawfully obstructed the ability of thousands of service members to obtain U.S. citizenship, placing them in a state of personal and professional limbo. The N-426 Policy prevents service members from enjoying the benefits and rights that accrue with citizenship, such as the right to vote and fully participate in the civic life of their adopted homeland, to bring their immediate family members to the United States before they deploy, or to travel with a U.S. passport. Without citizenship, service members are also unable to advance their careers since many roles in the military, including the more technical and senior roles as well as those requiring a security clearance, necessitate U.S. citizenship. Many of these roles would offer better opportunities for promotion and a higher salary.

12.    The N-426 Policy also places many service members in peril because of their inability to obtain U.S. citizenship. Non-citizen service members deployed overseas have no right to U.S. consular services and protections. As foreign nationals, they may have different rights and vulnerabilities compared to their U.S. citizen counterparts in the countries where they are stationed. Service members lacking lawful immigration status can be placed in removal proceedings and deported from this country, notwithstanding their ongoing military service and eligibility to naturalize. Without citizenship, these service members cannot petition to adjust the immigration status of their parents, spouses, or children left behind in this country during their deployment, nor can they travel freely outside of and return to this country. For these service members, the inability to naturalize also jeopardizes their ability to work and remain in the United States following military service, potentially cutting them off from benefits afforded to veterans, such as Veterans Administration healthcare.

13.     The N-426 Policy is unlawful. It directly violates Congress's clear command that DoD play a purely ministerial role in certifying honorable service. It concocts additional substantive criteria and procedural requirements, which service members must meet before they can obtain their certification of honorable service and apply for naturalization. By implementing the N-426 Policy, DoD violates the INA and the Administrative Procedure Act.

## JURISDICTION AND VENUE

14.     This case arises under the Constitution and the laws of the United States and presents a federal question within this Court's jurisdiction under 28 U.S.C. § 1331. The Court has authority to grant declaratory relief pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201–2202, and injunctive relief pursuant to 5 U.S.C. § 702.

15.     Venue is proper in the District of Columbia under 28 U.S.C. § 1391(b)(2) and (e)(1) because a substantial part of the events giving rise to the claims occurred in this district, Defendant DoD is an agency of the United States, and Plaintiffs sue Defendant Mark Esper in his official capacity as an officer of the United States.

## RELATED LAWSUITS

16.     In September 2017, three individuals brought a class action against DoD and the Secretary of Defense challenging their refusal to certify the N-426s of non-citizen service members in the Selected Reserve who enlisted through the Military Accessions Vital to the National Interest ("MAVNI") program. Plaintiffs in that case later amended their complaint to include a challenge to DoD's refusal to certify the N-426s of Selected Reserve MAVNI service members pursuant to the N-426 Policy. This Court issued a preliminary injunction enjoining the N-426 Policy as it applies to Selected Reserve MAVNI service members who have not received an N-426 certification. *Kirwa v. U.S. Dep't of Def.*, 285 F. Supp. 3d 21 (D.D.C. 2017).

17.     In May 2017, ten individuals brought a class action against DoD, DHS, and

USCIS challenging, *inter alia*, DoD's revocation or threat to revoke N-426s issued to Selected Reserve MAVNI service members. Plaintiffs in that case later amended their complaint to include a challenge to DoD's revocation or threat to revoke N-426s issued to Selected Reserve MAVNI service members pursuant to the N-426 Policy. On October 27, 2017, this Court issued a preliminary injunction enjoining the N-426 Policy as it applies to this group of non-citizen service members. Order, *Nio v. U.S. Dep't of Homeland Sec.*, No. 17-cv-998 (D.D.C. Oct. 27, 2017), ECF No. 74.

18.     This complaint involves common issues of fact and arises out of the same core events as the *Kirwa* and *Nio* actions. This lawsuit, like *Kirwa* and *Nio*, challenges DoD's unlawful refusal to certify the N-426s of non-citizens serving honorably during wartime. However, *Kirwa* and *Nio* were both challenges on behalf of classes of Selected Reserve MAVNI service members, whereas this lawsuit is on behalf of all other non-citizen service members, including lawful permanent resident and active duty MAVNI service members, who are similarly entitled to an N-426 certification under 8 U.S.C. § 1440 but who remain subject to the N-426 Policy. This lawsuit also involves similar issues of injury to Plaintiffs and the prospective class as those in *Kirwa* and *Nio*. In all three cases, service members are experiencing significant delays in their ability to apply for naturalization, resulting in similar harms.

## PARTIES

19.     Plaintiff Ange Samma is a lawful permanent resident who enlisted in the U.S. Army in July 2018. Plaintiff Samma serves on active duty as a Private First Class (E-3) with the 339th Quartermaster Company at Camp Humphreys in South Korea.

20.     Plaintiff Abner Bouomo is a lawful permanent resident who enlisted in the U.S. Army in December 2017. Plaintiff Bouomo serves on active duty as a Private First Class (E-3) with the 25th Infantry Division at Schofield Barracks in Hawaii.

21.     Plaintiff Ahmad Isiaka is a lawful permanent resident who enlisted in the U.S. Army in January 2020. Plaintiff Isiaka serves in the Selected Reserve of the U.S. Army Reserve as a Private Second Class (E-2) with the 644th Transportation Company in Houston, Texas.

22.     Plaintiff Michael Perez is a lawful permanent resident who enlisted in the U.S. Army in November 2017. Plaintiff Perez serves on active duty as a Private Second Class (E-2) with the 2nd Battalion, 377th Parachute Field Artillery Regiment at Joint Base Elmendorf-Richardson in Alaska.

23.     Plaintiff Sumin Park enlisted in the U.S. Army as a lawful permanent resident in January 2017. Plaintiff Park serves on active duty as a Private Second Class (E-2) with the 2nd Battalion, 377th Parachute Field Artillery Regiment at Joint Base Elmendorf-Richardson in Alaska.

24.     Plaintiff Yu Min Lee enlisted in the U.S. Army through the MAVNI program in July 2016. Plaintiff Lee serves on active duty as a Specialist (E-4) at Schofield Barracks in Hawaii.

25.     Defendant DoD is an executive branch department of the U.S. federal government that is responsible for issuing and implementing the N-426 Policy.

26.     Defendant Mark Esper is the Secretary of Defense and has supervisory responsibility over DoD. Plaintiffs sue Defendant Esper in his official capacity.

## LEGAL FRAMEWORK

### A.     Non-Citizen Enlistment in the U.S. Military

27.     U.S. citizens, lawful permanent residents, and people from the Marshall Islands, Micronesia, and Palau may enlist in the U.S. military. 10 U.S.C. § 504(b)(1)(A)–(C).

28.     In addition, the Secretary of Defense and the Secretaries of the military service departments are authorized to enlist people who do not fall into the categories above if their

enlistment is "vital to the national interest." *Id*. § 504(b)(2)(A). In November 2008, pursuant to this provision, the Secretary of Defense authorized the MAVNI program. The MAVNI program permits certain foreign nationals, who are not lawful permanent residents or people from the Marshall Islands, Micronesia, and Palau, to enlist if they are healthcare professionals or possess foreign language skills with an associated cultural background critical to the military.

**B.    Expedited Naturalization through Military Service**

29.    In 1952, Congress enacted the INA, codified at 8 U.S.C. § 1101 et seq., which sets forth the requirements for naturalization.

30.    The INA provides non-citizen service members with two different expedited naturalization processes—one for military service during "peacetime," 8 U.S.C. § 1439, and the other for military service during designated "periods of hostilities," *id*. § 1440. On July 3, 2002, President George W. Bush issued Executive Order 13269, which designated the period "beginning on September 11, 2001" as a "period of hostilities" and rendered non-citizen service members eligible for expedited naturalization pursuant to section 1440 from that date onward. The Executive Order remains in effect to this day.

