## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| ANGE SAMMA, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Civil Action No. 1:20-cv-01104-ESH |
| | ) | The Honorable Ellen Segal Huvelle |
| UNITED STATES DEPARTMENT OF | ) | |
| DEFENSE and MARK ESPER, in his | ) | |
| official capacity as Secretary of Defense, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## MEMORANDUM IN SUPPORT OF DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO PLAINITFFS' MOTION FOR SUMMARY JUDGMENT

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................................. 1

BACKGROUND ................................................................................................................. 3

   I.   STATUTORY AND REGULATORY BACKGROUND ................................................... 3

     A. Authorization for non-citizen service members to naturalize in exchange for honorable military service ................................................................................................... 3

     B. Statutory history of § 1440 ................................................................................. 5

     C. The October 13, 2017 Memorandum .......................................................... 6

     D. The 2020 NDAA ................................................................................................. 9

     E. Prior litigation regarding N-426 honorable service certification ................................. 10

  II.   PLAINTIFFS' COMPLAINT AND PROCEDURAL BACKGROUND ........................ 10

STANDARD OF REVIEW ............................................................................................... 12

ARGUMENT ..................................................................................................................... 13

   I.   FIVE OF THE SIX PLAINTIFFS SHOULD BE DISMISSED BECAUSE THEIR CLAIMS ARE MOOT, AND NO PLAINTIFF HAS STANDING TO CHALLENGE THE O-6 REQUIREMENT ............................................................................................... 13

  II.   DEFENDANTS ARE ENTITELD TO SUMMARY JUDGMENT ON PLAINTIFFS' APA CLAIMS ................................................................................................................. 15

     A. DoD's honorable service determinations under § 1440 are committed to agency discretion by law ................................................................................................. 16

     B. Because Defendants do not have a ministerial, non-discretionary duty to certify honorable service within a certain amount of time, Plaintiffs' § 706(1) claim fails .... 20

     C. Because Defendants' time-in-service requirements and O-6 requirement are the products of reasoned decision-making, Plaintiffs' arbitrary and capricious claim fails 26

       1. Time-in-service requirements ................................................................... 27

       2. O-6 requirement ....................................................................................... 29

D. The challenged policies are neither contrary to law nor in excess of DoD's authority under § 1440 ............................................................................................................ 30

E. DoD was not required to undertake notice-and-comment rulemaking to promulgate the challenged policies................................................................................................. 40

III. PLAINTIFFS ARE NOT ENTITLED TO MUCH OF THE RELIEF THEY SEEK ........ 42

**CONCLUSION** .................................................................................................................... 44

# TABLE OF AUTHORITIES

## CASES

*Air Cargo v. U.S. Postal Serv.*,
   674 F.3d 852 (D.C. Cir. 2012) ................................................................................................ 43

*Am. Ass'n of Retired Pers. v. EEOC*,
   823 F.2d 600 (D.C. Cir. 1987) ................................................................................................ 21

*Am. Bankers Ass'n v. Nat'l Credit Union Admin.*,
   934 F.3d 649 (D.C. Cir. 2019) ................................................................................................ 31

*Anderson v. Liberty Lobby, Inc.*,
   477 U.S. 242 (1986) ................................................................................................................ 12

*Ass'n of Private Sector Colls. & Univs. v. Duncan*,
   681 F.3d 427 (D.C. Cir. 2012) ................................................................................................ 31

*AT&T Corp. v. Iowa Utils. Bd.*,
   525 U.S. 366 (1999) ................................................................................................................ 38

*Balt. Gas & Elec. Co. v. NRDC*,
   462 U.S. 87 (1983) .................................................................................................................. 27

*BedRoc Ltd., LLC v. United States*,
   541 U.S. 176 (2004) ................................................................................................................ 35

*Bland v. Connally*,
   293 F.2d 852 (D.C. Cir. 1961) ................................................................................................ 36

*Block v. Cmty. Nutrition Inst.*,
   467 U.S. 340 (1984) ................................................................................................................ 17

*Camp v. Pitts*,
   411 U.S. 138 (1973) ................................................................................................. 7, 8, 9, 10

*Cent. States Motor Freight Bureau, Inc. v. ICC*,
   924 F.2d 1099 (D.C. Cir. 1991) .............................................................................................. 32

*Chappell v. Wallace*,
   462 U.S. 296 (1983) ................................................................................................................ 38

*Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*,
  467 U.S. 837 (1984) ............................................................................ 31, 32, 37
*Cigar Ass'n of Am. v. FDA*,
  315 F. Supp. 3d 143 (D.D.C. 2018) ............................................................ 40

*Citizens for Responsibility and Ethics in Wash. v. SEC*,
  916 F. Supp. 2d 141 (D.D.C. 2013) ............................................................ 20

*City of Arlington v. FCC*,
  569 U.S. 290 (2013) .................................................................................... 33

*City of Erie v. Pap's A.M.*,
  529 U.S. 277 (2000) .................................................................................... 13

*Clarke v. United States*,
  915 F.2d 699 (D.C. Cir. 1990) .................................................................... 13

*Clifford v. Pena*,
  77 F.3d 1414 (D.C. Cir. 1996) ...................................................................... 7

*Consolidated Edison of N.Y. v. NLRB*,
  305 U.S. 197 (1938) .................................................................................... 38

*Covelo Indian Cmty. v. Watt*,
  551 F. Supp. 366 (D.D.C. 1982),
  *aff'd as modified* (Dec. 21, 1982),
  *vacated as moot* (Feb. 1, 1983) ................................................................ 21

*Ctr. for Biological Diversity v. Trump*,
  No. 1:19-CV-00408 (TNM), 2020 WL 1643657 (D.D.C. Apr. 2, 2020) ................ 16

*Davis v. FEC*,
  554 U.S. 724 (2008) .................................................................................... 15

*Davis v. Woodring*,
  111 F.2d 523 (D.C. Cir. 1940) ............................................................... 18, 28

*Dep't of Navy v. Egan*,
  484 U.S. 518 (1988) .................................................................................... 19

*Diabo v. Sec'y of HEW*,
  627 F.2d 278 (D.C. Cir. 1980) .................................................................... 38

*Dist. No. 1, Pac. Coast Dist., Marine Eng'rs' Beneficial Ass'n v. Mar. Admin.*,
  215 F.3d 37 (D.C. Cir. 2000) ...................................................................... 16

*Doe 2 v. Shanahan*,
  755 F. App'x 19 (D.C. Cir. 2019) ............................................................ 18

*FCC v. Fox Television Stations, Inc.*,
  556 U.S. 502 (2009) ................................................................................ 26

*Fong Chew Chung v. United States*,
  149 F.2d 904 (9th Cir. 1945) ........................................................ 36, 37, 41

*FPC v. Transcontinental Gas Pipe Line Corp.*,
  423 U.S. 326 (1976) ................................................................................ 34

*Gay Veterans Ass'n, Inc. v. Sec'y of Defense*,
  668 F. Supp. 11 (D.D.C. 1987),
  *aff'd* 850 F.2d 764 (D.C. Cir. 1988) .................................................... 33, 38

*Gil v. Whitford*,
  138 S. Ct. 1916 (2018) ............................................................................ 15

*Gilligan v. Morgan*,
  413 U.S. 1 (1973) .............................................................................. 17, 19

*Goldman v. Sec'y of Defense*,
  734 F.2d 1531 (D.C. Cir. 1984) .............................................................. 40

*Harmon v. Brucker*,
  355 U.S. 579 (1958) ................................................................................ 33

*Heckler v. Chaney*,
  470 U.S. 821 (1985) ................................................................................ 16

*HoChunk, Inc. v. Sessions*,
  253 F. Supp. 3d 303 (D.D.C. 2017) .......................................................... 13

*Kirwa v. U.S. Dep't of Defense ("Kirwa I")*,
  285 F. Supp. 3d 21 (D.D.C. 2017) ...................................................... *passim*

*Kirwa v. U.S. Dep't of Defense ("Kirwa II")*,
  285 F. Supp. 3d 257 (D.D.C. 2018) .................................................... 10, 18

*Kotab v. U.S. Dep't of Air Force*,
  No. 2:18-CV-2031-KJD-CWH, 2019 WL 4677020 (D. Nev. Sept. 25, 2019) ...................... 18

*Kuang v. U.S. Dep't of Defense*,
  778 F. App'x 418 (9th Cir. 2019) ............................................................ 19

*Legal Assistance for Vietnamese Asylum Seekers v. Dep't of State, Bureau of Consular Affairs*,
   104 F.3d 1349 (D.C. Cir. 1997) .............................................................................. 16

*Lujan v. Defenders of Wildlife*,
   504 U.S. 555 (1992) ................................................................................... 14, 15

*Marsh v. Ore. Nat. Res. Council*,
   490 U.S. 360 (1989) .......................................................................................... 26

*Mashpee Wampanoag Tribal Council, Inc. v. Norton*,
   336 F.3d 1094 (D.C. Cir. 2003) ........................................................................ 25

*Mindes v. Seaman*,
   453 F.2d 197 (5th Cir. 1971) ............................................................................ 19

*Mohon v. Agentra, LLC*,
   400 F. Supp. 3d 1189 (D.N.M. 2019) ............................................................... 37

*Motor Vehicle Mfrs. Ass'n v. State Farm*,
   463 U.S. 29 (1983) ............................................................................................ 30

*NAACP v. HUD*,
   817 F.2d 149 (1st Cir. 1987) ............................................................................. 44

*Nat'l Cable & Telecomm. Ass'n v. Brand X Internet Servs.*,
   545 U.S. 967 (2005) .......................................................................................... 32

*Nat'l Shooting Sports Found., Inc. v. Jones*,
   716 F.3d 200 (D.C. Cir. 2013) .......................................................................... 39

*NFFE v. United States*,
   905 F.2d 400 (D.C. Cir. 1990) .......................................................................... 16

*Nio v. U.S. Dep't of Homeland Sec.*,
   No. 17- 998 (ESH), 2017 WL 3917006 (D.D.C. Sept. 6, 2017)........................ 25

*North Dakota v. United States*,
   495 U.S. 423 (1990) .......................................................................................... 18

*Norton v. Southern Utah Wilderness Alliance* ("*SUWA*"),
   542 U.S. 55 (2004) ....................................................................................... 20, 21

*Orloff v. Willoughby*,
   345 U.S. 83 (1953) ............................................................................................ 18

*Palisades Gen. Hosp. Inc. v. Leavitt*,
   426 F.3d 400 (D.C. Cir. 2005) ........................................................................... 42, 43

*Patterson v. Lamb*,
   329 U.S. 539 (1947) ............................................................................................ *passim*

*Policy and Research, LLC v. U.S. Dep't of Health of Human Servs.*,
   313 F. Supp. 3d 62 (D.D.C. 2018) ........................................................................... 13

*Pub. Citizen Health Research Grp. v. FDA*,
   740 F.2d 21 (D.C. Cir. 1984) ............................................................................... 20, 24

*Pub. Citizen v. FERC*,
   839 F.3d 1165 (D.C. Cir. 2016) ................................................................................ 21

*Regions Hosp. v. Shalala*,
   522 U.S. 448 (1998) .................................................................................................. 32

*Resolute Forest Prods., Inc. v. U.S. Dep't of Agric.*,
   130 F. Supp. 3d 81 (D.D.C. 2015) ............................................................................ 12

*Roberts v. Napolitano*,
   792 F. Supp. 2d 67 (D.D.C. 2011) ...................................................................... 17, 20

*Robinson v. Shell Oil Co.*,
   519 U.S. 337 (1997) .................................................................................................. 32

*Seaboard World Airlines, Inc. v. Gronouski*,
   230 F. Supp. 44 (D.D.C. 1964) ................................................................................. 42

*SEC v. Chenery Corp.*,
   332 U.S. 194 (1947) .................................................................................................. 34

*Serv. Emps. Int'l Union Nat'l Indus. Pension Fund v. Harborview Healthcare Ctr., Inc.*,
   191 F. Supp. 3d 13 (D.D.C. 2016) ............................................................................ 12

*Shawnee Trail Conservancy v. Nicholas*,
   343 F. Supp. 2d 687 (S.D. Ill. 2004) ........................................................................ 21

*Silva v. Sec'y of Labor*,
   518 F.2d 301 (1st Cir. 1975) ..................................................................................... 44

*Simms v. Sullivan*,
   877 F.2d 1047 (D.C. Cir. 1989) ................................................................................ 38

*Simon v. Eastern Ky. Welfare Rights Organization*,
  426 U.S. 26 (1976) ................................................................................ 14