31.    8 U.S.C. § 1440(a) provides:

> *Any person who, while an alien or a noncitizen national of the United States, has served honorably* as a member of the Selected Reserve of the Ready Reserve or in an active-duty status in the military, air, or naval forces of the United States . . . during any . . . period which the President by Executive order shall designate as a period in which Armed Forces of the United States are or were engaged in military operations involving armed conflict with a hostile foreign force . . . *may be naturalized as provided in this section* . . . . (emphasis added)

32.    Section 1440 instructs that "[t]he executive department under which" service members have "served shall determine" and must prove "by a duly authenticated certification . . . whether the applicant served honorably." *Id*. § 1440(a), (b)(3). USCIS, the DHS component responsible for processing and adjudicating naturalization applications, has prescribed Form N-

426, Request for Certification of Military or Naval Service, as the form DoD must use to certify

a service member's honorable service. *See* 8 C.F.R. § 329.4; U.S. Citizenship & Immigr. Servs.,

*USCIS Policy Manual*, Vol. 12, Pt. I, Ch. 5.

33.     A service member may apply for naturalization with USCIS once DoD has

certified their honorable service using Form N-426. *See* 8 C.F.R. § 329.4. Section 1440 requires

service members to comply with the general eligibility criteria for naturalization, with certain

exceptions. Under the INA and its implementing regulations, a civilian who wishes to naturalize

as a U.S. citizen generally must be at least 18 years old, be a lawful permanent resident of the

United States, have "resided continuously within the United States" for "at least five years after

having been lawfully admitted for permanent residence," and have "been physically present in

the United States" for at least half that time.[1] 8 C.F.R. § 316.2(a)(1)–(4); *see also* 8 U.S.C.

§§ 1423, 1427, 1429, 1445. A civilian must also demonstrate "good moral character" for the five

years preceding the date of application for naturalization and be "attached to the principles of the

Constitution of the United States, and favorably disposed toward the good order and happiness of

the United States." 8 C.F.R. § 316.2(a)(1)(7); *see also* 8 U.S.C. §§ 1423, 1427(d). In addition, a

civilian must not have "a final finding of deportability" or be in removal proceedings at the time

of application. 8 U.S.C. § 1429. Finally, a civilian must pay a fee to submit the naturalization

application, which is currently $725. *See* 8 C.F.R. § 103.7.

34.     8 U.S.C. § 1440 waives or modifies several of the requirements set forth above.

First, it makes naturalization available to "[a]ny person who, while an alien or a noncitizen

national of the United States," has served honorably during a designated period of hostilities, not

---

[1] Civilians who are spouses of U.S. citizens are only required to demonstrate continuous residence for at least three years and physical presence for at least half that time. *See* 8 U.S.C. § 1430(a).

just to lawful permanent residents. 8 U.S.C. § 1440(a). Second, it waives the continuous

residence and physical presence requirements. *Id*. § 1440(b)(2); *see also* 8 C.F.R. § 329.2. Third,

it requires a service member to demonstrate "good moral character" for one year (not five)

preceding the date of application for naturalization. 8 C.F.R. § 329.2(d). Fourth, it waives the age

requirement and the prohibition against naturalization for persons with deportation orders or in

removal proceedings. 8 U.S.C. § 1440(b)(1). Finally, it waives the naturalization application fee.

*Id*. § 1440(b)(4).

35.     Once an individual submits a naturalization application, USCIS must conduct a

background investigation, *see* 8 U.S.C. § 1446(a); 8 C.F.R. § 335.1, which includes a full

criminal background check by the Federal Bureau of Investigation, *see* 8 C.F.R. § 335.2(b). After

completing the background investigation, USCIS must schedule a naturalization examination at

which a USCIS officer interviews the applicant. *See Id.* § 335.2(a).

36.     If the applicant has complied with all of the requirements for naturalization set

forth in the INA and its implementing regulations, USCIS "shall grant the application." *Id*.

§ 335.3. Once USCIS has granted an application, the applicant must take the oath of allegiance,

following which the person "shall be deemed a citizen of the United States." *Id*. §§ 337.1, 337.9.

37.     Citizenship granted pursuant to 8 U.S.C. § 1440 may be revoked "if the person is

separated from the Armed Forces under other than honorable conditions before the person has

served honorably for a period or periods aggregating five years." 8 U.S.C. § 1440(c).

## FACTUAL BACKGROUND

**A.    Immigrants Make Valuable Contributions to the U.S. Military**

38.     Immigrants have made valuable contributions to the U.S. military throughout this

nation's history, serving in the Revolutionary War and in every major conflict since the founding

of the Republic. During World War I, nearly a half million immigrants—about a quarter of

whom were non-citizens—fought on behalf of the United States.[2] More than 300,000 immigrants served during World War II, over a third of whom were non-citizens.[3]

39.     Immigrants have continued to play a vital role in the U.S. military in the modern era, including since 2001, when the current period of armed conflict commenced. In 2009, there were nearly 115,000 immigrants serving in the U.S. military, representing almost 8 percent of the then–1.4 million military personnel on active duty.[4]

40.     Non-citizens make up a considerable number of those fighting in today's wars. Between 1999 and 2010, approximately 80,000 non-citizens enlisted in the military, accounting for 4 percent of the total number of persons entering service in that period.[5] Between 2011 and 2015, an average of about 10,000 non-citizens served in the Army per year.[6] The role non-citizens have played in recent conflicts is also reflected in the number—over 100,000—that have naturalized on the basis of their military service since 2001.[7]

41.     DoD has reported that approximately 5,000 lawful permanent residents enlist in the military each year.[8] And from 2008 to 2016, the MAVNI program recruited 10,400 foreign

---

[2] *See* Lynn O'Neil & Omer S. Senturk, *Thesis: Non-Citizens in the U.S. Military*, Naval Postgraduate Sch. 12 (2004).

[3] *See id.* at 15–16; Immigration & Naturalization Serv., U.S. Dep't of Justice, *Foreign-Born in the United States Army During World War II, with Special Reference to the Alien*, 6 Monthly Review 43, 48 (1948).

[4] *See* Margaret D. Stock, *Essential to the Fight: Immigrants in the Military Eight Years After 9/11*, Immigration Policy Ctr., Am. Immigration Council 4 (2009) (citing data provided to the author by the Defense Manpower Data Center).

[5] *See* U.S. Dep't of Def., *Population Representation in the Military Services: Fiscal Year 2010 Summary Report* 41.

[6] *See* Che T. Arosemena, *Immigrants and the US Army: A Study in Readiness and the American Dream*, Sch. of Advanced Military Studies 55 (2016).

[7] *See* U.S. Dep't of Homeland Sec., Yearbook of Immigration Statistics 2019 tbl. 20 (2018).