*Spokeo, Inc. v. Robins*,
  136 S. Ct. 1540 (2016) ......................................................................... 14

*Stewart v. Smith*,
  673 F.2d 485 (D.C. Cir. 1982) ............................................................. 42

*Town of Chester, N.Y. v. Laroe Estates, Inc.*,
  137 S. Ct. 1645 (2017) .................................................................... 14, 15

*United States ex rel. Miller v. Bill Harbert Int'l Constr., Inc.*,
  No. 95-1231 (RCL), 2007 WL 851871 (D.D.C. Mar. 14, 2007) .............. 25

*United States v. Kelly*,
  82 U.S. 34 (1872) ............................................................................ 36, 41

*United States v. Wilson*,
  290 F.3d 347 (D.C. Cir. 2002) ......................................................... 22, 24

*Vt. Yankee Nuclear Power Corp. v. Nat. Res. Defense Council, Inc.*,
  435 U.S. 519 (1978) .............................................................................. 34

*Wash. Hosp. Ctr. v. Bowen*,
  795 F.2d 139 (D.C. Cir. 1986) ............................................................. 33

*WorldCom, Inc. v. FCC*,
  238 F.3d 449 (D.C. Cir. 2001) ............................................................. 39

**STATUTES**

8 U.S.C. § 324 ......................................................................................... 5

5 U.S.C. § 553 .................................................................................... 40, 41

5 U.S.C. § 555 ....................................................................................... 26

5 U.S.C. § 701 ....................................................................................... 16

5 U.S.C. § 704 ....................................................................................... 12

5 U.S.C. § 706 ................................................................................. *passim*

8 U.S.C. § 1001 ...................................................................................... 5

8 U.S.C. § 1101 ............................................................................................................. 3

8 U.S.C. § 1439 ................................................................................................... 4, 5, 19
8 U.S.C. § 1440 ............................................................................................... *passim*

10 U.S.C. § 504 ........................................................................................................... 3

10 U.S.C. § 619 ......................................................................................................... 19

10 U.S.C. § 1201 ....................................................................................................... 19

38 U.S.C. § 101 ......................................................................................................... 35

Pub. L. 76-853, 54 Stat. 1137 (1940) .................................................. 5, 22, 23, 36, 41

Pub L. 77-507, 56 Stat. 176 (1942) .......................................................................... 5

Pub. L. 80-567, 62 Stat. 281 ...................................................................... 5, 6, 37, 41

Pub. L. 83-86, 67 Stat. 108 (1953) ............................................................................ 6

Pub. L. 87-301, 75 Stat. 650 (1961) .......................................................................... 6

Pub. L. 90-633, 82 Stat. 1343 (1968) ........................................................................ 6

Pub. L. 97-116, 95 Stat. 1611 (1981) ........................................................................ 6

Pub. L. 100-525, 102 Stat. 2609 (1988) .................................................................... 6

Pub. L. 101-649, 104 Stat. 4978 (1990) .................................................................... 6

Pub. L. 102-232, 105 Stat. 1749 (1991) .................................................................... 6

Pub. L. 105-85, 111 Stat. 1629 (1997) ...................................................................... 6

Pub. L. 108-136, 117 Stat. 1691 (2003) .................................................................... 6

*Immigration and Nationality Act,*
    Pub L. 82-414, 66 Stat. 163 (1952), now codified at 8 U.S.C. § 1440 ........................... 6, 23, 37

National Defense Authorization Act for Fiscal Year 2020 ("2020 NDAA"),
    Pub. L. 116-92, 133 Stat. 1198 ............................................................................. 9, 31

**REGULATIONS**

8 C.F.R. § 329.4 ...................................................................................................... 4, 5

32 C.F.R. § 41.5 (1969) ...................................................................................... 28

32 C.F.R. § 41.9 (1981) ...................................................................................... 28

32 C.FR. § 41.5 (1973) ....................................................................................... 28

31 Fed. Reg. 705 (Jan. 19 1966) ........................................................................ 28

47 Fed. Reg. 10162 (Mar. 9, 1982) .......................................................... 28, 29, 42

63 Fed Reg. 56081 (Oct. 21, 1998) .................................................................... 29

## RULES

Fed. R. Civ. P. 56 ............................................................................................... 12

Local R. 7 ............................................................................................................. 3

## UNITED STATES CONSTITUTION

U.S. Const. art. I, § 8, cls. 12-14 ......................................................................... 3

U.S. Const. art. II, § 2, cl. 1 ................................................................................. 3

## OTHER AUTHORITIES

2020 NDAA, Report of the Committee on Armed Services House of Representatives, Report
   116-120 § 524, Time Requirements for Certification of Honorable Service (June 19, 2019) .....
   ............................................................................................................................ 23
2020 NDSS § 526 ........................................................................................... 23, 30
Civilian terms for military experience, https://handsonbanking.org/military/career-
   transition/resume-writing/civilian-terms-for-military-experience/ .......................... 24

Exec. Order No. 13,269, 67 Fed. Reg. 45,287 (July 3, 2002) ............................. 4

H. Rpt. 82-1365 .................................................................................................... 6

H. Rpt. 116-333 .............................................................................................. 30, 39

https://www.congress.gov/bill/116th-congress/senate-bill/1790 ...................... 9

*Naturalization of Aliens Serving in the Armed Forces of the U.S.: Hearing on H.R. 6073, H.R.
   6416, and H. R. 6439 before the H. Comm. on Immigration and Naturalization*,
   77th Cong. 12 (1942) ................................................................................... 22, 23

**INTRODUCTION**

During World War II, Congress created a statutory scheme whereby aliens serving in the military could become naturalized citizens in exchange for qualifying military service.  As part of that scheme, Congress delegated to Defendants, the Department of Defense ("DoD") and Defense Secretary Mark Esper (sued in his official capacity), the responsibility for certifying that an alien's service has been "honorable."  The history surrounding the passage of this statutory authority makes clear that the mere act of enlisting in the military does not automatically entitle an alien to become a naturalized citizen; rather, consistent with DoD's long-standing practice, military officials must make an informed assessment of an alien's service based on a sufficiently developed service record.

In October 2017, DoD issued a policy memorandum setting forth certain requirements for alien service members, including Lawful Permanent Residents ("LPRs") and members who enlisted via the Military Accessions Vital to the National Interest ("MAVNI") pilot program, to satisfy before their service can be deemed honorable.  Plaintiffs, six Army soldiers who seek to become naturalized U.S. citizens on account of their military service, challenge two of those requirements in this case:  (1) a requirement that, consistent with standards for determining honorable service generally applicable across the military, an alien service member have served a requisite amount of time and (2) a requirement that the certifying official be a commissioned officer in the pay grade of O-6.  Plaintiffs raise various claims to these policies under the Administrative Procedure Act ("APA").

Defendants are entitled to summary judgment on all of Plaintiffs' claims.  Five of the six Plaintiffs now have certifications of having served honorably and thus already have the relief that they seek, and the sixth Plaintiff lacks standing to challenge the O-6 requirement.  Plaintiffs'

claims also fail under the APA.  Because Congress delegated DoD the discretion to determine what constitutes honorable service, DoD's establishment of a process and criteria for making those determinations is not subject to judicial review.  Even if it were, the nature of honorable service determinations and the legislative history of the statute demonstrate that DoD's duty rises above the level of being ministerial and non-discretionary.  The two requirements challenged in this case, moreover, were the reasonable products of DoD's decision-making process exercised pursuant to that authority and were consistent with the responsibilities delegated to it by Congress.  Despite Plaintiffs' claims to the contrary, DoD was exempt from notice-and-comment rulemaking procedures when issuing the two requirements.  Defendants are accordingly entitled to judgment in this case.

A driving theory behind Plaintiffs' claims is that this Court is bound by its prior rulings in *Kirwa v. U.S. Department of Defense*, but that is not so.  The Court's rulings in that case were issued in the context of a preliminary injunction motion and a motion to dismiss, and the Court has discretion to consider anew issues raised by Plaintiffs' claims.  More importantly, the legal landscape has shifted in the time that the Court last examined DoD's October 13, 2017 policy under the APA.  Both the Ninth Circuit Court of Appeals and a district court have issued rulings recognizing that DoD has broad discretion over the process and criteria for making honorable service determinations.  Most recently, in the National Defense Authorization Act for Fiscal Year 2020, Congress reiterated that it intends for the military to exercise its judgment when determining what service constitutes as honorable.  To the extent the Court considers itself to be restricted by its prior rulings, these developments present good cause for re-examination.

# BACKGROUND

## I.    STATUTORY AND REGULATORY BACKGROUND[1]

## A.    Authorization for non-citizen service members to naturalize in exchange for honorable military service

The relevant statutory authorities at issue in this case closely parallel those previously examined by this Court in *Kirwa v. U.S. Dep't of Defense*, 285 F. Supp. 3d 21 (D.D.C. 2017) ("*Kirwa I*").   The Constitution assigns to Congress and the President the responsibility to establish the nation's armed forces and to employ them for the protection of the nation's security. U.S. Const. art. I, § 8, cls. 12-14 & art. II, § 2, cl. 1.   Consistent with this authority, Congress has enacted legislation concerning who may, and who may not, serve in the Armed Forces. With respect to citizenship and residency, Congress has specified in 10 U.S.C. § 504(b) that "[a] person may be enlisted in any armed force only if the person is" (1) "[a] national of the United States"; (2) "[a]n alien who is lawfully admitted for permanent residence"; or (3) "[a] person described in section 341" of compacts between the United States and the Federated States of Micronesia, the Republic of the Marshall Islands, and Palau. 10 U.S.C. § 504(b)(1) (citations omitted).[2]   Congress further carved out an exception to these citizenship and residency requirements, authorizing DoD to enlist nonresidents if DoD "determines that such [enlistment] is . . . vital to the national interest," § 504(b)(2).   Pursuant to this latter authority, the Secretary of

---

[1] Consistent with Local Rule 7(h)(2), Defendants submit this section of their brief in lieu of a statement of undisputed material facts.

[2] A U.S. national is defined as "(A) a citizen of the United States, or (B) a person who, though not a citizen of the United States, owes permanent allegiance to the United States," 8 U.S.C. § 1101(a)(22), cited in 10 U.S.C. § 504(b)(1)(A), while a LPR is defined as a person "lawfully accorded the privilege of residing permanently in the United States as an immigrant in accordance with the immigration laws, such status not having changed," 8 U.S.C. § 1101(a)(20), cited in 10 U.S.C. § 504(b)(1)(B).

Defense in 2008 authorized the creation of the MAVNI pilot program.  *See Kirwa I*, 285 F. Supp. 3d at 29.

Congress recognized the contribution by alien service members who have provided valuable service to the country by offering them a path to citizenship.  Specifically, non-citizen soldiers who have "served honorably at any time" for "a period or periods aggregating one year" are eligible to be naturalized as citizens.  8 U.S.C. § 1439(a).  During designated periods of war,[3] Congress likewise permits soldiers who have served honorably to be eligible for naturalization but did not designate a specific amount of time that the service member must serve in order to be eligible. *See* 8 U.S.C. § 1440(a).  Under both §§ 1439 and 1440, Congress assigned the military with the role of determining whether a soldier has served honorably.  *See* § 1439(b)(3) ("[T]he applicant shall furnish to the Secretary of Homeland Security, . . . a certified statement from the proper executive department for each period of his service upon which he relies for the benefits of this section, clearly showing that such service was honorable and that no discharges from service, including periods of service not relied upon by him for the benefits of this section, were other than honorable (the certificate or certificates herein provided for shall be conclusive evidence of such service and discharge)."); § 1440(a) ("The executive department under which such person served shall determine whether persons haves served honorably in active-duty status, and whether separation from service was under honorable conditions.").

DoD certifies honorable service for a noncitizen service member using U.S. Citizenship and Immigration Services Form N-426.  *See* 8 C.F.R. § 329.4.  Certain sections of the forms are completed by the service member seeking naturalization, while others are filled out by military

---

[3] The Armed Forces have been in a state of such conflict since September 11, 2001.  *See* Exec. Order No. 13,269, 67 Fed. Reg. 45,287 (July 3, 2002).

officials.  *See Kirwa I*, 285 F. Supp. 3d at 27.  Service members seeking to be naturalized must submit a certified N-426 along with their application for naturalization.  *See* 8 C.F.R. § 329.4.