[8] *See* Dep't of Def. Fact Sheet, *Military Accessions Vital to the National Interest (MAVNI) Recruitment Pilot Program* 3, *available at* https://dod.defense.gov/news/mavni-fact-sheet.pdf.

nationals, who were not lawful permanent residents, into the military.[9]

42.    Immigrants are critical to the readiness of the U.S. military. In every recruitment year between 2002 and 2013, with the exception of 2009, the Army would have failed its recruitment goals for its active duty force without non-citizen enlistments.[10]

43.    Immigrant, and specifically non-citizen, recruits also tend to be of "higher quality" than their citizen counterparts. DoD reported that in 2016, the majority of non-citizen recruits were "high-quality," with Tier 1 education credentials (*i.e.*, at least a high school diploma as opposed to an alternative credential, such as a GED) and an Armed Forces Qualification Test ("AFQT") score in the 50th percentile or higher. It further reported that a higher percentage of non-citizen recruits in the Army (which had over half of all non-citizen recruits) were high-quality compared to citizen recruits.[11] MAVNI recruits, in particular, are of exceptional quality, averaging four more years of education and 17 points higher on the AFQT than non-MAVNI service members and with English proficiency generally on par with that of native-born speakers.[12]

44.    Non-citizens also perform better than their citizen counterparts once they join the military. In particular, they have substantially lower attrition rates, even after controlling for other demographic and service-related characteristics.[13]

---

[9] *See* U.S. Gov't Accountability Off., *Immigration Enforcement: Actions Needed to Better Handle, Identify, and Track Cases Involving Veterans* 7 (2019).

[10] *See* Arosemena, *supra* note 7, at 52 (citing Defense Manpower Data Center accessions data, FY 2002 to FY 2013).

[11] *See* U.S. Dep't of Def., *Population Representation in the Military Services: Fiscal Year 2016 Summary Report* 42.

[12] *See* Arosemena, *supra* note 7, at 49.

[13] Molly McIntosh & Seems Sayala, *Non-Citizens in the Enlisted U.S. Military*, Center for Naval Analyses 8–10 (2011); Anita U. Hattiangadi et al., *Non-Citizens in Today's Military: Final Report*, Ctr. for Naval Analyses 56–59, 63–65 (2005).

45.     Finally, non-citizens are likely to possess skills critical to the military, particularly

linguistic diversity and cultural competencies as well as medical and information-technology

expertise.[14] DoD initiated the MAVNI program for this very reason, to recruit non-citizens who

have skills "vital to the national interest," including healthcare professionals and individuals with

expertise in certain foreign languages and cultures. 10 U.S.C. § 504(b)(2).

46.     Immigrants have repeatedly gone above and beyond the call of duty in their

military service to the United States. Many immigrants have served with distinction and are

among those awarded the highest honors in the military. Over 20 percent of recipients of the

military's highest honor—the Congressional Medal of Honor—have been immigrants.[15]

Immigrants have also won significant awards in combat and many have sacrificed their lives

fighting for this country since 2011.[16]

**B.      Congress Has Historically Allowed Non-Citizens Serving During Wartime to Naturalize Almost Immediately Upon Entering Service**

47.     The United States has a well-established tradition of rewarding non-citizens who

enlist in the military with an expedited path to citizenship. Moreover, that tradition has long

recognized that non-citizens enlisting during wartime should be awarded an opportunity to apply

for naturalization almost immediately upon entering service.

---

[14] *See* Muzaffar Chishti et al., *Noncitizens in the U.S. Military: Navigating National Security Concerns and Recruitment Needs*, Migration Policy Inst. 10–11 (2019).

[15] *See Examining Immigrant Americans' Contribution to the Armed Forces and National Defense*: *Hearing Before the S. Comm. on the Judiciary*, 106th Cong. (1999) (statement of Sen. Spencer Abraham, Chairman, S. Comm. on the Judiciary); *see also* U.S. Citizenship & Immigr. Servs., *USCIS Facilities Dedicated to the Memory of Immigrant Medal of Honor Recipients*, https://www.uscis.gov/about-us/find-uscis-office/uscis-facilities-dedicated-memory-immigrant-medal-honor-recipients.

[16] *See Contributions of Immigrants to the United States Armed Forces: Hearing Before the S. Comm. on the Armed Services*, 109th Cong. (2006) (statement of Gen. Peter Pace, USCMC, Chairman, Joint Chiefs of Staff); P'ship for a New Am. Econ., *An Unheralded Contribution: Honoring America's Fallen Foreign-Born Service Members Post 9/11* 6 (2015).

48.     Congress first authorized the expedited naturalization of non-citizens serving in the military during the War of 1812 by passing legislation permitting non-citizens to immediately become citizens so long as they had declared an intention to naturalize before the start of hostilities.[17]

49.     During the Civil War, the Union passed several laws to encourage the enlistment of non-citizens by offering a path to expedited naturalization. An 1862 law permitted "any alien" who "has been or shall be hereafter honorably discharged . . . to become a citizen" upon proof of one year's residency (reduced from the general requirement of five) within the United States.[18]

50.     Congress provided an expedited path to citizenship for non-citizens serving during World War I. In a 1918 law, it authorized "any alien" serving in the military during the war to "file his petition for naturalization . . . without proof of the required five years' residence within the United States."[19] In discussing this Act, senators emphasized that the nearly 125,000 non-citizen soldiers then serving in the U.S. Army should not be sent to fight in a war overseas without first obtaining their citizenship.[20]

51.     During World War II, Congress again passed legislation providing an expedited path to citizenship for non-citizen service members. A 1942 law authorized any non-citizen

---

[17] *See* An Act Supplementary to the Acts Heretofore Passed on the Subject of a Uniform Rule of Naturalization, 3 Stat. 53, 53 (1813).

[18] *See, e.g.*, An Act to Define the Pay and Emoluments of Certain Officers of the Army, and for Other Purposes, 12 Stat. 594, 597 (1862).

[19] *See* An Act to Amend the Naturalization Laws and to Repeal Certain Sections of the Revised Statutes of the United States and Other Laws Relating to Naturalization, Pub. Law No. 65-144, 40 Stat. 542 (1918).

[20] *See* 56 Cong. Rec. 5,009 (daily ed. April 12, 1918) (statement of Sen. Hardwick) ("It is impossible, or at least it is unfair, to send these soldiers to the battle line in Europe until they have been naturalized and made citizens of this country, so that they will not be subjected to charges of treason against the governments and princes of whom they were formerly subjects. The War Department is not willing to subject these men to that sort of danger. It is not fair to them and it is not just to the country.").

serving during the war to apply for naturalization and waived several requirements, including a

period of residence within the United States.[21] A subsequent 1944 law also eliminated the

requirement for proof of lawful entry into the United States.[22]

**C.    The INA and Its Implementing Regulations Allow Non-Citizens Serving Honorably During Wartime to Naturalize Almost Immediately upon Entering Service**

52.    In 1952, Congress enacted the INA, which continues to authorize an expedited

path to citizenship for non-citizens serving in the U.S. military.

53.    Under 8 U.S.C. § 1440, which governs expedited military naturalization during

wartime, service members must meet a single requirement to apply for naturalization—they must

have "served honorably as a member of the Selected Reserve of the Ready Reserve or in an

active-duty status." *Id.* § 1440(a). Active duty service members begin their service when they

ship to basic training. Members of the Selected Reserve begin their service either when they ship

to basic training or when they participate in their first drill, whichever comes first.

54.    Section 1440 imposes no other requirement for service members to demonstrate

their eligibility to apply for naturalization.

55.    The plain language of section 1440—"served honorably"—makes clear that the

honorable service requirement is backwards-looking.

56.    Section 1440 does not condition the honorable service requirement upon any

minimum length of service.

57.    The legislative history of the INA makes clear that Congress deliberately chose

not to require any minimum length of honorable service for non-citizens seeking to naturalize

---

[21] *See* An Act to Further Expedite the Prosecution of the War, 56 Stat. 182, 186 (1942).