**B.      Statutory history of § 1440**

Congress enacted a series of laws governing naturalization through military service before enacting what is now §§ 1439 and 1440.  Section 324 of the Naturalization Act of 1940 permitted aliens serving honorably in the Armed Forces to apply for citizenship.  *See* Pub. L. 76-853, 54 Stat. 1137 (1940).  That statute prescribed a minimum period of honorable service—three years—before an alien service member was eligible to apply for citizenship.  *See id*.  After the United States entered World War II, Congress passed the Second War Powers Act of 1942. Pub L. 77-507, 56 Stat. 176 (1942).  The Second War Powers Act amended the Naturalization Act, inserting Section 701, which provided for citizenship for aliens serving in World War II. *See id*. § 1001.  This provision was similar to § 324 but did not require that a solider develop a three-year record of honorable service in order to obtain citizenship.  *Id*.  Honorable service was proven by obtaining "a duly authenticated copy of the record of petitioner's service, showing that petitioner is or was . . . serving honorably in such armed forces."  *Id*.  Nevertheless, the statute did not grant service members the affirmative right to naturalization on the first day that the member serves in the military, instead leaving to the military's discretion what type of service record was sufficient to establish an "honorable" characterization of service.  *Id*.

In 1948, Congress again amended the Naturalization Act, adding the specific provision at issue in this case: "The executive department under which such person served shall determine whether persons have served honorably."  Pub. L. 80-567, 62 Stat. 281.  Congress also amended the statute to provide certification of that requirement either by "affidavits . . . of at least two . . . members of the military or naval forces of a noncommissioned or warrant officer grade" or "by a

duly authenticated certification from the executive department under which the petitioner is serving." *Id*.

In 1952, Congress "carried forward substantially the provisions of existing law," including the "honorable service" provisions, when enacting sections 328 and 329 of the Immigration and Nationality Act.  H. Rpt. 82-1365 at 79.  *See Immigration and Nationality Act*, Pub L. 82-414, 66 Stat. 163, §§ 328, 329 (1952), now codified at 8 U.S.C. § 1440.  Since then, Congress amended § 1440 eight times over five decades, primarily to expand its coverage to aliens serving during different periods of war, but also to make other technical or substantive amendments.  *See* Pub. L. 83-86, 67 Stat. 108 (1953); Pub. L. 87-301, 75 Stat. 650 (1961); Pub. L. 90-633, 82 Stat. 1343 (1968); Pub. L. 97-116, 95 Stat. 1611 (1981); Pub. L. 100-525, 102 Stat. 2609 (1988); Pub. L. 101-649, 104 Stat. 4978 (1990); Pub. L. 102-232, 105 Stat. 1749 (1991); Pub. L. 105-85, 111 Stat. 1629 (1997); Pub. L. 108-136, 117 Stat. 1691 (2003).  In 2003, Congress amended § 1439 to reduce the mandatory service requirement for naturalization from three years of honorable service to one year of honorable service.  *See* Pub. L. 108-136, 117 Stat. 1691 (2003).  But Congress did not repeal, explicitly or by implication, the military's authority to determine a *de minimis* period of time in order to characterize service as honorable.

## C.     The October 13, 2017 Memorandum

The challenged policies in this case were an outgrowth of periodic reviews DoD undertook of the MAVNI pilot program.  As a pilot, the MAVNI program is subject to periodic reviews, which DoD used to evaluate various aspects of the program, most prominently its security screening procedures.  *See* SAMMA_0114-140.[4]  The information gleaned from these program reviews also informed DoD's policies for LPR and other alien service members.  *See*

---

[4] Defendants' references to the Administrative Record throughout this brief uses the Bates numbering in the Record.

SAMMA_0015-23 (noting that "lessons learned from the MAVNI Pilot Program" were a basis for the policy changes for LPR service members set forth in the October 13, 2017 Memorandum).

In 2016, DoD conducted a comprehensive review of the MAVNI pilot program, in light of security concerns that were discovered and later affirmed by an Office of Inspector General Investigation. *See* SAMMA_0019, 0051-52. DoD issued a new policy in September of that year imposing new security screening requirements and suspending acceptance of new applicants into the program. *See* SAMMA_019, 0114-22. DoD continued to review the program in 2017, including a review of more than 700 N-426s that had been certified in 2016 and 2017. *See* Decl. of Stephanie Miller[5] (attached as Exhibit 1) ¶ 5; *see also* SAMMA_0169-210. That review revealed that, at least in recent years, DoD had failed to ensure that service members developed an "honorable" service record before certifying their service as "honorable" under § 1440. *See* SAMMA_0020 (noting that N-426 certifications were being made based on one day of service); SAMMA_0041-42; Miller Decl. ¶ 5. DoD also continued to engage in deliberations about security screening and other eligibility requirements for honorable service certification. *See* Miller Decl. ¶ 7; SAMMA_0041-42.

The two policies at issue in this case—the time-in-service requirements and the O-6 requirement—resulted from these reviews and deliberations in 2017 and were designed to correct those prior failures. With regard to the time-in-service requirements, DoD's deliberations revealed a desire to ensure that its honorable service policy with respect to N-426s is consistent

---

[5] Defendants submit the Miller declaration to "illuminate reasons [for the challenged policies that are] obscured but implicit in the administrative record." *See Clifford v. Pena*, 77 F.3d 1414, 1418 (D.C. Cir. 1996); *see also Camp v. Pitts*, 411 U.S. 138, 141–43 (1973) (holding that courts may "obtain from the agency, either through affidavits or testimony . . . additional explanation of the [contemporaneous] reasons for the agency decision").

with the characterization of service standards it uses for entry-level discharges.  *See*
SAMMA_0041-42, 0058-114.  Regarding the O-6 requirement, DoD's review of certified N-
426s revealed that they were often certified by low-level officials, including officials who were
not otherwise authorized to evaluate a service member's performance.  *See* Miller Decl. ¶ 5.  To
this point, certain N-426s that were analyzed as part of DoD's 2017 review had been certified by
civilian staff administrators, unit administrators, and individuals at the GS-07 pay scale.  *See*
SAMMA_0169-210.

On October 13, 2017, Defendants issued three policy memoranda, one of which contains
the two policies challenged by Plaintiffs in this case.  That document is a memorandum from
A.M. Kurta, who was performing the duties of the Under Secretary of Defense for Personnel and
Readiness at the time, addressed to the Secretaries of the Military Departments and the
Commandant of the Coast Guard and regarding honorable service certification for purposes of
naturalization (hereinafter referred to as "the October 13, 2017 Memorandum" or
"Memorandum").  *See* SAMMA_0006-09.  The Memorandum sets forth standards and
procedures for DoD to employ when making honorable service determinations; these criteria
vary depending on whether the service member enlisted prior to or after the date of the
Memorandum.  *Id*.  Relevant here, the Memorandum establishes a "Military Training and
Required Service" standard, stating that a service member seeking honorable service certification
must have "served in a capacity, for a period of time, and in a manner that permits an informed
determination as to whether the member served honorably" (the "time-in-service requirements").
*Id*.  For service members who accessed on or after October 13, 2017 (Section I of the policy,
which is at issue in this case), the specific requirements are as follows:

- For service members in an active component, the member is eligible for honorable
  service certification if he or she (1) successfully completed basic training, (2)

completes at least 180 consecutive days of active-duty service, inclusive of basic training, and (3) the characterization of service is honorable;

- For service members in the Selected Reserve of the Ready Reserve, the member is eligible for honorable service certification if he or she (1) successfully completes basic training, (2) completes at least one year of satisfactory service towards non-regular retirement as a member of the Selected Reserve, inclusive of basic training, and (3) the characterization of service is honorable;

- For service members in an active component, or in the Selected Reserve of the Ready Reserve, who have served in an active duty status in a hazardous duty area, the member is eligible for honorable service certification if he or she (1) successfully completes basic training, (2) satisfactorily serves one or more days of active-duty service in a combat zone, a qualified hazardous duty area, or an area where service in the area has been designated to be in direct support of a combat zone and which qualifies the member for hostile fire or imminent danger pay, and (3) the characterization of the service is honorable.

SAMMA_0007-08.   With respect to the certifying official, the Memorandum stated that certifications were to be made by the Secretary of the Military Department concerned, with the ability to delegate that authority to a commissioned officer in the pay grade of O-6 or higher (the "O-6 requirement").  SAMMA_0006.

## D.    The 2020 NDAA

Following Defendants' promulgation of the challenged policies, Congress passed legislation addressing the issue of honorable service certification.   *See* National Defense Authorization Act for Fiscal Year 2020 ("2020 NDAA"), Pub. L. 116-92, § 526.[6]   In particular, Congress directed the Secretary of Defense to "publish regulations for submission and processing of a completed . . . Form N-426."   *Id*.   Congress further instructed that "[s]uch regulations shall designated the appropriate level for the certifying officer as well as establish time requirements for the form to be returned to the" requesting service member.   *Id*.   In response to this directive, on April 24, 2020, DoD issued a policy memorandum updating the

---

[6] The 2020 NDAA is available at https://www.congress.gov/bill/116th-congress/senate-bill/1790.

October 13, 2017 Memorandum ("the April 24, 2020 Memorandum").  *See* SAMMA_0001-05.

The April 24, 2020 Memorandum leaves in place the requirement that the certifying official be a

commissioned officer serving in the pay grade of O-6 or higher and specifies that the certifying

official will process a N-426 request for certification "with priority" and return it to the

requesting service member within thirty days of submission.  SAMMA_0001.

**D.     Prior litigation regarding N-426 honorable service certification**

As noted above, in *Kirwa v. DoD*, this Court previously addressed APA challenges to the

same October 13, 2017 Memorandum at issue in this case.  The *Kirwa* Plaintiffs are MAVNI

soldiers who enlisted in the Army's Selected Reserve of the Ready Reserve prior to September

30, 2016 and who challenge the security screening procedures imposed by the policy in order to

be eligible for honorable service certification.  *See Kirwa I*, 285 F. Supp. 3d at 32-33.  In October

2017, the Court granted Plaintiffs' Motion for a Preliminary Injunction, concluding that Plaintiffs

were likely to succeed on their claims under the APA.  *Id*. at 35-42.  Among other things, the

Court ordered DoD to "use [its] best efforts to certify or deny Form N-426s . . . within two

business days of receipt."  *See Kirwa v. U.S. Dep't of Defense*, 17-cv-1793-ESH, Am. Order,

ECF No. 32 at 1-2 (Oct. 27, 2017).  In that same order, the Court approved DoD's policy of

having the certifying official be a commissioned officer in a pay grade of O-6 or higher.  *Id*. at 2.

Shortly thereafter, the Defendants in *Kirwa* moved to dismiss the complaint, or in the

alternative, for summary judgment.  *See Kirwa v. U.S. Dep't of Defense*, 285 F. Supp. 3d 257,

263 (D.D.C. 2018) ("*Kirwa II*").  The Court dismissed the Plaintiffs' substantive due process

claim but otherwise denied the Defendants' motion, including denying the motion for summary

judgment without prejudice.  *Id*. at 276.  *Kirwa* continues to be an active case before the Court.

## II.     PLAINTIFFS' COMPLAINT AND PROCEDURAL BACKGROUND

Plaintiffs, five LPR soldiers and one active-duty MAVNI soldier serving in the Army, filed their Complaint in this case on April 28, 2020.  Compl., ECF No. 1, ¶¶ 19-24.  Plaintiffs contend that they have a "right" to receive certified N-426s and that Defendants' policies are precluding them from doing so and thus violate the APA.  *See generally, id*.  Specifically, Plaintiffs contend that Defendants are violating 5 U.S.C. § 706(1) by unlawfully withholding their certifications until they meet the requisite time-in-service requirements and that such withholding constitutes an unreasonable delay.  *Id*. ¶¶ 155-57.  In addition, Plaintiffs claim that Defendants' policy violates 5 U.S.C. § 706(2) because it is arbitrary and capricious and exceeds Defendants' authority under § 1440.  *Id*. ¶¶ 159-62.  Plaintiffs lastly allege that Defendants were required to undertake notice-and-comment rulemaking in order to promulgate the policy.  *Id*. ¶¶ 164-66.  Plaintiffs seek an order invalidating the challenged policy and requiring Defendants to "use their best efforts to certify or deny Form N-426s within two business days of receipt." *Id*., Prayer for Relief.  Additionally, Plaintiffs request that the Court enjoin Defendants from discharging or separating Plaintiffs during the pendency of their requests for N-426 certification and processing of their naturalization applications, "except as related to the conduct of an individual service member and based on sufficient grounds generally applicable to all members of the military." *Id*.