[22] *See* An Act Relating to the Naturalization of Persons Not Citizens Who Serve Honorably in the Military or Naval Forces during the Present War, 58 Stat. 886, 886–87 (1944).

during wartime. The 1968 Senate Committee on the Judiciary Report accompanying amendments to the INA explained that section 1440 provides that an individual "who has served honorably . . . may be naturalized without regard to the requirements concerning age, residence, physical residence, physical presence, court jurisdiction, or *a waiting period*." [23] S. Rep. No. 1268-1292, at 4 (1968) (emphasis added). The Report further compares section 1440 (service during wartime) with section 1439 (service during peacetime) and emphasizes that while "[t]he peacetime serviceman must have a minimum of 3 years' service, *the wartime serviceman has no minimum required*."[24] *Id*. at 5 (emphasis added). The Report explained the purpose for this distinction: "[A] serviceman is afforded an opportunity to acquire a citizenship before he is assigned to active combat, whereas if service in a defined combat zone is a condition to the acquisition of citizenship, the serviceman killed in action could never avail himself of the special benefits provided by his adopted country." *Id*. at 13.

58. DHS, which is responsible for implementing and enforcing the naturalization laws, reads section 1440 to provide that service members establish their eligibility to apply for naturalization by demonstrating only that they have served honorably.

59. DHS has also explicitly acknowledged in past rulemaking that section 1440 imposes no minimum service duration requirement.

60. The USCIS Policy Manual, USCIS's central repository for its immigration policies, confirms that the sole requirement to apply for naturalization under section 1440 is

---

[23] This Report accompanied an amendment to the INA to expand eligibility for expedited naturalization under 8 U.S.C. § 1440 to those who served during the Vietnam War and in future designated periods of military hostilities.

[24] In 2003, Congress amended 8 U.S.C. § 1439, reducing from three years to one year the period of honorable service required to qualify for naturalization through military service during peacetime. *See* National Defense Authorization Act for Fiscal Year 2004 ("NDAA 2003"), Pub. Law No. 108-136, 117 Stat. 1392 (2003).

demonstration of honorable service.

61.     USCIS Form N-426 further reflects that section 1440 establishes a service member's eligibility to apply for naturalization based solely upon the demonstration of honorable service. The form instructs DoD to record the applicant's periods of service and designate "yes" or "no" as to whether the applicant has served honorably during each period. It does not require DoD to verify whether a service member has met a minimum service duration or any other requirement.

**D.     DoD's Role in Certifying Honorable Service is Purely Ministerial**

62.     In the INA, Congress charged the Secretary of Homeland Security "with the administration and enforcement of this chapter and all other laws relating to immigration and naturalization of aliens, except insofar as . . . such laws relate to the powers, functions, and duties conferred upon," *inter alia*, the Attorney General. 8 U.S.C. § 1103(a)(1). 8 U.S.C. § 1421(a) delegates to the Attorney General "[t]he sole authority to naturalize persons as citizens of the United States." The Attorney General has, in turn, authorized USCIS "to perform such acts as are necessary and proper to implement the Attorney General's [naturalization] authority" under 8 U.S.C. § 1421. 8 C.F.R. § 310.1.

63.     Defendants have no legal authority to implement or enforce the immigration and naturalization laws of the United States.

64.     In 8 U.S.C. § 1440, Congress assigned to DoD the narrow, non-discretionary, and ministerial role of "determin[ing] whether persons have served honorably" by providing "a duly authenticated certification." *Id*. § 1440(a), (b)(3).

65.     Defendants have admitted in the *Nio* litigation that "DoD serves a ministerial role in determining if an individual is serving honorably." Defs.' Resp. to Pls.' Mot. for Prelim. Inj. at 36, *Nio v. United States Dep't of Homeland Sec.*, No. 17-cv-998 (D.D.C. July 7, 2017), ECF No.

19.

66.     USCIS Form N-426 also instructs DoD to play a ministerial role in certifying honorable service by requiring DoD to record the applicant's periods of service and indicate whether the applicant has served honorably during each period.

67.     DoD's longstanding practice has been to fulfill its ministerial role by certifying honorable service based solely on whether a service member has served honorably at the time DoD completed the N-426. This practice consisted of "a cursory records check to determine if the enlistee (1) was in the active duty or the Selected Reserves, (2) had valid dates of service, and (3) had no immediately apparent past derogatory information in his service record." *Kirwa*, 285 F. Supp. 3d at 29.

68.     DoD's longstanding practice has also been to permit a broad range of military personnel with access to an individual's service records to certify the N-426.

69.     DoD's past certification process often took as little as a single day to complete.

**E.     Defendants' Unlawful N-426 Policy**

70.     On October 13, 2017, DoD set forth the N-426 Policy in a memorandum titled "Certification of Honorable Service for Members of the Selected Reserve of the Ready Reserve and Members of the Active Components of the Military or Naval Forces for Purposes of Naturalization."

71.     In direct contravention of 8 U.S.C. § 1440, the N-426 Policy mandates that service members who enlist on or after October 13, 2017 may not receive N-426 certifications of honorable service until they meet a series of new requirements and follow a new process.

72.     The N-426 Policy specifies that no service member may receive an N-426 certification until the following criteria are met:

1.  <u>Legal and Disciplinary Matters</u>: The Service Member is not the subject of pending disciplinary action or pending adverse administrative action or proceeding, and is not the subject of a law enforcement or command investigation; **AND**

2.  <u>Background Investigation and Suitability Vetting</u>: The Service Member has completed applicable screening and suitability requirements . . . ; **AND**

3.  <u>Military Training and Required Service</u>: The Service Member has served in a capacity, for a period of time, and in a manner that permits an informed determination as to whether the member served honorably, as set forth below.

a.  *For Service Members in an Active Component*:

[. . .]

- Completed at least 180 consecutive days of active duty service, inclusive of the successful completion of basic training . . . .

b.  *For Service Members in the Selected Reserve of the Ready Reserve*:

[. . .]

- Completed at least one year of satisfactory service . . . as a member of the Selected Reserve, inclusive of the member's successful completion of basic training . . . .

73.     The N-426 Policy also alters the process for service members to obtain an N-426 certification. The N-426 must now be completed by the Secretary of the applicable service, who may delegate this authority "to a commissioned officer serving in the pay grade of O-6 or higher." The O-6 pay grade designates a full Colonel in the Army, Air Force, or Marines, and a Captain in the Navy or the Coast Guard.

74.     None of the new criteria imposed by the N-426 Policy is permissible under law. By statute, DoD has a mandatory, non-discretionary, ministerial duty to certify the honorable service of all non-citizens who have served honorably during a designated period of military hostilities. The N-426 Policy imposes additional conditions upon honorable certification beyond this single requirement. DoD has no authority or discretion to mandate compliance with those additional conditions for non-citizens who have served honorably to obtain their N-426

certifications.

75.     The N-426 Policy is also directly at odds with DoD's own past interpretation and practice with respect to certifications of honorable service under section 1440. DoD previously regularly and routinely certified the honorable service of non-citizens without any of the unlawful requirements now being imposed by the N-426 Policy. It also previously permitted a broad range of military personnel with access to an individual's service records to complete N-426 certifications.

76.     DoD did not provide public notice prior to the issuance of the N-426 Policy.

77.     DoD did not solicit, receive, or consider comments from the public regarding the changes made by the N-426 Policy.

78.     DoD did not provide any statement of the basis or purpose of the changes—either with respect to the new criteria or the new process for service members to obtain a certification of honorable service—in the N-426 Policy.

79.     DoD has not, and cannot, provide a valid rationale for either the new criteria or new process set forth in the N-426 Policy.

80.     By conditioning N-426 certification upon additional, non-statutory, substantive criteria and requiring such certification be completed by a designated officer of O-6 pay grade or higher, Defendants are unlawfully withholding or unreasonably delaying the issuance of N-426 certifications to Plaintiffs and similarly-situated service members.