On the same day that Plaintiffs filed their Complaint, they also moved for a preliminary injunction.  *See* Pls.' Mot. for Prelim. Inj. ("Pls.' Mot."), ECF No. 4.  Following a telephonic status conference with the parties, the Court entered an order consolidating the preliminary injunction hearing with a hearing on the merits, construing Plaintiffs' preliminary injunction motion as a motion for summary judgment, and setting a briefing schedule on cross-motions for

11

summary judgment.  *See* Order, ECF No. 15.  During the status conference, counsel for Plaintiffs

clarified that they are challenging only Section I of the October 13, 2017 Memorandum, which

applies to service members who enlisted after the date of the policy.  *See* Tr. of 5/5/20

Teleconference (attached as Exhibit 2), 3:3-7.  Plaintiffs further confirmed that the only claims at

issue in the case are those brought under the APA.[7]  *Id.* 18:10-17.  Defendants accordingly

proceed with their motion based on that understanding.

## STANDARD OF REVIEW

Summary judgment must be granted to a party who has shown that "there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed R.

Civ. P. 56(a).  In the ordinary civil case, the inquiry reduces to "whether the evidence presents a

sufficient disagreement to require submission to a [factfinder] or whether it is so one-sided that

one party must prevail as a matter of law."  *Serv. Emps. Int'l Union Nat'l Indus. Pension Fund v.*

*Harborview Healthcare Ctr., Inc.*, 191 F. Supp. 3d 13, 17 (D.D.C. 2016) (quoting *Anderson v.*

*Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986)).  However, in the APA context, the district

court's function is generally to determine whether the evidence in the certified administrative

record permitted the agency to make the decision it did.  "Summary judgment thus serves as the

mechanism for deciding, as a matter of law, whether an agency action is supported by the

administrative record and is otherwise consistent with the APA standard of review."  *Resolute*

*Forest Prods., Inc. v. U.S. Dep't of Agric.*, 130 F. Supp. 3d 81, 89 (D.D.C. 2015).  Further, while

---

[7] Count I of Plaintiffs' Complaint asserts a stand-alone claim under the Immigration and Nationality Act.  *See* Compl. ¶¶ 148-53.  Plaintiffs did not pursue this claim in their Motion for Preliminary Injunction.  *See* ECF No. 4.  Even if they had, Plaintiffs have identified no private right of action in that Act that permits them to sustain this claim, nor could they do so while still maintaining their claims under the APA, given the substantial overlap between them.  *See* 5 U.S.C. § 704 (providing for review of final agency action "for which there is no other adequate remedy").

in the ordinary civil case the plaintiff might be entitled to conduct discovery prior to summary judgment, *see* Fed. R. Civ. P. 56(d), discovery is typically not available in APA cases.  Instead, "the court must limit its review to the 'administrative record' and the facts and reasons contained therein to determine whether the agency's action was 'consistent with the relevant APA standard of review.'"  *Policy and Research, LLC v. U.S. Dep't of Health of Human Servs.*, 313 F. Supp. 3d 62, 74 (D.D.C. 2018) (quoting *HoChunk, Inc. v. Sessions*, 253 F. Supp. 3d 303, 307 (D.D.C. 2017)).

## ARGUMENT

Plaintiffs' various APA claims in this case must fail for multiple reasons.  To begin, five of the six Plaintiffs lacks standing to bring any claim because they now have certified Form N-426s, and the remaining Plaintiff has failed to establish standing to challenge the O-6 requirement.  Defendants' honorable service determinations under § 1440 are also committed to agency discretion by law, thereby rendering non-reviewable their decision to require a certain amount of service prior to evaluating that service and their decision to designate the O-6 pay grade as the certifying official.  Plaintiffs fare no better on the merits on their claims.  Rather than being a ministerial, non-discretionary duty, Defendants' certification of honorable service is an inherently military judgment, and Defendants reasonably promulgated policies consistent with its statutory authority to guide how it exercises that judgment.  Judgment in favor of Defendants is therefore warranted in this case.

## I.     FIVE OF THE SIX PLAINTIFFS SHOULD BE DISMISSED BECAUSE THEIR CLAIMS ARE MOOT, AND NO PLAINTIFF HAS STANDING TO CHALLENGE THE O-6 REQUIREMENT

As an initial matter, five of the six Plaintiffs have received certified N-426s since the Complaint was filed and should accordingly be dismissed for lack of standing.  The mootness

doctrine limits Article III courts to deciding "actual, ongoing controversies." *Clarke v. United States*, 915 F.2d 699, 701 (D.C. Cir. 1990) (quotation omitted). "A case is moot when the issues presented are no longer live or the parties lack a legally cognizable interest in the outcome." *City of Erie v. Pap's A.M.*, 529 U.S. 277, 287 (2000) (citation omitted).

During the parties' May 5, 2020 telephonic status conference, the Court encouraged Defendants to certify N-426s forms for those Plaintiffs who are eligible for certification under the policy. *See* Tr. of 5/5/20 Teleconference at 17:24 – 18:6 ("It would be nice if you could take care of the people that really just present a wholly different issue which is some way or another bureaucracy is not giving them what they're entitled to have . . . ."). Defendants have done precisely that by certifying as having served honorably all five of the Plaintiffs who satisfy the time-in-service requirements. *See* Decl. of Andrew D. Turpin (attached as Exhibit 3) ¶¶ 4-5 (discussing certifications of Plaintiffs Perez and Park); Decl. of Mercie Turner (attached as Exhibit 4) ¶ 4 (discussing certification of Plaintiff Samma); Decl. of Chelsea P. Aubuchon (attached as Exhibit 5) ¶ 4 (discussing certification of Plaintiff Lee); Decl. of Kourtney C. Slaughter (attached as Exhibit 6) ¶ 4 (discussing certification of Plaintiff Bouomo). Because these Plaintiffs now have the relief they seek in this case, their claims must be dismissed as moot.

Plaintiff Isiaka is not eligible for certification under the policy's time-in-service requirements, but he nevertheless lacks standing to challenge the requirement that the certifying official be a commissioned officer with a pay grade of O-6 or higher. Standing "require[s] plaintiffs to 'allege such a personal stake in the outcome of a controversy as to justify the exercise of the court's remedial powers on their behalf.'" *Town of Chester, N.Y. v. Laroe Estates, Inc.*, 137 S. Ct. 1645, 1650 (2017) (quoting *Simon v. Eastern Ky. Welfare Rights*

*Organization*, 426 U.S. 26, 38 (1976)).  "[T]he 'irreducible constitutional minimum' of standing consists of three elements."  *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992)).  A "plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision."  *Id*.  "[A] plaintiff must demonstrate standing for each claim he seeks to press and for each form of relief that is sought."  *Town of Chester*, 137 S. Ct. at 1650 (quoting *Davis v. FEC*, 554 U.S. 724, 734 (2008)).

Plaintiff Isiaka fails to allege anywhere in the Complaint that his purported injury—his inability to obtain a certified N-426—was caused by the O-6 requirement.  Instead, Plaintiff Isiaka claims that his certification request was denied because "he had not been serving for long enough and . . . would have to complete basic combat and advanced individual training before he could receive his certification."  Compl. ¶ 105.  Plaintiff's Isiaka's alleged injury is therefore not traceable to the O-6 policy:  even if it were invalidated, he would still be ineligible because he does not meet the time-in-service requirement.  *See Gil v. Whitford*, 138 S. Ct. 1916, 1934 (2018) (holding that, because "standing is not dispensed in gross[,] [a] plaintiff's remedy must be tailored to redress the plaintiff's particular injury").  By not alleging any injury stemming from the O-6 requirement, Plaintiff Isiaka cannot sustain a challenge to that aspect of the policy.  Accordingly, no Plaintiff in this case has standing to challenge that requirement.

## II.   DEFENDANTS ARE ENTITELD TO SUMMARY JUDGMENT ON PLAINTIFFS' APA CLAIMS

Plaintiffs' claims should be dismissed at the outset because Defendants' honorable service certifications are committed to agency discretion by law and are thus not subject to judicial review.  Even if that were not the case, Defendants are entitled to an entry of judgment because their certification obligations under § 1440 involve an exercise of discretion and are not

ministerial, the promulgated policies are the product of a sound and rational decision-making process, and Defendants did not exceed their statutory authority in issuing them.  Nor were Defendants required to undergo notice-and-comment rulemaking in order to promulgate the requirements.  Accordingly, all of Plaintiffs' challenges under the APA fail.

## A.     DoD's honorable service determinations under § 1440 are committed to agency discretion by law

Review under the APA is not warranted in this case because Defendants' decision to require a certain amount of time-in-service to be eligible for honorable service certification and a pay grade of O-6 or higher to certify is "committed to agency discretion by law."  *See* 5 U.S.C. § 701(a)(2).  Under the APA, the Court may not review final agency action "if the statute is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion."  *Heckler v. Chaney*, 470 U.S. 821, 830 (1985).  "[I]f no judicially manageable standards are available for judging how and when an agency should exercise its discretion, then it is impossible to evaluate agency action."  *Legal Assistance for Vietnamese Asylum Seekers v. Dep't of State, Bureau of Consular Affairs*, 104 F.3d 1349, 1353 (D.C. Cir. 1997) (quoting *Heckler*, 470 U.S. at 830).  Of particular relevance here, the D.C. Circuit has held that determinations requiring military expertise are not proper subjects of judicial intervention. *See, e.g., Dist. No. 1, Pac. Coast Dist., Marine Eng'rs' Beneficial Ass'n v. Mar. Admin.*, 215 F.3d 37, 41–42 (D.C. Cir. 2000) (finding that "determinations regarding the military value" are "not subjects fit for judicial involvement"); *NFFE v. United States*, 905 F.2d 400, 406 (D.C. Cir. 1990) ("[T]he federal judiciary is ill-equipped to conduct reviews of the nation's military policy."); *Ctr. for Biological Diversity v. Trump*, No. 1:19-CV-00408 (TNM), 2020 WL 1643657, at *16 (D.D.C. Apr. 2, 2020) (holding that DoD's decision to use military funds in support of border wall construction project was committed to agency discretion because the

statutory authority "calls for sensitive judgments that Congress plainly intended military officials to make").

"Whether and to what extent a particular statute precludes judicial review is determined not only from its express language, but also from the structure of the statutory scheme, its objectives, its legislative history, and the nature of the administrative action involved." *Block v. Cmty. Nutrition Inst*., 467 U.S. 340, 345 (1984).   Because Congress by its express language invoked a military administrative personnel action that had long been delegated to unreviewable military discretion—characterization of a service member's service—these factors converge and support a determination in this case that Defendants' time-in-service requirements and O-6 requirement are non-reviewable.

Section 1440's references to "honorable service" indicate that Congress left it to DoD's discretion both to construe the phrase and to determine the manner in which DoD decides whether service is honorable.   The use of this military term of art, decoupled from any explanatory or qualifying language, indicates that Congress delegated to DoD not merely a perfunctory role of checking a box on an immigration form but, more importantly, the discretion to make an underlying determination of whether a soldier had served honorably—and, by extension, what it means to serve honorably.   *See Roberts v. Napolitano*, 792 F. Supp. 2d 67, 73-74 (D.D.C. 2011) (statute authorizing Global Entry program included general mandates but was "silent as to the criteria the Secretary of Homeland Security should apply in approving applications for entry into the . . . program," and such statutory silence "indicates that Congress committed to the [agency] the sole discretion to determine eligibility guidelines and evaluate applicants").   Because the military characterizes service to ensure proper military discipline and control, it is a "decision[] as to the composition, training, equipping, and control of a military

force [that is] essentially [a] professional military judgment, subject *always* to civilian control of the Legislative and Executive Branches." *Gilligan v. Morgan*, 413 U.S. 1, 10 (1973) (emphasis in original).

The lack of criteria in § 1440 for making honorable service determinations is especially notable, given that Congress has not been reluctant to set standards for other military decision-making processes.  For example, Congress imposed a one-year service requirement for service members seeking honorable service certifications during times of peace.  8 U.S.C. § 1439(a).  Congress also set forth detailed criteria for DoD to use when making disability determinations for purposes of retirement pay, *see* 10 U.S.C. § 1201(b), and set specific time-in-grade requirements for DoD to follow when determining eligibility for promotion, *see* 10 U.S.C. § 619(a).  Such examples demonstrate that Congress is capable of defining a statutory term or otherwise providing meaningful standards to apply when it so intends.  Section 1440 evidences no such Congressional intent, thereby indicating that Congress left it to DoD to construe the phrase "honorable service."  This is especially true regarding DoD's ability to make ancillary decisions where the statute is silent, including the length of a service record necessary to make such a determination and the seniority of the certifying official.  *See Roberts*, 792 F. Supp. 2d at 73-74 (statutory silence "indicates that Congress committed to the [agency] the sole discretion to determine eligibility guidelines and evaluate applicants" for program).