F.     **Plaintiffs' Service Commitments**

81.     The commitment that each Plaintiff has undertaken as a service member in the U.S. military is serious and substantial. The standard enlistment contract—Enlistment/ Reenlistment Document Armed Forces of the United States (DD Form 4)—obligates service members to eight years of service. Moreover, in a time of war, the contract states that enlistment

may be extended without consent "for the duration of the war and for six months after its end."

82.     The contract emphasizes that the agreement "is more than an employment contract" and, as such, requires service members to (1) "obey all lawful orders and perform all assigned duties," (2) be subject to discharge "and given a certificate for less than honorable service" if their "behavior fails to meet acceptable military standards," which may "hurt . . . future job opportunities and . . . claim[s] for veteran's benefits," (3) be "[s]ubject to the military justice system," and (4) be "[r]equired upon order to serve in combat or other hazardous situations." As confirmation of enlistment, the contract also requires service members to take the Oath of Enlistment:

> I . . . do solemnly swear (or affirm) that I will support and defend the Constitution of the United States against all enemies, foreign and domestic; that I will bear true faith and allegiance to the same; and that I will obey the orders of the President of the United States and the orders of the officers appointed over me, according to regulations and the Uniform Code of Military Justice.

83.     As members of the U.S. military, Plaintiffs may be required to compromise individual liberties that are otherwise considered fundamental in American society. The military provides recruits, prior to their enlistment, with United States Military Entrance Processing Command Form 601-23-4—"Restrictions on Personal Conduct in the Armed Forces"—which specifies that military service entails behavioral limitations not applicable to civilians in the United States. Various military regulations and directives place limits, for example, on service members' exercise of their right to free speech and association. Recruits must indicate that they understand the military's restrictions on personal conduct before they take the Oath of Enlistment.

## G.     Plaintiffs' Honorable Service and N-426 Requests

84.     Plaintiffs are non-citizens eligible to apply to naturalize under 8 U.S.C. § 1440. They have signed enlistment contracts, taken the Oath of Enlistment, and are currently serving in

an active duty status or in the Selected Reserve. They are serving during a designated period of military hostilities, and they are doing so honorably.

85.     Plaintiff Ange Samma is a lawful permanent resident who enlisted in the U.S. Army in July 2018 and currently serves on active duty as a Private First Class (E-3).

86.     Private Samma shipped to basic combat training at Fort Jackson, South Carolina in February 2019 and completed that training in April 2019. Private Samma shipped to advanced individual training at Fort Lee, Virginia in April 2019 and completed that training in July 2019. Private Samma shipped to his duty station at Camp Humphreys in South Korea on July 30, 2019, where he currently serves with the 339th Quartermaster Company.

87.     Private Samma first requested his N-426 certification from his drill sergeant at basic combat training on or about March 2019. His drill sergeant told him that non-citizens used to be naturalized at basic combat training but that he would be unable to help Private Samma obtain the certification.

88.     Private Samma next requested his N-426 certification from his drill sergeant at advanced individual training in April 2019. His drill sergeant informed him that because Private Samma was an active duty soldier, he would need to serve six months before he would be eligible for the N-426 certification. His drill sergeant further explained that even if he were to give Private Samma's N-426 to an officer of O-6 pay grade to certify, because of the six-month service duration requirement, the O-6 would not certify the N-426 at that time.

89.     Private Samma again requested his N-426 certification from his drill sergeant at advanced individual training on or about June or July 2019. His drill sergeant again refused to help him obtain the certification.

90.     Private Samma next requested his N-426 certification from his platoon sergeant in

August 2019, soon after he arrived at his duty station. Together with his platoon sergeant, Private

Samma then brought the N-426 to the S-1 office, which is responsible for military personnel

matters. The S-1 office informed Private Samma that he would need to obtain a memorandum

and order from his company commander stating that he needed the N-426 certification before it

could send the N-426 up to an officer of O-6 pay grade for certification. Private Samma obtained

the memorandum and order from his company commander and submitted them to the S-1 office.

91.     Private Samma received his N-426 on October 24, 2019, and sent it directly to

USCIS so that USCIS could process his naturalization application.

92.     On December 20, 2019, Private Samma received an email from the USCIS Field

Office in Guam informing him that because his N-426 was incomplete, he would have to provide

a new N-426 before his naturalization application could proceed. The office informed him that

two parts of the form, Parts 5 and 6, were not completed and that the certifying official had failed

to provide a date next to their signature. Part 5 requires the certifying official to indicate whether

the applicant served honorably during their periods of military service. Part 6 requires the

certifying official to indicate if the applicant has separated from service.

93.     Private Samma submitted another N-426 for certification to the S-1 office on

February 12, 2020. On April 14, 2020, Private Samma received his N-426, but the N-426 was the

same as the one he previously received on October 24, 2019 with the missing information filled

in. The USCIS Field Office in Guam has informed him that it will not accept this N-426 and that

Private Samma must submit an entirely new N-426 certification.

94.     Private Samma has still not received his N-426 certification. It has been 14

months since Private Samma began serving in an active duty status by shipping to basic combat

training and he has served honorably at all times since entering service.

95.     Plaintiff Abner Bouomo is a lawful permanent resident who enlisted in the U.S. Army in December 2017 and currently serves on active duty as a Private First Class (E-3).

96.     Private Bouomo shipped to basic combat training at Fort Jackson, South Carolina in April 2019 and completed that training in June 2019. Private Bouomo shipped to advanced individual training at Fort Lee, Virginia in June 2019 and completed that training in October 2019. Private Bouomo shipped to his duty station at Schofield Barracks in Hawaii on October 17, 2019, where he currently serves with the 25th Infantry Division.

97.     Private Bouomo first requested his N-426 certification from a civilian Army employee while undergoing in-processing at basic combat training in June 2019. The civilian Army employee refused to help him obtain the N-426 certification and gave him a memorandum stating that soldiers would have to wait until they report to their duty station to obtain the certification. The memorandum also stated that soldiers would have to have the N-426 certified by an officer of O-6 pay grade or higher in their chain of command.

98.     Private Bouomo next requested his N-426 certification from his drill sergeant at advanced individual training on or about July 2019. His drill sergeant asked Private Bouomo to provide an N-426 for certification, which he did. In October 2019, as Private Bouomo was nearing his graduation, he asked his drill sergeant about his N-426 certification. His drill sergeant told Private Bouomo he had not yet obtained the certification. On the day of Private Bouomo's graduation from advanced individual training, Private Bouomo's drill sergeant returned his uncompleted N-426 to him and told him he would have to get it certified at his duty station.

99.     Private Bouomo next requested his N-426 certification in November 2019 from the non-commissioned officer ("NCO") above him in his chain of command. The NCO told Private Bouomo that he would send the N-426 up his chain of command for certification. In

January 2020, the S-1 military personnel office informed Private Bouomo that he would have to serve one year before he would be eligible for the N-426 certification.

100. Private Bouomo has still not received his N-426 certification. It has been 12 months since Private Bouomo began serving in an active duty status by shipping to basic combat training and he has served honorably at all times since entering service.

101. Plaintiff Ahmad Isiaka is a lawful permanent resident who enlisted in the U.S. Army in January 2020 and currently serves in the Selected Reserve of the U.S. Army Reserve as a Private Second Class (E-2).

102. Private Isiaka began drilling with the 644th Transportation Company in Houston, Texas in February 2020.

103. Private Isiaka requested his N-426 certification from his Unit Administrator on or about the end of February or beginning of March 2020. His Unit Administrator refused to help him obtain the certification and told him that he had not been serving for long enough and that he would have to complete basic combat and advanced individual training before he could receive his certification.