Consistent with this principle of military deference, courts have been reluctant to infringe on DoD's discretion for making honorable service determinations or to otherwise review policies that apply to service members seeking to naturalize by way of their service.  *See, e.g.*, *Davis v. Woodring*, 111 F.2d 523, 525 (D.C. Cir. 1940) (holding that court was "wholly without any effective power of review" over a soldier's claim that he was entitled to an honorable

characterization of service).   Although this Court has previously concluded, in the context of ruling on a motion for a preliminary injunction and a motion to dismiss, that Defendants' N-426 certifications are subject to judicial review, *see Kirwa I*, 285 F. Supp. 3d at 35-36; *Kirwa II*, 285 F. Supp. 3d at 266, a district court judge in the District of Nevada recently reached the opposite conclusion, dismissing on non-reviewability grounds an APA challenge to the same honorable service policy memorandum at issue in this case, *see Kotab v. U.S. Dep't of Air Force*, No. 2:18-CV-2031-KJD-CWH, 2019 WL 4677020, at *9 (D. Nev. Sept. 25, 2019) ("The statute governing DoD's honorable service certifications sets forth no meaningful standard to evaluate either whether DoD should certify a soldier as having served honorably or when DoD should so certify.").   Also in 2019, the Ninth Circuit vacated a preliminary injunction issued by the district court enjoining a policy (one of the three policies issued on October 13, 2017) requiring LPRs to complete security screening before accessing into active-duty or reserve service.[8]   *Kuang v. U.S. Dep't of Defense*, 778 F. App'x 418, 419 (9th Cir. 2019) (reasoning that "military decisions about national security and personnel are inherently sensitive and generally reserved to military discretion, subject to the control of the political branches").   These cases indicate that policies that govern determinations about characterizing service are inherently military judgments that are not subject to judicial review.   This Court should likewise conclude that Defendants' honorable service certifications for N-426 purposes are committed to agency discretion by law.

---

[8] The analysis in *Kuang* was guided by a test to determine the reviewability of a military policy first articulated in *Mindes v. Seaman*, 453 F.2d 197 (5th Cir. 1971).   Although the D.C. Circuit has not adopted the *Mindes* test, the *Kuang* court's discussion about the discretion afforded to the military over personnel matters was guided Supreme Court precedent that is not limited to a *Mindes* analysis.   *See Kuang*, 778 F. App'x at 421 (citing *Dep't of Navy v. Egan*, 484 U.S. 518, 527 (1988); *Gilligan v. Morgan*, 413 U.S. 1, 10 (1973)).

The nature of the administrative action at issue in § 1440—Defendants' certification of a service member's service as honorable—further compels the conclusion that honorable service determinations are inherently military judgments to which courts have routinely deferred.  *See North Dakota v. United States*, 495 U.S. 423, 443 (1990) ("[W]e properly defer to the judgment of those who must lead our Armed Forces in battle."); *Orloff v. Willoughby*, 345 U.S. 83, 93 (1953) ("[J]udges are not given the task of running the Army."); *Doe 2 v. Shanahan*, 755 F. App'x 19, 24 (D.C. Cir. 2019) ("Courts must be particularly careful not to substitute our judgment of what is desirable for that of the executive and legislative branches, or our own evaluation of evidence for their reasonable evaluation because it is difficult to conceive of an area of governmental activity in which the courts have less competence." (citation omitted)). Even if the Court concludes that DoD's policies governing its honorable service certification determinations are subject to judicial review, there are, at a minimum, entitled to substantial deference.

## B.  Because Defendants do not have a ministerial, non-discretionary duty to certify honorable service within a certain amount of time, Plaintiffs' § 706(1) claim fails

Even if the Court were to conclude that honorable service determinations are not committed to agency discretion by law, summary judgment in favor of Defendants is still warranted because Plaintiffs' claims fail as a matter of law.  Plaintiffs first contend that Defendants have a non-discretionary and ministerial duty under § 1440 to certify honorable service based solely on the record of a service member at the time an N-426 request is submitted. *See* Pls.' Mot. at 25.  For the reasons that follow, this claim has no merit.

Under § 706(1), courts have the authority to "compel agency action unlawfully withheld or unreasonably delayed." As the Supreme Court explained in *Norton v. Southern Utah Wilderness Alliance* ("*SUWA*"), "the only agency action that can be compelled under the APA is

action legally required," 542 U.S. 55, 63 (2004) (emphasis omitted), that is, "when the agency has failed to act in response to a clear legal duty," *Citizens for Responsibility and Ethics in Wash. v. SEC*, 916 F. Supp. 2d 141, 148 (D.D.C. 2013) (citing *SUWA*, 542 U.S. at 63-64). The D.C. Circuit has further explained that "[w]hen agency recalcitrance is in the face of a clear statutory duty or is of such magnitude that it amounts to an abdication of statutory responsibility, the court has the power to order the agency to act to carry out its substantive statutory mandates." *Pub. Citizen Health Research Grp. v. FDA*, 740 F.2d 21, 32 (D.C. Cir. 1984). But such injunctive relief is appropriate only "if the court's study of the statute and relevant legislative materials cause[s] it to conclude that the defendant official ha[s] failed to discharge a duty that Congress intended him to perform." *Covelo Indian Cmty. v. Watt*, 551 F. Supp. 366, 381 (D.D.C. 1982), *aff'd as modified* (Dec. 21, 1982), *vacated as moot* (Feb. 1, 1983).

Importantly, "Section 706[(1)] does not provide a court with a license to substitute its discretion for that of an agency merely because the agency is charged with having unreasonably withheld action," *Am. Ass'n of Retired Pers. v. EEOC*, 823 F.2d 600, 605 (D.C. Cir. 1987), or because "a plaintiff is [] dissatisfied with the way an agency exercises its discretion," *Shawnee Trail Conservancy v. Nicholas*, 343 F. Supp. 2d 687, 700 (S.D. Ill. 2004). Rather, for a court to order an agency to act, there must exist a "ministerial or non-discretionary act" that the agency has failed to take. *SUWA*, 542 U.S. at 64-65. The D.C. Circuit views this requirement as imposing "strict limits on reviewable inactions." *Pub. Citizen v. FERC*, 839 F.3d 1165, 1172 (D.C. Cir. 2016) (citation and internal quotation marks omitted).

For reasons similar to those discussed in the preceding section, *see* Part II(A), § 1440 imposes no ministerial, non-discretionary obligation for DoD to certify honorable service based on a *de minimus* amount of service. The relevant statutory language states only that a service

member who "has served honorably" during a time of war "may be naturalized," and that DoD "shall determine whether" such a service member "served honorably in an active-duty status, and whether separation from such service was under honorable conditions."  § 1440(a).  Congress placed no limits in § 1440 on Defendants' ability to ensure that it has a sufficient record upon which to characterize service and to assign the certifying authority to the appropriate rank.

The relevant military practices, contemporaneous to Congress's inclusion of an honorable service requirement as part of the naturalization process, confirm that Congress intended for DoD to have more than a ministerial role.  When Congress passed the Nationality Act in 1940, which for the first time authorized naturalization for persons serving in the Armed Forces, the military had long been using several different terms to characterize service, including "honorable, dishonorable, and unclassified."  *See Patterson v. Lamb*, 329 U.S. 539, 542 (1947) (noting that these characterizations of service pre-date World War I).  Of these possible characterizations, Congress selected "honorable" as the type of service necessary in order to naturalize.  Pub. L. 76-853, 54 Stat. 1137 (1940).  Had Congress intended for other characterizations of service such as "unclassified" to make a service member eligible for naturalization, it would have made that clear in the statute, given its presumed knowledge of the military's practice.  *See United States v. Wilson*, 290 F.3d 347, 356-57 (D.C. Cir. 2002) ("Congress is presumed to preserve, not abrogate, the background understandings against which it legislates. . . . Congress is presumed to be aware of established practices and authoritative interpretations of the coordinate branches." (citation omitted)).

Section § 1440's legislative history also evidences Congressional intent to vest discretion in DoD when making honorable service determinations.  In 1942, when Congress eliminated the three-year time in service requirement for citizenship, the principal draftsman of the legislation

specifically rejected the idea that the legislation would "simply make it mandatory that any one who joins the army *immediately gets citizenship*." *Naturalization of Aliens Serving in the Armed Forces of the U.S.: Hearing on H.R. 6073, H.R. 6416, and H. R. 6439 before the H. Comm. on Immigration and Naturalization*, 77th Cong. 12 (1942) (statement of Rep. A. Leonard Allen) (emphasis added).   A congressman serving on the House Committee on Immigration and Naturalization at the time, who supported the legislative changes, likewise assured other committee members that eliminating the three-year requirement was never intended to provide an alien with "citizenship papers *the next day after he joins the army*, in any instance." *Id*. at 14 (statement of Rep. Noah M. Mason) (emphasis added).

Statutory changes that followed shortly thereafter further confirm that DoD's role in certifying honorable service rises above the ministerial level.   The Nationality Act of 1940 required proof of honorable service "by duly authenticated copies of records of the executive departments having custody of the records of such service."   Pub. L. No. 76-853, § 324(e), 54 Stat. 1137, 1150.   But this requirement was amended in 1948, mandating that noncitizen soldiers submit a certified statement from the executive department under which the soldiers served, *affirming* that their service was honorable (essentially the same rules that apply today).   Pub. L. No. 82-414, §§ 328(b)(3), 329(b)(4), 66 Stat. 163, 249-50.   This shift in the law reflected Congress's intent that DoD would make a substantive determination of honorable service and further undercuts any notion that the role is ministerial.   If Congress had viewed the honorable service determination as merely *pro forma*, Congress could have simply retained the straightforward proof-of-service requirement from the 1940 Act.

The N-426 directives in the 2020 NDAA provide further proof that Congress intends for DoD to function as more than just a rubber stamp for honorable service certifications.   Congress

gave DoD discretion to determine "the appropriate level" for officials who certify the form as well as the time necessary for returning the form.  *See* 2020 NDAA § 524.  Notably, the House version of § 526 proposed that the level of official be a commissioned officer serving in the pay grade of O-6 or higher (the same requirement that Defendants already had in place at that time).  *See* 2020 NDAA, Report of the Committee on Armed Services House of Representatives, Report 116-120 § 524, Time Requirements for Certification of Honorable Service (June 19, 2019).  In the Army, commissioned officers at that pay grade hold the rank of Colonel and serve as commanders of "brigade-sized elements (around 5,000 soldiers)."  SAMMA_0165.  "Colonels are the final authority on everything that occurs in units they hold charge of," and the rank is considered to be "a highly prestigious position . . . achieved only by the most qualified of officers."[9]  *Id.*  The fact that the House was contemplating requiring certifications to be made by such senior-level officials, combined with the fact that Congress ultimately left it within DoD's discretion to designate the pay grade of the certifying officer, further indicates that Congress views honorable service determinations to have an evaluative component and not simply be ministerial.  Otherwise, if the only consideration for honorable service was whether the requestor was serving, it simply would not matter who checked a box.

Plaintiffs' motion does not address any of the legislative history, including the 2020 NDAA, but instead refers generally to the Court's ruling in *Kirwa* to support their claims.  *See* Pls.' Mot. at 25.  Plaintiffs assert that DHS regulations implementing § 1440 "instruct DoD to play a ministerial role," but that argument misconstrues the § 706(1) analysis, which examines

---

[9] Another source describes the pay grades of O-5 and O-6 as being equivalent to the chief executive officers, chief operating officer, or program director of a company.  *See* Civilian terms for military experience, https://handsonbanking.org/military/career-transition/resume-writing/civilian-terms-for-military-experience/ (last visited May 21, 2020).

only whether there is a "clear statutory duty" or "substantive statutory mandates."  *See Pub. Citizen Health Research Grp.*, 740 F.2d at 32.  What another Executive Branch agency may say about DoD's responsibilities does not determine what responsibilities *Congress* gave to DoD by statute.