104. Private Isiaka has still not received his N-426 certification. It has been two months since Private Isiaka began serving in the Selected Reserve by participating in Selected Reserve drills with his unit and he has served honorably at all times since entering service.

105. Plaintiff Michael Perez is a lawful permanent resident who enlisted in the U.S. Army in November 2017 and currently serves on active duty as a Private Second Class (E-2).

106. Private Perez shipped to basic combat training at Fort Jackson, South Carolina in April 2019 and completed that training in June 2019. Private Perez shipped to advanced individual training at Fort Lee, Virginia in June 2019 and completed that training in September

2019. Private Perez shipped to his duty station at Joint Base Elmendorf-Richardson in Alaska on

September 26, 2019, where he currently serves with the 2nd Battalion, 377th Parachute Field

Artillery Regiment.

107.    Private Perez first requested his N-426 certification from his drill sergeant at basic

combat training in April 2019. His drill sergeant refused to help him obtain the N-426

certification and told him that service members were no longer able to obtain the certification

while at basic combat training.

108.    Private Perez next requested his N-426 certification from his drill sergeant at

advanced individual training in July 2019. His drill sergeant asked Private Perez to provide an N-

426 for certification, which he did. In September 2019, as Private Perez was nearing his

graduation, he asked his drill sergeant about his N-426 certification. His drill sergeant informed

him he would be unable to help him obtain the certification and that he should request it at his

duty station.

109.    Private Perez next requested his N-426 certification from his platoon sergeant at

his duty station in October 2019. His platoon sergeant told Private Perez that he would have to

send the N-426 up his chain of command for certification.

110.    In February 2020, Private Perez's platoon sergeant returned his uncompleted N-

426 to him and told him that his chain of command had informed him that Private Perez would

have to serve one year in active duty before he would be eligible for the certification.

111.    Private Perez has still not received his N-426 certification. It has been 12 months

since Private Perez began serving in an active duty status by shipping to basic combat training

and he has served honorably at all times since entering service.

112.    Plaintiff Sumin Park enlisted in the U.S. Army in January 2017 as a lawful

permanent resident and currently serves on active duty as a Private Second Class (E-2).

113.    Private Park shipped to basic combat training at Fort Jackson, South Carolina in June 2019 and completed that training in August 2019. Private Park shipped to advanced individual training at Fort Lee, Virginia in August 2019 and completed that training in October 2019. Private Park shipped to her duty station at Joint Base Elmendorf-Richardson in Alaska on November 7, 2019 where she currently serves with the 2nd Battalion, 377th Parachute Field Artillery Regiment.

114.    Private Park first requested her N-426 certification from her drill sergeant at advanced individual training on or about September or October 2019. Her drill sergeant refused to help her obtain the certification and told her that she should request it when she got to her duty station because seeking a signature from an officer of O-6 pay grade would take longer than nine weeks, which was the length of her advanced individual training.

115.    Private Park next requested her N-426 certification from her platoon sergeant at her duty station in February 2020. Her platoon sergeant told Private Park that he would have to send the N-426 up his chain of command but that he anticipated it would take a long time for the N-426 to reach an officer of O-6 pay grade. Her platoon sergeant could not give her an estimate of how long it would take for her to receive her N-426 certification.

116.    In March 2020, Private Park's platoon sergeant returned her uncompleted N-426 to her and told her that his chain of command had informed him that she would have to serve one year in active duty before she would be eligible for the N-426 certification.

117.    Private Park has still not received her N-426 certification. It has been ten months since Private Park began serving in an active duty status by shipping to basic combat training and she has served honorably at all times since entering service.

118.     Plaintiff Yu Min Lee enlisted in the U.S. Army through the MAVNI program in July 2016 and currently serves on active duty as a Specialist (E-4).

119.     Specialist Lee shipped to basic combat training at Fort Jackson, South Carolina in September 2019 and completed that training in November 2019. Specialist Lee shipped to advanced individual training at Fort Lee, Virginia in November 2019 and completed that training in February 2020. Specialist Lee shipped to her duty station at Schofield Barracks in Hawaii on February 24, 2020.

120.     Specialist Lee first requested her N-426 certification from her drill sergeant at advanced individual training in January 2020. Her drill sergeant asked her to provide an N-426 for certification, which she did. Specialist Lee checked in with her drill sergeant about the progress of her N-426 certification several times in January and February 2020. In February 2020, her drill sergeant also asked Specialist Lee to provide a Form N-400, which is the naturalization application that goes to USCIS. Specialist Lee provided her drill sergeant with a completed N-400, at which point he informed her that because she was about to graduate, he would be unable to help her obtain the N-426 certification. While Specialist Lee was speaking with her drill sergeant, another drill sergeant came over and informed her drill sergeant that Specialist Lee would need to compete 180 days of service before she could obtain the N-426 certification.

121.     Specialist Lee has still not received her N-426 certification. It has been seven months since she began serving in an active duty status by shipping to basic combat training and she has served honorably at all times since entering service.

**H.     Defendants' Unlawful Conduct Has Caused, and Will Continue to Cause, Substantial and Irreparable Harm to Plaintiffs**

122.     Plaintiffs are suffering and will continue to suffer irreparable harm due to

Defendants' actions.

123.     Depriving service members of their opportunity to become naturalized citizens—an opportunity guaranteed by statute and earned through honorable military service—is an ongoing harm for which monetary damages cannot provide relief.

124.     Defendants' conduct is unlawfully depriving Plaintiffs of the opportunity to exercise the fundamental rights and benefits that accompany citizenship, including the right to vote, the right to sponsor immediate family members, and the right to travel with a U.S. passport.

125.     Plaintiffs Bouomo, Isiaka, and Samma, for example, would like to exercise the right to sponsor immediate family members. Plaintiff Bouomo had hoped citizenship would offer him the opportunity to sponsor his mother, who currently resides in Cameroon. Similarly, Plaintiff Isiaka had hoped citizenship would offer him the opportunity to sponsor his mother and father, who currently reside in Nigeria. Plaintiff Samma had hoped citizenship would offer him the opportunity to sponsor his brother, who was in the United States on a non-immigrant visa until recently, for a green card through adjustment of status. His brother has since had to leave the United States because his visa was about to expire and he lacked a sponsor to obtain a green card.

126.     Plaintiffs Bouomo, Perez, and Samma would also like to exercise the right to travel with a U.S. passport. Plaintiff Bouomo's Cameroonian passport expired after he enlisted in the Army. In expectation of receiving his U.S. citizenship and a U.S. passport through his military service, Plaintiff Bouomo has not renewed it to date, as it would require him to travel to a Cameroonian embassy or consulate. Similarly, Plaintiff Perez's Philippine passport expired after he enlisted in the Army. In expectation of receiving his U.S. citizenship and a U.S. passport through his military service, Plaintiff Perez has not renewed it to date, as it would require him to

travel to a Philippines embassy or consulate. Plaintiff Samma is currently serving at his duty station in South Korea and when traveling there was unable to produce a U.S. passport, unlike his fellow soldiers also traveling to South Korea. Plaintiff Samma felt this difference was palpable and highlighted distinctions between himself and his fellow soldiers.