Plaintiffs also cite a passing statement made by Government counsel during oral argument in *Nio v. U.S. Dep't of Homeland Security*, in which counsel stated that "DoD serves a ministerial role in determining if an individual is serving honorably."  ECF No. 19 at 36, No. 17-998 (ESH) (D.D.C.).  That statement does not supersede the terms of statutory law that governs this issue, and, in any event, does not bind Defendants in this case.  Government counsel's passing reference to a "ministerial role" was not an essential feature of the Government's argument in *Nio*, nor did the Court even address this point in denying the *Nio* Plaintiffs' motion for a preliminary injunction.  *See Nio v. U.S. Dep't of Homeland Sec.*, No. 17- 998 (ESH), 2017 WL 3917006 (D.D.C. Sept. 6, 2017); *see also United States ex rel. Miller v. Bill Harbert Int'l Constr., Inc.,* No. 95-1231 (RCL), 2007 WL 851871, at *1 (D.D.C. Mar. 14, 2007) ("[T]he doctrine of judicial admissions has never been applied to counsel's statement of his conception of the legal theory of the case.  When counsel speaks of legal principles . . . he makes no judicial admission and sets up no estoppel which would prevent the court from applying . . . the proper legal principles").[10]

---

[10] Furthermore, read in its full context, counsel's use of the term "ministerial" did not diminish DoD's institutional role under § 1440(a). On the contrary, counsel wrote that "USCIS should defer to DoD to determine when an individual is serving honorably in the armed services, and the N-426 serves just that purpose." ECF No. 19 at 36, No. 17-998 (ESH) (D.D.C.) (emphasis added).  Counsel's point during argument simply was that USCIS has an independent responsibility to exercise its "own judgment to determine that it needs . . . specific, additional information from DoD in certain circumstances." *Id.*  That argument, and the argument that Defendants present here (*i.e.*, that DoD's honorable-service determinations involve an exercise of discretion) are not in tension with one another.

In any event, even assuming any aspect of DoD's duty under § 1440 is ministerial, at most, it would be a ministerial requirement that a DoD department pass judgment upon a request for an honorable service determination one way or the other.  *See* 8 U.S.C. § 1440 (providing that DoD "*shall determine* whether persons have served honorably") (emphasis added).  That DoD is required to make a determination does not eliminate discretion on *what* determination to make.  Furthermore, the APA requires only that an agency act "within a reasonable time." *Mashpee Wampanoag Tribal Council, Inc. v. Norton*, 336 F.3d 1094, 1099 (D.C. Cir. 2003) (quoting 5 U.S.C. § 555(b)).  Here, by way of the April 24, 2020 Memorandum promulgated in response to Congress's directive in the 2020 NDAA, Defendants have established the time period by which it must act upon any such requests.

In sum, the text and history of § 1440 make clear that Congress intended for DoD to exercise its discretion when making honorable service determinations.  Plaintiffs' § 706(1) claim accordingly fails.

## C. Because Defendants' time-in-service requirements and O-6 requirement are the products of reasoned decision-making, Plaintiffs' arbitrary and capricious claim fails

Defendants are similarly entitled to judgment on Plaintiffs' claim that the time-in-service requirements and the O-6 requirement are arbitrary and capricious.  Plaintiffs provide little support for this claim, instead faulting Defendants for purportedly failing to provide a sufficient explanation of its policies and generally seeking to expand this Court's ruling in *Kirwa* to cover their claims.  *See* Pls.' Mot. at 23-24.  Neither assertion has merit, and this claim must fail.

When considering whether an agency's decision was arbitrary and capricious, a "reviewing court must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment."  *Marsh v. Ore. Nat. Res.*

*Council*, 490 U.S. 360, 377 (1989) (citation and internal quotation marks omitted).  "This inquiry must be searching and careful, but the ultimate standard of review is a narrow one."  *Id.* (citation and internal quotation marks omitted).  As the Supreme Court has cautioned, a reviewing "court is not to substitute its judgment for that of the agency," and it should uphold even "a decision of less than ideal clarity" so long as "the agency's path may reasonably be discerned."  *FCC v. Fox Television Stations*, *Inc*., 556 U.S. 502, 513-14 (2009) (citation and internal quotation marks omitted).  Ultimately, the question is whether the agency's decision is "within the bounds of reasoned decisionmaking."  *Balt. Gas & Elec. Co. v. NRDC*, 462 U.S. 87, 105 (1983).  Both the time-in-service requirements and the O-6 requirement satisfy this standard because they were reasonable responses to issues identified by DoD regarding how it administers its statutory duty under § 1440.

### 1.    Time-in-service requirements

The Administrative Records shows that the time-in-service requirements were included in the October 13, 2017 Memorandum to align DoD's honorable service characterizations with how DoD defines honorable service more broadly.  *See* SAMMA_0041-42.  DoD specifically discussed ensuring that its N-426 honorable service policy is consistent with Department of Defense Instruction ("DoDI") 1332.14, *see id.*, which governs entry-level separations from service, *see* SAMMA_0089-90.  Among other things, DoDI 1332.14 states that entry-level separations—those that occur within the first 180 days of active-duty service—will be uncharacterized.  *Id.*  DoD further aligned the time-in-service requirements in the October 13, 2017 Memorandum with those in DoDI 1332.14 by allowing for limited exceptions, such as when a service member is mobilized or serving in a war zone.  *Compare id.* *with* SAMMA_0008.  The Administrative Record thus reveals that the motivating factor behind the

time-in-service requirements was fairness and consistency:  the desire to treat all enlisted service members the same with regard to how DoD characterizes their service.[11]

Plaintiffs claim, without support, that the October 13, 2017 Memorandum "upend[s]" DoD's longstanding practice of certifying honorable service based solely on whether non-citizens have served honorably at the time" they request certification.  *See* Pls.' Mot. at 23.  The converse is true.  At the time Congress first required "honorable" service as a condition to naturalization under what is now § 1440, the military used several different terms to characterize service.  *See Patterson*, 329 U.S. at 542 (discussing the three types of service characterizations that existed prior to World War I:  honorable, dishonorable, and unclassified); *see also Davis*, 111 F.2d at 524.  The military, moreover, has always required a substantial record of service when evaluating whether service is honorable.  *See Patterson*, 329 U.S. 542 (holding that the military may decline to characterize service for those soldiers who had served only for a *de minimis* time period because the "honorable" characterization of service is reserved for "soldiers who performed military service after having become fully and finally absorbed into that service"); *Davis*, 111 F.2d at 523-24 (declining to review the military's refusal to characterize a soldier's service after he had served in the military only for thirty-two days).

After the honorable service requirement was relocated to the Immigration and Nationality Act of 1952, the military continued to require soldiers to develop some substantial record of service in order for their service to be characterized as "honorable."  From 1966 to 1982, military regulations defining honorable service required officials to consider "length of service" as one factor before a soldier's service could be characterized as "honorable," but those regulations

---

[11] With respect to the one-year time-in-service requirement for service members in the Selected Reserve of the Ready Reserve, the Administrative Record shows an awareness by DoD that such service members serve in an active-duty capacity less frequently and thus build their service record at a slower rate.  *See* SAMMA_0055.

provided substantial discretion regarding the amount of time required to develop a sufficient record of service.  *See* 32 C.F.R. § 41.9(a)(1) (1981); 32 C.FR. § 41.5(a) (1973); 32 C.F.R. § 41.5(a) (1969); 31 Fed. Reg. 705, 705 (Jan. 19 1966).

Beginning in 1982, the military modified its policies to provide more specific guidance regarding the length of service required to establish a record sufficient to characterize service. *See* 47 Fed. Reg. 10162, 10175, 10183 (Mar. 9, 1982).  These regulations defined an "entry level status" for soldiers as the "first 180 days of continuous active military service."  *Id*.  "For members in a reserve component who have not completed 180 days of continuous active military service and who are not on active duty, entry level status begins upon enlistment in a reserve component . . . and terminates 180 days after beginning an initial period of entry level active duty training."  *Id*.  During entry-level status, a soldier's record of service is insufficient to establish a basis for characterization and is instead "[u]ncharacterized."  *See id*. at 10183.  But "[a]fter six months of service, [a] member will have established a sufficient record to warrant characterization of service.  If an Honorable characterization is warranted, it will be issued."  *Id*. at 10165.  Although DoD removed these policies from the Code of Federal Regulations in 1998, they have continued under DoDI 1332.14.  *See* 63 Fed Reg. 56081, 56081 (Oct. 21, 1998).  Far from being a departure from its past practice, as Plaintiffs contend, the time-in-service requirements in the October 13, 2017 Memorandum returned DoD's process for making honorable service determinations to what had existed previously:  ensuring that the requesting service member had a sufficient service record to allow DoD to make an informed determination about the characterization of his or her service.

2.      <u>O-6 requirement</u>

Equally flawed is Plaintiffs' claim that the O-6 requirement is arbitrary and capricious. Here, the Administrative Record demonstrates that DoD arrived at that decision after reviewing more than 700 N-426s that were certified in 2016 and 2017, which revealed that in many instances the certifying official was so junior as to not be qualified to sign performance reviews. *See* Miller Decl. ¶ 5; SAMMA_0169-210.  DoD accordingly designated commissioned officers in the pay grade of O-6 or higher to be the certifying authority.  Materials considered by DoD in implementing the O-6 requirement shows that these officers "are the final authority on everything that occurs in units they hold charge of" and are "responsible for everything their units do or fail to do."  *See* SAMMA_0165 (further describing the rank as "a highly prestigious position, . . . achieved only by the most qualified of officers"); SAMMA_0142 (stating that the rank of colonel (an O-6 pay grade in the Army) "is realized by a select few and truly constitutes the elite of the officer corps," whose "maximum contribution to the Army is made as commanders and senior staff officers").  Here, too, the Administrative Record evidences that the O-6 requirement promotes consistency between service characterizations made for purposes of naturalization and similar determinations made elsewhere throughout the military.  DoDI 1332.14, for example, permits delegation of certain honorable service characterizations during times of mobilization or "other appropriate circumstances" to officers with general court-martialing convening authority, *see* SAMMA_0089, and commissioned officers in the pay grade of O-6 possess such authority, *see* Miller Decl. ¶ 8 (citing 10 U.S.C. § 823).

Further developments after issuance of the O-6 requirement confirm its validity.  First, this Court in *Kirwa* incorporated DoD's selection of the O-6 pay grade as its certifying authority as part of its preliminary injunction.  *See* Am. Order *Kirwa*, 17-cv-1793-ESH, ECF No. 32 at 2.

Second, the 2020 NDAA specifically directed DoD to designate "an appropriate level for the certifying officer," 2020 NDSS § 526, and one chamber of Congress voted to impose the O-6 requirement, *see* H. Rpt. 116-333 at 1208. In this sense, the O-6 requirement presents the exact opposite of one of the hallmarks of arbitrariness: rather than "rel[ying] on factors which Congress has not intended it to consider" in violation of the APA, *see State Farm*, 463 U.S. at 43, the O-6 requirement is consistent with a specific Congressional directive. These circumstances further undercut Plaintiffs' suggestion that DoD is bound to permit certification by "a broad range of military personnel with access to an individual's service record." *See* Pls.' Mot. at 23. And Defendants' O-6 requirement cannot be arbitrary or capricious under such circumstances.

**D.     The challenged policies are neither contrary to law nor in excess of DoD's authority under § 1440**

Plaintiffs also claim that the time-in-service requirements and O-6 requirement must be set aside under 5 U.S.C. § 706(2)(A) and § 706(2)(C) as "not in accordance with law and in excess of statutory jurisdiction or authority." Compl. ¶ 159-61. Specifically, Plaintiffs claim that the policy "violates the INA and its implementing regulations and exceeds DoD's . . . duty to certify the honorable service of non-citizens serving during wartime pursuant to 8 U.S.C. § 1440 and its implementing regulations." Compl. ¶ 161. But DoD's policies for determining whether a service member has served "honorably" or not under § 1440 represent a more-than-reasonable construction of the agency's authority under the statute. The Supreme Court long ago held that the military acts "within its power" by requiring a minimum time-in-service before it characterizes service as "honorable" because that characterization of service is reserved for "soldiers who performed military service after having become fully and finally absorbed into that service." *Patterson*, 329 U.S. at 542. And requiring a military officer of a significant enough

31

pay grade to understand the significance of characterizing service as "honorable," is not only a reasonable interpretation of § 1440, but an interpretation fortified by Section 526 of the National Defense Authorization Act for Fiscal Year 2020, Pub. L. 116-92, 133 Stat. 1198.