127.    For some Plaintiffs, such as Plaintiffs Lee and Park, naturalization through military service would also afford protection from removal proceedings and deportation. Immigration and Customs Enforcement officials have stated in the *Nio* litigation that "any alien without legal immigration status in the United States is subject to removal and may be placed in removal proceedings for failing to maintain status or for any other violation of the immigration laws which would make the alien removable." Dec. of Nathalie Asher in Supp. of Defs.' Suppl. Mem. in Opp. to Pls' Mot. for Prelim. Inj. ¶ 5, *Nio v. U.S. Dep't of Homeland Sec.*, No. 17-cv-998 (D.D.C. Aug. 14, 2017), ECF No. 31-1.

128.    Plaintiff Lee enlisted in the military through the MAVNI program as a recipient of Deferred Action for Childhood Arrivals ("DACA"). However, her DACA status and work authorization expired during her military service and she has been unable to apply for naturalization on the basis of her service because DoD has unlawfully withheld her N-426 certification. Because Plaintiff Lee lacks lawful immigration status in the United States, she lives in fear of being placed in removal proceedings and deported from this country.

129.    Plaintiff Park enlisted in the military in 2017 as a conditional permanent resident. She subsequently applied to remove the conditions on her permanent resident status and obtain a Permanent Green Card. In 2019, Plaintiff Park received an interview date for her application to remove the conditions on her permanent resident status. Because the interview date was just prior to her ship-out date to basic combat training, Plaintiff Park contacted her military recruiter,

who informed her that she did not have to attend the interview and that she would obtain her citizenship through the military. In reliance on her recruiter's statement and in expectation of naturalizing through the military, Plaintiff Park did not attend the interview and, as a result, did not pursue her application. However, she is unable to apply for naturalization based on her military service because DoD has unlawfully withheld her N-426 certification, Plaintiff Park therefore lives in fear of being placed in removal proceedings and deported from this country.

130.    By withholding N-426 certifications from Plaintiffs Lee and Park, DoD is not even granting these service members the modicum of protection that may accompany a pending naturalization application.

131.    For service members whose lawful immigration status is in question, naturalization through military service would also allow them to petition to adjust the status of their immediate family members in the United States and to travel outside of and return to this country. Plaintiff Lee, for example, wishes to travel abroad to visit her ailing grandmother, but fears doing so would jeopardize her ability to return home to this country. Citizenship would also ensure that service members such as Plaintiffs Lee and Park can work and remain in the United States and access veterans' benefits following their military service.

132.    Service members deployed overseas, such as Plaintiff Samma, may also face risks that their U.S. citizen counterparts do not. Without U.S. citizenship, Plaintiff Samma has no right to U.S. consular services and protection. And as a foreign national, he may have different rights and vulnerabilities compared to his fellow U.S. citizen soldiers in the country where he is stationed.

133.    Many service members, including Plaintiffs, dream of joining the U.S. military to put their skills to work for their adopted country and to develop skills they may use both in their

military and future careers. However, the N-426 Policy has made it more difficult for Plaintiffs to advance in their careers because many roles in the military, including the more technical and senior roles as well as those requiring a security clearance, necessitate U.S. citizenship.

134.    Plaintiff Lee holds a bachelor's degree in linguistics and was eligible to join the Army as a MAVNI recruit because she speaks a language and has an associated cultural background the military deems vital to the national interest. However, her current military occupational specialty, automated logistics specialist, does not utilize the expertise for which she was recruited into the military. Plaintiff Lee would like to re-classify her military occupational specialty to an intelligence-related role and her Armed Service Vocational Aptitude Battery and General Technical test scores are high enough to qualify her for more advanced roles, including in intelligence. But many of these roles are unavailable to her because she is not a U.S. citizen. In particular, intelligence roles require a security clearance, which she cannot obtain without U.S. citizenship. The military service roles of interest to Plaintiff Lee would also come with a higher rank and pay grade.

135.    Plaintiff Isiaka holds a bachelor's degree in electrical and electronics engineering and a master's degree in subsea engineering. He would like to apply to be an officer in the Army, for which he is eligible as a college graduate, but is unable to without U.S. citizenship. As an officer, Plaintiff Isiaka would receive a higher rank and pay grade.

136.    Plaintiff Bouomo has an associate's degree in computer science but would like to obtain a bachelor's degree in this field and become an officer in the Army using the opportunities the military makes available to service members. To that end, he would like to apply to the Army's Green to Gold Active Duty Option Program, which would allow him to complete his bachelor's degree and earn a commission as an officer. However, he is unable to apply to the

program without U.S. citizenship. As an officer, Plaintiff Bouomo would receive a higher rank and pay grade.

137.    Plaintiff Samma was working towards his associate's degree in electrical engineering when he enlisted in the Army. His current military occupational specialty is water treatment specialist but he would like to re-classify that role to an information technology-related one, for which he has the requisite Armed Forces Qualification Test score and which would relate to his desired career as an electrical engineer. However, the military service roles of interest to Plaintiff Samma require a security clearance, which he cannot obtain without U.S. citizenship. These roles would also come with better promotion opportunities. Plaintiff Samma was also recently selected to work at the Camp Humphreys Tax Assistance Center following a competitive process, but was told that he could not continue in the role because he lacked a security clearance. This role would have helped Plaintiff Samma attain experience that would have been useful to his future career.

138.    Plaintiff Perez's current military occupational specialty is wheeled vehicle mechanic but he would like to re-classify that role to one involving medical services, aviation, or administration. However, the military service roles of interest to Plaintiff Perez require U.S. citizenship. Some of these roles would also come with salary bonuses.

139.    The deprivation of citizenship and other injuries inflicted on Plaintiffs by the N-426 Policy continue with each passing day. And every day of lost citizenship rights and benefits is a day that these Plaintiffs can never recover or be recompensed for losing. Without the ability to obtain the myriad privileges and opportunities that naturalization affords, these service members are suffering harm.

## CLASS ACTION ALLEGATIONS

140.    The named Plaintiffs bring this action pursuant to Rule 23 of the Federal Rules of

Civil Procedure on behalf of themselves and all other persons similarly situated. The named

Plaintiffs seek to represent the below-described class ("Proposed Class").

141.     Proposed Class: All individuals who: (a) are non-citizens serving honorably in the

U.S. military; (b) have requested but not received a certified Form N-426; and (c) are not

Selected Reserve MAVNIs covered by the *Kirwa* lawsuit.

142.     The members of the Proposed Class warrant class action treatment because they

fulfill the requirements of Rule 23(a) of the Federal Rules of Civil Procedure.

143.     The Proposed Class meets the numerosity requirement of Rule 23(a)(1) because

the members of the class are so numerous that joinder of all members is impractical. While the

exact number of class members is unknown to Plaintiffs at this time, DoD's own statements and

policy documents indicate that the proposed class would comprise several thousand service

members.

144.     The Proposed Class meets the commonality requirement of Rule 23(a)(2) because

there are questions of law and fact common to the class, including, for example, whether DoD

has a ministerial duty to complete N-426 certifications and whether the N-426 Policy, which

establishes new criteria and a new procedure for N-426 certification, is contrary to law.

145.     The Proposed Class meets the typicality requirement of Rule 23(a)(3) because the

claims of the named Plaintiffs are typical of the claims of each of the class members. Plaintiffs

and class members are similarly affected by Defendants' wrongful conduct in violation of federal

law, including 8 U.S.C. § 1440, that is described herein.

146.     The named Plaintiffs will fairly and adequately protect the interests of the

Proposed Class as required by Rule 23(a)(4) because their interests are identical to those of the

other members of the class. Fair and adequate protection of the interests of the class will be

further ensured because the named Plaintiffs are represented by competent legal counsel who are experienced in federal litigation, are undertaking representation on a pro bono basis, and have adequate resources and commitment to represent the class as a whole. Plaintiffs are committed to continuing to represent the class until their claims for declaratory and permanent injunctive relief are fully and finally adjudicated and until all eligible class members who seek to obtain N-426 certifications allowing them to apply for naturalization receive them from DoD.