As Plaintiffs recognize, the Court must analyze the October 13 Memorandum under § 706(2)(C) by applying "the well-known *Chevron* framework." *Ass'n of Private Sector Colls. & Univs. v. Duncan*, 681 F.3d 427, 441 (D.C. Cir. 2012).[12]   Under that framework, the Court must first determine, using traditional tools of statutory construction, "whether Congress has directly spoken to the precise question at issue." *Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 842, 843 n.9 (1984).  If Congress's intent is clear, "that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Id*. at 842-843.  If, however, Congress was "silent or ambiguous with respect" to the challenged issue, the Court then assesses whether the agency's interpretation "is based on a permissible construction of the statute." *Id*. at 843.  The Court must defer to Defendants' interpretation of the statute if it is reasonable "even if the agency's reading differs from what the court believes is the best statutory interpretation." *Nat'l Cable & Telecomm. Ass'n v. Brand X Internet Servs.*, 5445 U.S. 967, 980 (2005).

Under *Chevron* step one, the Court must "determine whether the language at issue has a plain and unambiguous meaning with regard to the particular dispute." *Robinson v. Shell Oil Co.*, 519 U.S. 337, 340 (1997).  The Court asks "whether Congress has directly spoken to the precise question at issue," *Chevron*, 467 U.S. at 842, which must "be interpreted tightly," *Cent. States Motor Freight Bureau, Inc. v. ICC*, 924 F.2d 1099, 1104 (D.C. Cir. 1991).  In accordance with these standards, Plaintiffs can prevail at this step if, and only if, they can show that their

---

[12] *Chevron* governs claims under both 5 U.S.C. § 706(2)(A) and § 706(2)(C).  *Am. Bankers Ass'n v. Nat'l Credit Union Admin.*, 934 F.3d 649, 662 (D.C. Cir. 2019).

reading is "the only possible interpretation."  *See Regions Hosp. v. Shalala*, 522 U.S. 448, 460 (1998) (citations omitted).  Plaintiffs have failed to meet that burden here.

Section 1440 provides that DoD "shall determine whether [non-U.S. citizen service members] have served honorably in an active-duty status, and whether separation from such service was under honorable conditions."  8 U.S.C. § 1440(a).  The statute makes two references to DoD's role in the naturalization process, and, in both places, the only criteria imposed by Congress is that the service must have been (1) honorable and (2) in an active-duty status.  *See* 8 U.S.C. § 1440(a) ("The executive department under which such person served shall determine whether persons have served honorably in an active-duty status . . . ."); § 1440(b)(3) ("[S]ervice in the military, air or naval forces of the United States shall be proved by a duly authenticated certification from the executive department under which the applicant served or is serving, which shall state whether the applicant served honorably in an active-duty status . . . .").  Nowhere in § 1440(a) or elsewhere in the Immigration and Nationality Act ("INA") did Congress set forth what it means to have "served honorably" in the Selected Reserve or on active duty, nor does the statute prescribe the form and manner in which DoD must certify service as honorable.  Because Congress did not define what it means to have "served honorably," and because the meaning of that term is not self-evident, Congress decided that its meaning "would be resolved, first and foremost, by the [military], and desired the [military] (rather than the courts) to possess whatever degree of discretion" the term "served honorably" to allow.  *See City of Arlington v. FCC*, 569 U.S. 290, 296 (2013); *see also Wash. Hosp. Ctr. v. Bowen*, 795 F.2d 139, 143 (D.C. Cir. 1986) ("If a statute is silent or ambiguous, a court may assume that Congress implicitly delegated the interpretive function to the agency . . . ." (citation omitted)).  Defendants' policy of establishing criteria for what constitutes honorable service is consistent with the express language of § 1440.

33

Plaintiffs raise several arguments that the time-in-service requirements and O-6 requirement fail at *Chevron* step one, only one of which actually addresses DoD's longstanding minimum length-in-service requirement for characterizing service as "honorable." Specifically, Plaintiffs claim that § 1440 unambiguously requires the military to certify service members as having honorably served even in the absence of any substantive service record upon which to make that decision. Pls.' Mot. at 27. But "Congress knows how to speak in plain terms when it wishes to circumscribe, and in capricious terms when it wishes to enlarge, agency discretion," *Arlington*, 569 U.S. at 286, and nothing in the statute indicates that the military is required to certify a service member as having served honorably on the basis of a barebones record associated with a brief period of service, as Plaintiffs contend. Rather, courts have made clear that any formal characterization of service "must be based 'upon the record of the member's military service.'" *Gay Veterans Ass'n, Inc. v. Sec'y of Defense*, 668 F. Supp. 11, 16 (D.D.C. 1987), *aff'd* 850 F.2d 764 (D.C. Cir. 1988) (quoting *Harmon v. Brucker*, 355 U.S. 579, 581 (1958)). There must be "a direct nexus between the conduct authorizing" the characterization of service "and the actual performance of military duties." *Id*. at 19. And with respect to the requisite amount of service necessary for DoD to make such a determination, the Supreme Court established more than seventy years ago that the military acts "within its power" when declining to characterize a *de minimis* service record as "honorable." *See Patterson*, 329 U.S. at 542 (noting that an honorable service characterization is reserved for "soldiers who performed military service after having become fully and finally absorbed into that service").[13]

---

[13] Plaintiffs' reliance on the fact that § 1440 is "backwards looking," *see* Pls.' Mot. at 27, is unavailing for these same reasons. The statute plainly does not permit Defendants to characterize service based on a service member's unknown future actions or conduct, nor does the challenged policy permit Defendants to do so. But that does not mean that the military is required to characterize a soldier's service as "honorable" in the absence of a developed service

Furthermore, Plaintiffs' argument that the military must characterize a mere scintilla of service as "honorable" is contrary to principles of administrative law indicating that an agency "should normally be allowed to 'exercise its administrative discretion in deciding how, in light of internal organization considerations, it may best proceed to develop the needed evidence'" to make necessary agency findings. *See Vt. Yankee Nuclear Power Corp. v. Nat. Res. Defense Council, Inc*., 435 U.S. 519, 544 (1978) (quoting *FPC v. Transcontinental Gas Pipe Line Corp.*, 423 U.S. 326 (1976)).  This administrative discretion includes the "time dimension of the needed inquiry." *Id*. at 545 (quoting *SEC v. Chenery Corp.*, 332 U.S. 194, 196 (1947)).

Plaintiffs remaining arguments on this point are trivial or immaterial.  Plaintiffs claim that § 1440 "clearly establishes that service members must meet a single requirement to obtain a certification of honorable service so that they may apply for naturalization: they must have 'served honorably.'"  Pls.' Mot. at 26.  But this argument just sidesteps the issue, begging the question of what Congress intended by the phrase "served honorably."  As noted above, the long history of that phrase as construed by courts, Congress, and the military demonstrates that it means something more than a *de minimus* time in service.

Congress also could have used a different term to describe the requisite type of service necessary for naturalization.  *See, e.g.*, 38 U.S.C. § 101(2) (defining "veteran" to mean "a person who served in the active military, naval, or air service . . . *under conditions other than dishonorable*" (emphasis added).  Congress, however, did none of these things in § 1440, instead employing a military phrase that calls on DoD to make an evaluative judgment of a member's

---

record on which to base its determination.  Section 1440 contains no requirement that the military certify *de minimus* service as having been "honorable."  Section 1440's retrospective language, moreover, supports Defendants' reading that a characterization of "honorable" must be based on substantial service record evidence.  If Congress had intended Plaintiffs' reading, a more natural choice of language would have been "is serving honorably" instead of "has served honorably."

service based on a sufficient record of that service.  *See BedRoc Ltd., LLC v. United States*, 541 U.S. 176, 183 (2004) (holding that courts must "presume that the legislature says in a statute what it means and means in a statute what it says there") (internal citation omitted).

Plaintiffs also argue that Defendants have no role in implementing or enforcing the naturalization laws of the United States, *see* Pls.' Mot. at 27-28, but Defendants never professed to do any such thing.  Rather, Defendants are merely exercising their obligation under the statute. And the plain language of the statute makes that obligation clear:  as "[t]he executive department" under which § 1440 naturalization applicants have served is charged with the responsibility for "*determin[ing]* whether [such] persons have served honorably in an active-duty status, and whether separation from such service was under honorable conditions."  8 U.S.C. § 1440 (emphasis added).  To be sure, if "honorable" were a term used throughout the INA in immigration and naturalization contexts, the immigration agencies might receive deference for its interpretation of the term.  But as explained above, *see* Part II(A), "honorable" is a longstanding military characterization of service that must be applied similarly to all service members regardless of whether they are applying for naturalization under § 1440, *see Patterson*, 329 U.S. at 542; *United States v. Kelly*, 82 U.S. 34, 36 (1872); *Bland v. Connally*, 293 F.2d 852, 853 n.1 (D.C. Cir. 1961).  Far from constituting an effort to enforce immigration laws, the time-in-service requirements simply reflect Defendants' fulfilling its long-standing role to make an evaluative determination about the character of a service member's service.

The legislative history fortifies the conclusion that Congress intentionally left the construction of the term "honorable service" to the agency charged with making honorable service determinations.  The Nationality Act of 1940, which authorized naturalization for persons serving in the Armed Forces, required proof of honorable service "by duly authenticated copies

of records of the executive departments having custody of the records of such service." Pub. L. No. 76-853, § 324(e), 54 Stat. 1137, 1150.

But without explicit language making clear the military's discretion over honorable service determinations, that version of the statute proved difficult to administer. Shortly after the conclusion of World War II, for instance, a trial court judge reviewed a veteran's application for naturalization under the 1940 version of the statute. *See Fong Chew Chung v. United States*, 149 F.2d 904, 905-06 (9th Cir. 1945). The veteran petitioning for citizenship had served in the army during World War II and received a discharge stating that he was "hereby Honorably Discharged from the military service of the United States of America." *Id*. at 905. Nevertheless, the trial court judge erroneously determined that "'Honorably Discharged' as used in the certificate of discharge does not mean the same as 'served honorably,' which is used in the statute." *Id*. at 906. Substituting his judgment for that of the military, the judge held that the veteran "could not qualify under the statute." *Id*. at 906. The Ninth Circuit reversed the trial court judge, explaining that "[a]n honorable discharge connotes that the holder has been a member of the military organization of the country and that his conduct while in such organization has been such as to . . . certify that it has been honorable." *Id*.

Congress amended the statute in 1948 to address the "difficulties which arose in connection with the administration of section 701 [which were] to be avoided" and "eliminate[d]." H. Rep. No. 80-1408 at 3 (1948) (quoting letter from H. Graham Morison, Acting Assistant to the Attorney General, Dep't of Justice, to Earl C. Michener, Chairman, House Committee on the Judiciary, July 3, 1947). In so doing, Congress added the specific statutory provision at issue in this case: "The executive department under which such person served shall determine whether persons have served honorably." Pub. L. 80-567, 62 Stat. 281.

Congress also amended the statute to provide certification of that requirement either by "affidavits . . . of at least two . . . members of the military or naval forces of a noncommissioned or warrant officer grade" or "by a duly authenticated certification from the executive department under which the petitioner is serving." *Id*.  When Congress passed the Immigration and Nationality Act four years later, it retained this requirement, mandating that noncitizen soldiers submit a certified statement from the executive department under which the soldiers served, affirming that their service was honorable (essentially the same rules that apply today).  Pub. L. No. 82-414, §§ 328(b)(3), 329(b)(4), 66 Stat. 163, 249-50.

Having demonstrated that § 1440 does not address the amount of time permitted for making honorable service determinations, Defendants likewise should prevail at the second step of the *Chevron* analysis.  Courts "defer at step two to the agency's interpretation so long as the construction is 'a reasonable policy choice for the agency to make.'"  *Brand X*, 545 U.S. at 986 (quoting *Chevron*, 467 U.S. at 845)).  "[I]f the agency's decision makes it to step two, it is upheld almost without exception."  *Mohon v. Agentra, LLC*, 400 F. Supp. 3d 1189, 1220 (D.N.M. 2019).  It is plainly reasonable for the military to require some reasonably substantial record of service on which to characterize service as "honorable."  *See Patterson*, 329 U.S. at 542.  Otherwise, the military risks characterizing a soldier's record as honorable based only on a "mere scintilla" of service, as opposed to "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *See Consolidated Edison of N.Y. v. NLRB*, 305 U.S. 197, 229 (1938).  Indeed, courts routinely reprimand agencies for making findings on an insufficient record.  *Cf.*, *e.g.*, *Simms v. Sullivan*, 877 F.2d 1047, 1050 (D.C. Cir. 1989) (quoting *Diabo v. Sec'y of HEW*, 627 F.2d 278, 281 (D.C. Cir. 1980)) (SSA has duty "to develop the comprehensive record required for a fair determination of disability").  And the D.C. Circuit has

indicated that characterizations of military service may be reversed if "not based on substantial evidence." *Gay Veterans Ass'n v. Sec'y of Defense*, 850 F.2d 764, 768 (D.C. Cir. 1988) (quoting *Chappell v. Wallace*, 462 U.S. 296, 303 (1983)).  In fact, it is *Plaintiffs*' interpretation of § 1440 that is unreasonable because it effectively construes an important statutory requirement— "honorably"—out of existence by eliminating any evaluative component to that term.  *See AT&T Corp. v. Iowa Utils. Bd.*, 525 U.S. 366, 388-92 (1999) (agency interpretation unreasonable when it disregarded statutory term).