147.    The Proposed Class qualifies for certification under Rule 23(b)(1) because prosecuting separate actions would create a risk of inconsistent adjudications across class members. If the individual members of the class were to bring separate suits to challenge Defendants' policies and practices, Defendants may address the claims of these individuals while ignoring the concerns of the remaining class members, thereby exacerbating Defendants' violations of the law. Resolving this matter as a class action would also serve the Court's interest in judicial economy by avoiding overburdening the courts with individual lawsuits brought by each of the many service members whose N-426 certifications are being withheld due to Defendants' unlawful conduct. Alternatively, the Proposed Class qualifies for class action treatment under Rule 23(b)(2) because Plaintiffs seek declaratory and final injunctive relief. This relief is appropriate for the whole class as Defendants' actions and/or refusals to act apply generally to the class as a whole.

## CLAIMS FOR RELIEF

### Claim I: Immigration and Nationality Act and Implementing Regulations

148.    The Immigration and Nationality Act, 8 U.S.C. § 1440, provides for the expedited naturalization of non-citizens serving in the U.S. military during a designated period of military hostilities. President Bush designated a period of military hostilities beginning on September 11, 2001, which continues to this day.

149.    Section 1440 and its implementing regulations impose a single requirement for non-citizens serving during wartime to apply for expedited naturalization—they must have served honorably.

150.    Section 1440 and its implementing regulations mandate that DoD play a narrow, non-discretionary, and ministerial role in the naturalization process—it must certify whether a non-citizen service member has served honorably.

151.    The N-426 Policy creates additional, non-statutory, substantive criteria non-citizen service members must meet before DoD will certify their honorable service under 8 U.S.C. § 1440.

152.    Accordingly, the N-426 Policy violates 8 U.S.C. § 1440 and 8 C.F.R. § 329.2 as those provisions set forth the sole and exclusive applicable statutory and regulatory criteria for DoD certification of honorable service.

153.    As a result of these violations, Plaintiffs and class members have suffered and will continue to suffer irreparable injury in the form of unwarranted denials and unreasonable delays of their N-426 certifications.

### Claim II: Administrative Procedure Act (5 U.S.C. § 706(1)) (Unlawful Withholding and Unreasonable Delay)

154.    5 U.S.C. § 706(1) authorizes a court to "compel agency action unlawfully withheld or unreasonably delayed."

155.    8 U.S.C. § 1440 and its implementing regulations mandate that DoD play a narrow, non-discretionary, and ministerial role in the naturalization process—it must certify whether a non-citizen service member has served honorably.

156.    Plaintiffs have a right to receive N-426 certifications of honorable service to apply for naturalization pursuant to section 1440 based on their current service records.

157.    Through the N-426 Policy, Defendants have unlawfully withheld and/or unreasonably delayed N-426 certifications to Plaintiffs and the class contrary to the plain language of applicable law, including 8 U.S.C. § 1440.

158.    As a result of these violations, Plaintiffs and class members have suffered and will continue to suffer irreparable injury in the form of unwarranted denials and unreasonable delays of their N-426 certifications.

### Claim III: Administrative Procedure Act (5 U.S.C. § 706(2)) (Arbitrary and Capricious; In Excess of Statutory Jurisdiction or Authority)

159.    The Administrative Procedure Act, 5 U.S.C. § 706(2)(A), authorizes a court to hold unlawful and set aside final agency action found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law, or in excess of statutory jurisdiction or authority.

160.    The N-426 Policy is arbitrary and capricious because DoD did not provide any statement of the basis or purpose for the policy and it cannot provide a valid rationale for the policy.

161.    The N-426 Policy is also not in accordance with law and is in excess of statutory jurisdiction or authority because it violates the INA and its implementing regulations and exceeds DoD's narrow, non-discretionary, and ministerial duty to certify the honorable service of non-citizens serving during wartime pursuant to 8 U.S.C. § 1440 and its implementing regulations.

162.    As a result of these violations, Plaintiffs and class members have suffered and will continue to suffer irreparable injury in the form of unwarranted denials and unreasonable delays of their N-426 certifications.

<u>**Count IV: Administrative Procedure Act (5 U.S.C. § 553)**</u>
<u>**(Notice and Comment)**</u>

163.    The Administrative Procedure Act, 5 U.S.C. § 553, requires administrative agencies to provide a notice and comment period prior to implementing a substantive rule.

164.    The N-426 Policy constitutes a substantive agency rule within the meaning of 5 U.S.C. § 551(4).

165.    Defendants failed to provide a notice and comment period prior to adopting and implementing the N-426 Policy.

166.    Because the N-426 Policy is a substantive rule promulgated without the notice and comment period, it violates 5 U.S.C. § 553 and is therefore invalid.

167.    As a result of these violations, Plaintiffs and class members have suffered and will continue to suffer irreparable injury in the form of unwarranted denials and unreasonable delays of their N-426 certifications.

<u>**PRAYER FOR RELIEF**</u>

Plaintiffs, on behalf of themselves and the class, respectfully request that the Court:

a)     Certify the case as a class action as proposed herein;

b)     Appoint Plaintiffs as representatives of the class and Plaintiffs' counsel as Class Counsel;

c)     Declare the N-426 Policy violates the INA and the APA;

d)     Order Defendants to set aside the N-426 Policy;

e)     Enjoin Defendants from withholding certified Form N-426s from Plaintiffs and class members pursuant to the N-426 Policy;

f)     Enjoin Defendants from withholding certified Form N-426s from Plaintiffs and class members who have served honorably for one day or more, except where a

Plaintiff or class member has not served honorably as reflected in that individual's service record and based on sufficient grounds generally applicable to all members of the military;

g)      Order Defendants to use their best efforts to certify or deny Form N-426s within two business days of receipt of the Form N-426 from a service member;

h)      Order Defendants to authorize all military personnel authorized to certify Form N-426s prior to the N-426 Policy to certify Form N-426s;

i)      Enjoin Defendants from discharging or separating Plaintiffs and class members pending completion of their Form N-426s and processing of their naturalization applications, except as related to the conduct of an individual service member and based on sufficient grounds generally applicable to all members of the military;

j)      Award Plaintiffs and the class costs, expenses, and reasonable attorneys' fees, including under the Equal Access to Justice Act; and

k)      Award such further relief as the Court deems just or appropriate.


Dated: April 28, 2020                        Respectfully submitted,

                                              */s/ Jonathan Hafetz*

Jennifer Pasquarella                         Jonathan Hafetz (D.D.C. Bar No. NY0251)
Michelle (Minju) Cho                         Scarlet Kim
American Civil Liberties Union Foundation    Noor Zafar
    of Southern California                   Brett Max Kaufman (D.D.C. Bar. No. NY0224)
1313 West 8th Street                         American Civil Liberties Union Foundation
Los Angeles, CA 90017                        125 Broad Street, 18th Floor
(213) 977-5236                               New York, NY 10004
jpasquarella@aclusocal.org                   (212) 549-2500
mcho@aclusocal.org                           jhafetz@aclu.org
                                             scarletk@aclu.org
                                             nzafar@aclu.org
                                             bkaufman@aclu.org

Arthur B. Spitzer (D.C. Bar No. 235960)
American Civil Liberties Union Foundation
  of the District of Columbia
915 15th Street, NW, 2nd Floor
Washington, DC 20005
(202) 601-4266
aspitzer@acludc.org

*Counsel for Plaintiffs*