The time-in-service requirements, moreover, reasonably distinguish between active-duty soldiers, those serving in hazardous areas, and those serving as reservists.  Because reservists do not serve full-time, they typically will have not have developed a sufficient service record for characterization at 180 days of service.  *See* SAMMA_0055 (describing the occasions on which reservists will serve in an active-duty capacity).  And service members who are deployed to combat zones or to hazardous areas will typically have a sufficiently developed record of service. *See* 10 U.S.C. § 671(b) (stating that, even in a time of war, a service member deployed overseas must have a minimum of twelve weeks of basic training, with limited exceptions).  And Section IV of the October 13, 2017 Memorandum permits additional exceptions when it is clear, for any other reason, that a service member's record establishes a characterization of service as "honorable."  *See* SAMMA_0009.

For all of these reasons, Plaintiffs' challenge fails both steps of the *Chevron* test.

2.     O-6 requirement

Nothing in § 1440 indicates that DoD is foreclosed from deciding the appropriate rank of military official responsible for certifying service as "honorable," and DoD's decision to require an officer serving in the pay grade of O-6 or higher is both reasonable and consistent with the

"'wide discretion'" any agency has "in making line-drawing decisions." *Nat'l Shooting Sports Found., Inc. v. Jones*, 716 F.3d 200, 214 (D.C. Cir. 2013) (quoting *WorldCom, Inc. v. FCC*, 238 F.3d 449, 462 (D.C. Cir. 2001)). Plaintiffs make no argument to the contrary, nor do Plaintiffs make any effort to assert that the O-6 requirement exceeds Defendants' statutory authority. *See* Pls.' Mot. at 26-28. Plaintiffs' failure to address the O-6 requirement in their Motion may be for good reason: the 2020 NDAA expressly requires the "Secretary of Defense" to "publish regulations for submission and processing of" N-426 forms, including designating "the appropriate level for the certifying officer." 2020 NDAA § 526. Because Congress compelled DoD to select the appropriate rank for the certifying official, Defendants' designation of commissioned officers in the pay grade of O-6 is plainly authorized by the 2020 NDAA.[14] *See Cigar Ass'n of Am. v. FDA*, 315 F. Supp. 3d 143, 177, 180 (D.D.C. 2018) (agency interpretation valid under *Chevron* framework when "compelled by statute").

### E.  DoD was not required to undertake notice-and-comment rulemaking to promulgate the challenged policies

For their final challenge, Plaintiffs claim that because the October 13 "Policy is a substantive rule promulgated without the notice and comment period, it violates 5 U.S.C. § 553 and is therefore invalid." Compl. ¶ 166. But in so alleging, Plaintiffs overlook the fact that

---

[14] The reasonableness of Defendants' decision to require an officer serving in the pay grade O-6 or higher is again supported by the legislative history of the 2020 NDAA. Even though the final bill reflects the Conference Committee's decision to defer to DoD's judgment on this question, a majority of the House of Representatives had voted to ratify DoD's decision that an O-6 level officer is appropriate. *See* H. Rpt. 116-333 at 1208 ("The House amendment contained a provision . . . that would require the secretary of a military department or a designated commissioned officer serving in the pay grade of O-6 or higher to . . . provide [Form N-426] certification."). This congressional debate, moreover, took place against the backdrop of DoD already having imposed the O-6 requirement in October 2017. Defendants' exercise of its statutory authority cannot be said to be unreasonable where one branch of Congress affirmed its prior decision. The same is true in light of this Court's inclusion in *Kirwa* of the O-6 requirement in its preliminary injunction order as well. *See* Am. Order, *Kirwa v. Dep't of Defense*, 17-cv-1793, ECF No. 32 (Oct. 27, 2017).

§ 553 carves out exceptions for "(1) a military or foreign affairs function of the United States; or (2) a matter relating to agency management or personnel or to public property, loans, grants, benefits, or contracts." 5 U.S.C. § 553(a). The challenged policy meets both exceptions, so Plaintiffs' claim fails as matter of law.

First, the challenged policy is exempt from notice-and-comment rulemaking because it qualifies as "a military . . . function of the United States." 5 U.S.C. § 553(a)(1). Congress intended this exemption to apply broadly. *See* Tom C. Clark, *Attorney General's Manual on the Administrative Procedure Act* 26 (1947) ("The exemption for military . . . functions is not limited to activities of the War and Navy Departments but covers all military . . . functions of the Coast Guard and to [certain functions] of the Federal Power Commission."); *see also Goldman v. Sec'y of Defense*, 734 F.2d 1531, 1537 (D.C. Cir. 1984) ("[T]he efficacy or inefficacy of measures allegedly designed to serve a military purpose and taken by those to whom judgment on military affairs is entrusted does not alter their status as military matters.").

Here, Plaintiffs' challenge implicates Defendants' certification of honorable service under 8 U.S.C. § 1440, which is a quintessentially military function. *See United States v. Kelly*, 82 U.S. 34, 36 (1872) (describing an honorable characterization of service as a "formal, . . . judgment passed by the Government upon the entire military record of the soldier, and an authoritative declaration by it that he had . . . served in a status of honor"). The statutory history confirms the notion that characterizing military service under § 1440 is a military function. The Nationalization Act of 1940 gave the right to citizenship to certain people who had "served honorably" in the military. *See* Pub. L. 76-853 § 324. And after one court applying the section erroneously second-guessed the military's characterization of service for an applicant seeking naturalization, *see Fong Chew Chung*, 149 F.2d at 905-06, Congress amended the statute in 1948

41

to, among other things, insert the sentence at issue in this case tasking the military "executive department under which such person serve[s]" with making the determination as to whether an applicant has served honorably in the military, *see* Pub. L. 80-567.  As the House Report accompanying the bill indicates, the redraft was made to address "certain difficulties which arose in connection with the administration of [the original act]," House Rep. 80-1408, such as independent judicial determinations of whether a solider had served honorably, *see Fong Chew Chung*, 149 F.2d at 905-06.  Congress made clear with this amendment that characterizing service under § 1440 is an action exclusively within the province of the military.  As such, § 553 exempts DoD from engaging in notice-and-comment rulemaking when promulgating policies concerning honorable service certifications.

Second, and in addition to the military function exemption, the challenged policy is exempt because it "involve[s] . . . a matter related to agency management or personnel."  5 U.S.C. § 553(a)(2).  Specifically, the policy governs various facets of the honorable service determination, including the amount of time needed for military personnel to have served in order for the military to determine whether that service is honorable and what level of pay grade makes that determination.  Such a "character of service determination is . . . an administrative personnel action."  47 Fed. Reg. 10162, 10168 (Mar. 9, 1982).

To be sure, "a rule may not be characterized as one of 'management' or 'personnel' if it has a substantial effect on persons outside the agency."  *Stewart v. Smith*, 673 F.2d 485, 498 (D.C. Cir. 1982).  But that concern does not apply here.  Unlike, for example, a new post office policy directing postal workers to route mail by the most expeditious air service, without regard to the type of aircraft used, affecting a third-party airline's authority to carry mail, *see Seaboard World Airlines, Inc. v. Gronouski*, 230 F. Supp. 44, 45-46 (D.D.C. 1964), the challenged policy

42

affects only service members who are serving or who have served in the military and seek a characterization of their service. And while discharged members who have separated from the military can still seek N-426 certification, but their characterization of service under an N-426 must be based on the member's record of service in the military. This is akin to a reference provided by a former employer. *See Stewart*, 673 F.2d at 498-99 (holding that agency's age requirement does not substantially effect persons outside the agency because effect on those outside agency "is akin to that of any hiring standard"). Defendants are therefore also exempt from notice-and-comment rulemaking pursuant to the agency management and personnel exemption.

## III.     PLAINTIFFS ARE NOT ENTITLED TO MUCH OF THE RELIEF THEY SEEK

As a final matter, even if the Court were to conclude that Plaintiffs should prevail on any of their APA claims, Plaintiffs would still not be entitled to much of the relief requested in the Complaint. Unlike in a "garden variety civil suit," a district court in reviewing a final agency action "does not perform its normal role, but instead sits as an appellate tribunal." *Palisades Gen. Hosp. Inc. v. Leavitt*, 426 F.3d 400, 403 (D.C. Cir. 2005) (citation omitted). Accordingly, "under settled principles of administrative law, when a court reviewing agency action determines that an agency made an error of law, the court's inquiry is at an end: the case must be remanded to the agency for further action consistent with correct legal standards." *Id*. (citation omitted); *see also N. Air Cargo v. U.S. Postal Serv*., 674 F.3d 852, 861 (D.C. Cir. 2012) ("When a district court reverses agency action and determines that the agency acted unlawfully, ordinarily the appropriate course is simply to identify a legal error and then remand to the agency, because the role of the district court in such situations is to act as an appellate tribunal."). A district court

lacks authority to order specific relief where it finds a § 706(2) violation.  *Palisades Gen. Hosp.*,
426 F.3d at 403.

Given these limits on judicial power to remedy APA violations, the Court is without
authority to grant Plaintiffs several forms of relief that they request in their Complaint.  For
example, Plaintiffs request that the Court "enjoin[] Defendants from withholding certified Form
N-426s from Plaintiffs . . . pursuant to the N-426 Policy."  Compl., Prayer for Relief.  And they
request that the Court "[e]njoin Defendants from withholding certified N-426s from Plaintiffs . . .
who have served honorably for one day or more, except where a Plaintiff . . . has not served
honorably as reflected in that individual's service record and based on sufficient grounds
generally applicable to all members of the military" and from refusing to certify honorable
service "except as related to the conduct of an individual soldier as reflected in that soldier's
service record and based on sufficient grounds generally applicable to all members of the
military."  *Id*.  Yet these are precisely the types of relief that are not available under § 706(2) and
cannot be granted in the event that Plaintiffs prevail on that claim only.

Nor are Plaintiffs entitled to an order requiring Defendants to certify their service as
"honorable."  A court's power to compel agency action to redress a § 706(1) violation is limited
to the specific action unlawfully withheld or unreasonably delayed, *see NAACP v. HUD*, 817
F.2d 149, 160 (1st Cir. 1987); *Silva v. Sec'y of Labor*, 518 F.2d 301, 310-11 (1st Cir. 1975), and
here that action is an honorable service *determination*, not an automatic finding of
honorableness.  For the same reasons, the Court should not award Plaintiff an order
"[e]njoin[ing] Defendants from discharging or separating Plaintiffs . . . pending completion of
their Form N-426s and processing of their naturalization applications."  *See* Compl., Prayer for
Relief.  Defendants' purported failure to act under § 1440 pertains only to characterizations of

service and the statute says nothing about DoD foregoing separations while naturalization applications are pending.  Moreover, the Court should be reluctant to issue any order that would disturb the thirty-day timeline set by Defendants in the April 24, 2020 Memorandum, given the broad discretion over the pace of adjudicating requests for honorable service certification delegated to the military by Congress in the 2020 NDAA.

## **CONCLUSION**

For the foregoing reasons, the Court should grant Defendants' Cross-Motion for Summary Judgment and deny Plaintiffs' Motion for Summary Judgment.


Dated: May 22, 2020                    Respectfully submitted,

                                       JOSEPH H. HUNT
                                       Assistant Attorney General

                                       ANTHONY J. COPPOLINO
                                       Deputy Branch Director
                                       Federal Programs Branch

                                       */s/ Nathan M. Swinton*
                                       NATHAN M. SWINTON
                                       Senior Trial Counsel
                                       LIAM HOLLAND
                                       Trial Attorney
                                       U.S. Department of Justice
                                       Civil Division, Federal Programs Branch
                                       1100 L Street NW, Room 12022
                                       Washington, DC 20530
                                       Tel: (202) 305-7667
                                       Fax: (202) 616-8470
                                       Email: Nathan.M.Swinton@usdoj.gov

                                       *Attorneys for Defendants*