IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| ANGE SAMMA *et al.*, on behalf of themselves and others similarly situated,<br><br>*Plaintiffs,*<br><br>v.<br><br>UNITED STATES DEPARTMENT OF DEFENSE *et al.*,<br><br>*Defendants.* | No. 1:20-cv-01104-ESH |

**PLAINTIFFS' FURTHER SUPPLEMENTAL BRIEF IN SUPPORT OF
PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

Jennifer Pasquarella
Michelle (Minju) Cho
American Civil Liberties Union Foundation
  of Southern California
1313 West 8th Street
Los Angeles, CA 90017
(213) 977-5236
jpasquarella@aclusocal.org
mcho@aclusocal.org

Scarlet Kim (D.D.C. Bar No. NY0329)
Noor Zafar*
Jonathan Hafetz (D.D.C. Bar No. NY0251)
Brett Max Kaufman (D.D.C. Bar No. NY0224)
American Civil Liberties Union Foundation
125 Broad Street, 18th Floor
New York, NY 10004
(212) 549-2500
scarletk@aclu.org
nzafar@aclu.org
jhafetz@aclu.org
bkaufman@aclu.org

Arthur B. Spitzer (D.C. Bar No. 235960)
American Civil Liberties Union Foundation
  of the District of Columbia
915 15th Street, NW, 2nd Floor
Washington, DC 20005
(202) 601-4266
aspitzer@acludc.org

*Admitted *pro hac vice*

*Counsel for Plaintiffs*

Pursuant to the Court's invitation during the July 16, 2020 hearing on Plaintiffs' Motion for Summary Judgment, ECF No. 4, Plaintiffs' Motion for Class Certification, ECF No. 5, and Defendants' Cross-Motion for Summary Judgment, ECF No. 19, Plaintiffs hereby file this supplemental brief to further address their challenge to the O-6 requirement in the N-426 Policy. *See* Am. Compl. ¶¶ 75, 90, 92, 100, 120–121; Pls.' Mot. for Summ. J. 7, 16, 19, 23. For clarity, the "O-6 requirement" refers to Defendants' requirement that a military officer with a rank of O-6 of higher certify a Form N-426. This requirement was first grounded in the October 13, 2017 N-426 Policy ("Oct. 2017 Memo"), SAMMA_0002, which was superseded by an identical requirement in Defendants' April 24, 2020 memorandum ("April 2020 Memo") (along with a 30-day timeline for returning a submitted N-426 to a service member), SAMMA_0001.

## I.    Plaintiffs Have Standing to Challenge the O-6 Requirement.

Plaintiffs Isiaka, Gunawan, and Machado have standing to challenge the O-6 requirement. Each Plaintiff has established "(1) an 'injury in fact,' (2) a sufficient 'causal connection between the injury and conduct complained of,' and (3) a 'likel[ihood]' that the injury 'will be redressed by a favorable decision.'" *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 157-58 (2014) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992)).

First, each Plaintiff continues to suffer injury due to his inability to obtain an N-426 and seek naturalization under 8 U.S.C. § 1440. *See Nio v. U.S. Dep't of Homeland Sec.*, 270 F. Supp. 3d 49, 62 (D.D.C. 2017); *Kuang v. U.S. Dep't of Def.*, 340 F. Supp. 3d 873, 921 (N.D. Cal. 2018); *Roshandel v. Chertoff*, 554 F. Supp. 2d 1194, 1200–01 (W.D. Wash. 2008). The injury Plaintiffs and similarly situated class members are suffering is significant. They are prevented from exercising the fundamental rights and benefits that accompany citizenship, such as voting in the upcoming presidential election. *See* Am. Compl. ¶ 147. Plaintiffs Isiaka and Machado

1

would also like to sponsor their immediate family members to immigrate to the United States but are not able to do so. *See* Am. Compl. ¶ 148. Further, each Plaintiff has been unable to pursue opportunities for professional advancement within the military because certain positions are only available to U.S. citizens. *See* Am. Compl. ¶¶ 158, 161, 163.[1]

Second, Plaintiffs' injury is fairly traceable to the O-6 requirement. There is no question that the O-6 requirement has applied to Plaintiffs since they began their service and were eligible for an N-426, and that it has been and continues to be one factor preventing them from receiving an N-426. At the time each Plaintiff became eligible for an N-426, he was subject to the O-6 requirement contained in the Oct. 2017 Memo, which preceded the National Defense Authorization Act for Fiscal Year 2020 ("2020 NDAA").[2] Today, each Plaintiff is subject to the identical O-6 requirement imposed by the April 2020 Memo in response to section 526 of the

---

[1] Service members with temporary immigration status, such as DACA recipients like Plaintiff Lee, or conditional LPRs such as Plaintiffs Gunawan and Park, suffer additional injury, including the potential for deportation, if their status expires before they obtain an N-426. Although the individual claims brought by Plaintiffs Lee and Park are moot, there are likely other putative class members who are similarly situated and are at risk of falling out of lawful immigration status (and being subject to deportation) due to the delays they have experienced in obtaining an N-426. Plaintiff Lee is an active duty MAVNI and Defendants have represented that there are "several hundred" MAVNIs "that are DEPs awaiting to access onto active duty and ship to basic training." *See* Tr. of Teleconference, at 9:11–13, June 26, 2020, Ex. 10. For conditional LPRs such as Plaintiffs Gunawan and Park, of which there may be hundreds or even thousands, the delay in obtaining an N-426 places them in the difficult situation of deciding whether to undertake the expense and effort of adjusting their status or allowing their conditional status to expire and living in immigration limbo until they obtain their N-426. *See* Am. Compl. ¶ 152; Park Decl. ¶¶ 20-21, ECF No. 4-25; Gunawan Decl. ¶ 7. Prior to filing the complaint in this case, Plaintiffs Park and Lee filed a Motion for Leave to Proceed under Pseudonyms, which was denied. In support of that Motion, these Plaintiffs submitted a declaration explaining the real risk of removal that conditional LPRs who do not timely file a petition to adjust their status face, notwithstanding their current military service. Stock Decl., Ex. 1 ¶¶ 5, 11.

[2] Plaintiff Isiaka began drilling in February 2020 and was eligible for a certified N-426 at that time. *See* Am. Compl. ¶ 106. Plaintiffs Gunawan and Machado shipped to basic training in February 2020 and January 2020, respectively, and were eligible for N-426s once they commenced basic training. *See* Am. Compl. ¶¶ 131, 138.

2020 NDAA. This requirement, which significantly narrows the number of military officials who can certify N-426s, converts a ministerial duty into a bureaucratic maze that artificially and (as explained below) unreasonably limits Plaintiffs' access to the N-426 certification to which they are entitled.[3] Plaintiffs must now submit their N-426s to an O-6—of which there are an exponentially smaller number than the previous range of officials who could certify the form—or send them up the chain of command, which can take a considerable amount of time. *See e.g.*, Bouomo Decl., ¶ 7, Ex. A, ECF No. 4-20; Samma Decl. ¶¶ 10, 13-14, ECF No. 4-23; Park Decl. ¶ 8; *see also* Zachary R. New, *Ending Citizenship for Service in the Forever Wars*, 129 Yale L.J., Feb. 11, 2020 ("Notably absent . . . are procedures that applicants can follow to have their forms signed by [an O-6]. . . . In practice, this policy requires an individual either to have some personal connection with one of the highest-ranking individuals in the Armed Forces or to submit their form through the chain of command in the hopes that it will reach an appropriate officer who will complete it properly and submit the original back to them—all while being subject to additional delays of 180 days or more before the entire process may even begin."); *The Impact of Current Immigration Policies on Service Members and Veterans, and Their Families: Hearing Before H. Subcomm. on Immigration & Citizenship*, 116th Cong. at 1:32:35-42 (2019) (statement of Margaret Stock, Attorney, Cascadia Cross Border Law Group LLC) ("Every day, I get a call from a green card holder in the military who says . . . I can't get anybody to sign my N-426."). The actual certification of an N-426 is straightforward and current instructions estimate

---

[3] An officer of O-6 pay grade is a full Colonel in the Army, Air Force, or Marines, the rank just below that of Brigadier General, and a Captain in the Navy and the Coast Guard, the rank just below that of Rear Admiral Lower Half. *See* Dep't of Def., U.S. Military Rank Insignia, https://www.defense.gov/Resources/Insignias. Colonels in the Army typically command brigade-sized units, consisting of several thousand soldiers. *See* U.S. Army, U.S. Army Ranks, https://www.army.mil/ranks/.

that it will take a certifying official just 45 minutes to complete. *See* Pls.' Opp. to Defs.' Mot. for Summ. J., ECF No. 21, Ex. 5, at 3 ("Pls.' MSJ Resp.").[4] And in the past, military officials regularly completed the form within days, sometimes within a single day. *See Kirwa v. U.S. Dep't of Def.*, 285 F.Supp.3d 21, 30, 36 (D.D.C. 2017). In this context, it is clear that the requirement that an officer of O-6 rank or higher sign the form is a factor in the delay Plaintiffs and putative class members are experiencing in obtaining an N-426.[5]

Finally, Plaintiffs' injury would be redressed by the relief they seek. In particular, they request that the Court order Defendants to use their best efforts to certify or deny their N-426s within two business days. Integral to the effectiveness of that relief is the fact that removing the O-6 requirement would permit far more officials to certify N-426s than under the current policy. This relief would end one factor in the delay Plaintiffs continue to experience in obtaining an N-426 and seeking naturalization. *See Nat'l Parks Conservation Ass'n v. Manson*, 414 F.3d 1, 7 (D.C. Cir. 2005) ("A significant increase in the likelihood that [a litigant] would obtain relief that directly redresses the injury suffered will suffice for standing." (quotation marks omitted)).

---

[4] Previous instructions, which expired on July 31, 2019, estimated that completing an N-426 should take no more than 20 minutes. PI Resp., Ex. 4, at 3.

[5] All Plaintiffs were entitled to an N-426 months ago. For Plaintiffs Gunawan and Machado, any additional delay is particularly egregious because they either have completed or are about to complete their training and will therefore ship to their duty stations soon. *See* Defs.' Am. Supp. Br. in Resp. to Pls' Mot. for Class Cert. 3, ECF No. 32. But Congress's explicit intent in 8 U.S.C. § 1440 was to ensure not only that non-citizens obtain an N-426, but also *naturalize*, before they ship to their duty stations, and potentially to combat zones. See 1968 Senate Committee on Judiciary Report, ECF No. 4, Ex. 3 at 14. Plaintiffs further note that the April 2020 Memo states that "[u]pon receipt" of the N-426, "*the certifying official* will process it with priority and return it to the Service member concerned within 30-days of submission." SAMMA_0001 (emphasis added). This language indicates the 30-day clock begins to run when the O-6 receives an N-426, and not when Plaintiffs submit the form to go up the chain of command to the O-6. If so, Plaintiffs may have to wait even longer than 30 days to obtain their N-426s.

## II. The O-6 Requirement Is Not Agency Action Committed to Agency Discretion by Law.

This Court has authority to review the O-6 requirement. The plain text of the 2020 NDAA, the relevant statutory scheme, internal military guidance, and past practice all demonstrate there is a meaningful standard for the Court to review the O-6 requirement.

The Supreme Court has long recognized a "presumption favoring judicial review of administrative action." *Block v. Cmty. Nutrition Inst.*, 467 U.S. 340, 349 (1984). In order "to honor the presumption of judicial review," the Court has "read the § 701(a)(2) exception for action committed to agency discretion 'quite narrowly, restricting it to those rare circumstances where the relevant statute is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion.'" *Dep't of Commerce v. New York*, 139 S. Ct. 2551, 2568 (1984) (citation omitted); *see also Cody v. Cox*, 509 F.3d 606, 610 (D.C. Cir. 2007) ("5 U.S.C. § 701(a)(2) provides a 'very narrow exception' that applies only in 'rare instances.'") (quoting *Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 410 (1971)). Moreover, the Court has "generally limited the exception to certain categories of administrative decisions that courts traditionally have regarded as 'committed to agency discretion,' such as a decision not to institute enforcement proceedings, or a decision by an intelligence agency to terminate an employee in the interest of national security." *Dep't of Commerce*, 139 S. Ct. at 2568 (citations omitted).

Discretion, even broad discretion, is not synonymous with *unreviewable* discretion. To determine if the narrow exception to unreviewability applies, the court must "consider both the nature of the administrative action at issue and the language and structure of the statute that supplies the applicable legal standards for reviewing that action." *Sec'y of Labor v. Twentymile Coal Co.*, 456 F.3d 151, 156 (D.C. Cir. 2006). Moreover, the D.C. Circuit has explained that

5

...

> a statute's grant of "broad discretion to an agency does not render the agency's decisions completely nonreviewable under the 'committed to agency discretion by law' exception" unless the court also determines that the "statutory scheme[,] taken together with other relevant materials, provides *absolutely no guidance* as to how that discretion is to be exercised."

*Make the Road N.Y. v. Wolf*, 962 F.3d 612, 632 (D.C. Cir. 2020) (quoting *Robbins v. Reagan*, 780 F.2d 37, 45 (D.C. Cir. 1985) (alteration in original)) (emphasis added); *see also Watervale Marine Co., Ltd. v. U.S. Dep't of Homeland Sec.*, 55 F.Supp.3d 124, 141 (D.D.C. 2018) ("[T]he D.C. Circuit has made clear that a grant of broad discretion in a statute, through permissive language or otherwise, does not necessarily mean there are no standards for the court to apply."). Indeed, "[e]ven when there are no clear statutory guidelines, courts often are still able to discern from the statutory scheme a congressional intention to pursue a general goal" and therefore "have a meaningful role to play in reviewing agency action." *Robbins*, 780 F.2d at 45–46.

First, the text of the statute itself provides a straightforward and meaningful standard against which this Court can evaluate Defendants' designation of an official to certify N-426s. Section 526 of the 2020 NDAA requires the Secretary of Defense to "designate the *appropriate level* for the certifying officer." Pub. L. 116-92, § 526 (emphasis added). Of course, that Congress required assignment of this duty to a level that is "appropriate" presupposes that there are officers for whom the duty would be inappropriate.

Second, the relevant statutory scheme—section 526 read together with 8 U.S.C. § 1440—gives meaningful context and content to the "appropriateness" standard. *See Overton Park*, 401 U.S. at 411 (considering two separate statutory provisions together to determine reviewability of agency action). As Plaintiffs have previously explained, Congress's intent in enacting section 1440, as reflected in its text, statutory scheme, and legislative history, was to ensure non-citizens serving during wartime could apply for naturalization almost immediately upon entering service.

*See* Pls.' MSJ Resp. 19–21, 35-37. Moreover, as this Court found in *Kirwa v. United States Department of Defense*, section 1440 establishes that Defendants play a ministerial role in this naturalization process, by certifying N-426s. 285 F. Supp. 3d 21, 37 (D.D.C. 2017) (explaining that "because it is a ministerial duty, certification of honorable service for purposes of . . . naturalization is unlikely to be committed to DOD's sole discretion or to be otherwise unreviewable"). This ministerial duty is further demonstrated by the text, structure, and history of section 1440 as well as its accompanying regulatory regime. *See* Pls.' MSJ Resp 24–29.

The intent of section 1440 and the ministerial role Congress assigned to Defendants make clear that Congress has provided a meaningful standard against which to evaluate Defendants' assignment of N-426 certification to only officers of O-6 pay grade and above. Specifically, Congress established a benchmark for the Court to evaluate whether the official DoD has designated comports with its intent that non-citizens seek naturalization almost immediately upon entering service and Defendants' attendant administrative role in facilitating this process. The record, *see supra* 3–4, and this Court's discussion of the timeliness of N-426 certifications in *Kirwa*, *see* 285 F.Supp.3d at 29, 36, establish that it is inappropriate to assign this role to a high-ranking official whose limited availability as a numerical and administrative matter will significantly delay certification of a form that Congress has indicated should be processed promptly and that, by its own instructions, should take no more than 45 minutes to complete.[6] Not even Defendants would dispute that it would be inappropriate to assign this role to a three-star general. The question here is whether the Court has a standard to evaluate whether the O-6

---

[6] This delay is exacerbated by the lack of procedures that exist for service members to obtain O-6 sign-off as well as the amount of time it takes for a form to go up the chain of command to an O-6. *See* New, *supra*, at 3.

rank is also too high. The plain text of the 2020 NDAA, read together with its relevant statutory scheme, establish unequivocally that it does.

Third, Defendants' own internal guidance helps inform whether assigning N-426 certification to only O-6 officers and above is "appropriate." The D.C. Circuit has observed that "judicially manageable standards 'may be found in formal and informal policy statements and regulations as well as in statutes.'" *Steenholdt v. Fed. Aviation Admin.*, 314 F.3d 633, 638 (D.C. Cir. 2003) (quoting *Padula v. Webster*, 822 F.2d 97, 100 (D.C. Cir. 1987)). In *Padula*, the D.C. Circuit stated that "internal guidelines and rules not formally promulgated have occasionally been held to bind agency conduct" and that even agency representations in letters to third parties "might well be sufficient to establish a binding policy." 822 F.2d at 100–01.

Here, the military continues to maintain a number of internal resources that state that a broad range of military personnel below the rank of an O-6 may certify N-426s.[7] For example, the U.S. Navy "Guide to Naturalization Applications Based upon Qualifying Military Service," states that

> With the aid of the . . . PSD/personnel offices, Command/Staff Judge Advocates, and/or Naval Legal Service Offices, the applicant will complete the application for naturalization and the command will forward it to the USCIS.

Ex. 2, at 2.[8] This guide is currently available on the U.S. Navy Judge Advocate General's Corps ("JAG") website. https://www.jag.navy.mil/legal_services/documents/Navy%20Immigration%20Guide.pdf [https://perma.cc/7XSL-GR9T] (last visited July 23, 2020).[9] Similarly, an Air Force

---

[7] As Plaintiffs describe in their Motion for Summary Judgment, prior resources also made such representations. *See* Pls.' Mem. in Supp. of Mot. for Prelim. Inj. 13-14, ECF No. 4 ("Pls.' MSJ").

[8] Plaintiffs included an excerpt of this guide as Exhibit 11 in their Motion for Summary Judgment, but did not include the page containing this language, which is included as an exhibit to this brief.

[9] The Navy JAG website also maintains another version of this guide, dated June 22, 2011, which contains the same language quoted above. Ex. 3, at 2, https://www.jag.navy.mil/

guide currently available on the Joint Base Elmendorf-Richardson website titled "Total Force U.S. Citizenship" identifies the "certifying official" for an N-426 to be an official in the "Military Personnel Section." Ex. 4, at 1, 3, 5–6, https://www.jber.jb.mil/Portals/144/Services-Resources/personnel/customer-support/Customer-service-Citizenship-and-Immigration.pdf [https://perma.cc/B3V7-NTTK] (last visited July 23, 2020). And the Eighth Army, based at Camp Humphreys in South Korea, currently maintains on its website a guide titled "Applying for Citizenship: A Guide for Servicemembers," which provides that the "personnel office will verify . . . service data and complete the back of Form N-426." Ex. 5, at 1, https://8tharmy.korea.army.mil/sja/assets/doc/legal/Applying_for_Citizenship_-_A_Guide_for_Servicemembers.pdf [https://perma.cc/F37P-BNLE] (last visited July 23, 2020). These internal military resources provide further guidance to the Court when assessing whether the certifying official DoD has designated is appropriate in light of Congress's intent in section 1440 and the agency's ministerial role in certifying N-426s.

Fourth, past practice supports the "appropriateness" standard as a meaningful one for evaluating the O-6 requirement. Traditionally, N-426s were certified in a matter of days, sometimes in a single day—and part of the reason is that certification duties were assigned to those officials whose prevalence and availability would permit this practice to occur. *See Kirwa*, 285 F.Supp.3d at 29, 36; *see also id.* at 29 (describing how "USCIS, in conjunction with the Army, adopted a 'Naturalization at Basic Training Initiative' in order to provide expedited processing of naturalization application for non-citizen enlistees *once they arrived at* [basic training]") (emphasis added); *Immigration and Service Hearings*, *supra*, at 1:31:51–57

---

organization/documents/Navy_Immigration_Guide.pdf [https://perma.cc/ZC3Z-YUSC] (last visited July 23, 2020). Both versions of the guide also note that the service member can submit an N-426 for completion to their "local service record holder." Ex. 2, at 4; Ex. 3, at 3.

9

(describing predecessor programs that "existed during World War I, World War II, Korean War, the Vietnam War"). That practice sets a baseline of expectations about "appropriateness" against which Congress was legislating when it passed the 2020 NDAA. *See United States v. Wilson*, 290 F.3d 347, 356 (D.C. Cir. 2002) ("*Longstanding practices* of the Executive Branch can place a gloss on Congress's action in enacting a particular provision." (highlighting a two-decade consistent practice) (emphasis added) (citation, quotation marks, and alterations omitted)).

Finally, Plaintiffs highlight the practical consequences that would befall Plaintiffs and putative class members were the Court to find the O-6 requirement to be unreviewable. Defendants have represented that Selected Reservists who complete 180 days of active duty service can receive a DD Form 214 to apply for naturalization under section 1440. Defs.' Further Supp. Br. in Resp. to Pls.' Mot. for Class Cert. 4–5, ECF No. 34 ("Defs.' Suppl. Br."). But unlike the N-426, DD Form 214 can be signed by a broad range of military officials, so long as they have at least a rank of E-6 (Navy) (*i.e.,* Petty Officer) or E-7 (Army) (*i.e.,* Sergeant First Class), as well as by civilian employees. *See* Army Regulation 635-8, Ex. 6, at 12; Bureau of Navy Personnel Instruction 1900.8E, Ex. 7, at 16. In other words, Defendants' own representation is that the O-6 requirement creates two anomalous processes with respect to how non-citizens can seek naturalization under section 1440—one requiring sign-off by a high-ranking commissioned officer and one permitting sign off by non-commissioned officers. If the Court accepts that Defendants have unreviewable discretion to determine who may certify an N-426, it will simply rubberstamp this inconsistency without subjecting Defendants' action to scrutiny.

### III. Even If the O-6 Requirement Is Agency Action Committed to Agency Discretion by Law, It Is Still Subject to Notice-and-Comment Rulemaking.

The D.C. Circuit has held that "[e]ven when a decision is committed to agency discretion by law, and so is immune from substantive review, the agency's decision may still be subject to notice-and-comment rulemaking." *Make the Road*, 962 F.3d at 634; *see also Lincoln v. Vigil*, 508 U.S. 182, 195 (1993) ("We next consider the Court of Appeals's holding, *quite apart from the matter of substantive reviewability*, that . . . the [agency] was required to abide by the familiar notice-and-comment rulemaking provisions of the APA.") (emphasis added); *Am. Med. Ass'n v. Reno*, 57 F.3d 1129, 1134 (D.C. Cir. 1995) ("[U]nder the APA the ultimate availability of substantive judicial review is *distinct* from the question of whether the basic rulemaking strictures of notice and comment and reasoned explanation apply."). Whether agency action may still be subject to notice-and-comment rulemaking, notwithstanding its substantive reviewability, depends on the relevant statute. *See Make the Road*, 962 F.3d at 634. In *Make the Road*, the D.C. Circuit emphasized that notice-and-comment rulemaking is designed "to subject agency decisionmaking to public input and to obligate the agency to consider and respond to the material comments and concerns that are voiced." *Id*. But because the relevant statute explicitly stated that the challenged agency action was "in the sole and unreviewable discretion" of the agency, the Court concluded that the agency was "under no duty to consider the views of others." *Id*. at 632. The Court also highlighted that the statute authorized the agency to change the challenged policy "'at any time,' which in this context necessarily means without taking the time" to undergo the rulemaking process. *Id*. at 635 (citation omitted).

Here, the Court should find that Defendants' "designat[ion of] the appropriate level for the certifying officer" is subject to notice-and-comment rulemaking even if it finds the ultimate decision committed to agency discretion by law, because the 2020 NDAA provides no basis to

11

conclude that Congress wished to exempt DoD from the usual procedures for agency decision-making. Pub. L. 116-92, § 526. Unlike the statute in *Make the Road*, section 526 of the 2020 NDAA contains no language indicating DoD is "under no duty to consider the views of others." *Id*. at 634. Rather, notice-and-comment rulemaking would provide the agency with "analysis and critique by interested parties," and would also enable the agency "to cover the relevant points and eschew irrelevances." *Am. Med. Ass'n*, 57 F.3d at 1134 (citation omitted). Moreover, unlike the statute in *Make the Road*, section 526 makes no indication that DoD is free to change its policy regarding certifying officers "at any time." 962 F.3d at 634. In fact, its directive that the "Secretary of Defense publish regulations" addressing the certifying officer reflects a desire for DoD to formalize this policy to a degree where subsequent changes would be subject to some measure of process. Pub. L. 116-92, § 526.

Defendants do not dispute that the O-6 requirement is a legislative rule subject to notice-and-comment rulemaking. *See* Tr. of Video Conference, at 81:4-12, July 16, 2020, Ex. 9. Rather, they assert only that the requirement is exempt from notice-and-comment rulemaking because it involves a military function or a matter relating to agency management or personnel. As Plaintiffs explained in their summary judgment briefing, neither exemption applies because the O-6 requirement concerns who may sign the N-426—a form *for a different agency's use* for *naturalization* purposes. *See* Pls.' MSJ Resp. 40–42. Thus, the O-6 requirement remains subject to the notice-and-comment rulemaking procedures. Because Defendants failed to adhere to these procedures, the Court should hold unlawful and set aside the O-6 requirement.

**IV.    The O-6 Requirement Is Arbitrary and Capricious.**

Under 5 U.S.C. § 706(2), a court is authorized to hold unlawful and set aside final agency action that is arbitrary and capricious. Agency action is arbitrary and capricious where "the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an

important aspect of the problem, [or] offered an explanation for its decision that runs counter to the evidence before the agency . . . ." *Motor Vehicles Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). The agency "must examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" *Id.* (quoting *Burlington Truck Lines v. United States*, 371 U.S. 156, 168 (1962)). Moreover, "the requirement that an agency provide reasoned explanation for its action would ordinarily demand that it display awareness that it *is* changing position." *F.C.C. v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009) (emphasis in original). Accordingly, agency action is "arbitrary and capricious if it departs from agency precedent without explanation." *Dillmon v. Nat'l Transp. Safety Bd.*, 588 F.3d 1085, 1090 (D.C. Cir. 2009); *see also Fox Television Stations*, 556 U.S. at 515 ("An agency may not . . . depart from a prior policy *sub silentio*" and "must show that there are good reasons for the new policy.").

As Plaintiffs discussed in their summary judgment briefing, the O-6 requirement is a radical departure from the prior practice of permitting a broad range of military personnel to verify service records and complete the N-426. *See Kirwa*, 285 F. Supp. 3d at 28–29 (citing Army and Navy guides); *see also* Navy Military Personnel Manual, Pls.' MSJ, Ex. 13, at 2. Both with respect to the Oct. 2017 memo and the April 2020 memo, Defendants point to no contemporaneous justification for this change in policy. Instead, Defendants rely exclusively on a *post hoc* declaration by Stephanie Miller. Pls.' MSJ Resp. 33–34. "It is a foundational principle of administrative law that judicial review of agency action is limited to the grounds that the agency invoked when it took the action." *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1907 (2020) (quotation marks and citation omitted).

Even if Miller's created-for-the-litigation explanation could be credited, it makes no sense in light of Defendants' most recent representations. In her declaration, Miller stated

13

> In many instances, the officials signing the forms held the grades of sergeant, 1st lieutenant, 2nd lieutenant, or major. Because these grades are generally not sufficiently senior to sign performance appraisals in the military and given the general lack of guidance to the Services on this issue, we saw a need to develop a standard policy for the appropriate grade.

Defs.' Cross-Mot. for Summ. J., ECF No. 19-1, Ex. 1 ¶ 5, ("Defs.' MSJ"). This justification is entirely undermined by Defendants' recent representation that some Selected Reservists may seek naturalization under 8 U.S.C. § 1440 by using a DD Form 214, rather than a Form N-426. Defs.' Suppl. Br. 4–5 ("Upon completion of IET, a reservist is discharged from active duty back to the reserves and receives a DD Form 214 . . . . Very likely, a DD Form 214 received after successful completion of IET will characterize a service member's service as honorable and can thus provide a basis for naturalization."). As explained above, DD Form 214 can be signed by a broad range of military officials, so long as they have at least a rank of E-6 (Navy) or E-7 (Army), as well as by civilian employees. Ex. 4, at 12; Ex. 5, at 16. In the Army, an E-7 corresponds to a Sergeant First Class, which is a rank below that of a 1st Lieutenant, 2nd Lieutenant, or Major, grades that Miller asserted were "not sufficiently senior" to certify honorable service. Thus, according to Defendants, some non-citizens may use a form signed by non-commissioned officers (or even civilian employees), while others are required to use a form that must be signed by a high-ranking officer, to seek naturalization under section 1440. These disparate processes for seeking naturalization under section 1440 lay waste to Miller's claim that the O-6 requirement is designed to "to ensure that a sufficiently senior official was making the honorable service [certification]" and "to develop a standard policy for the appropriate grade." Defs.' MSJ, Ex. 1 ¶¶ 5, 8.

Plaintiffs further note that, more broadly speaking, Miller is wrong that "the grades of sergeant, 1st lieutenant, 2nd lieutenant, or major" are "generally not sufficiently senior to sign

performance appraisals in the military." It is not clear what relevance "performance appraisals" have for Defendants' ministerial duty to certify honorable service under section 1440. But in any event, the military's policies on performance appraisals vary across the branches. *See* Chaitra M. Hardison et al., Rand Corp., *360-Degree Assessments: Are They the Right Tool for the U.S. Military* 17 (2015) ("Each service has developed its own philosophy, policies, and procedures for evaluating the performance and potential of its officers."). In many circumstances, the grade of the appraiser is scaled to the grade of the appraisee and can include someone immediately above the appraisee in the chain of command. For example, Army Regulation 623-3, "Evaluation Reporting System," provides that "[t]he rater will be the immediate supervisor of the rated Soldier responsible for directing and assessing the rated Soldier's performance." Army Reg. 623-3, Ex. 8, at 8. Thus, Miller's justifications for the O-6 requirement, taken at face value, misrepresent Defendants' own policies and practices, and therefore "offered an explanation … that runs counter to the evidence before the agency." *Motor Vehicles*, 463 U.S. at 43.

A. <u>The O-6 Requirement is Arbitrary and Capricious, Notwithstanding the 2020 NDAA and the April 2020 Memo.</u>

The 2020 NDAA does not extinguish Plaintiffs' claim that the O-6 requirement is arbitrary and capricious for the simple reason that it does not incorporate this requirement. Rather, it provides that "[t]he Secretary of Defense shall publish regulations for submission and processing of a[n] [N-426]," including "designat[ing] the appropriate level for the certifying officer." Pub. L. 116-92, § 526. Defendants' *subsequent* rulemaking action—the April 2020 Memo—therefore remains subject to the APA.

Defendants' assertion regarding the 2020 NDAA rests on the premise that Congress "is presumed to be aware of established practices and authoritative interpretations of the coordinate branches" when it passes legislation. *See* Defs.' MSJ 22; Defs.' Reply in Supp. of Cross-Mot. for

15

Summ. J. 12, ECF No. 27 (quoting *Wilson*, 290 F.3d at 357)). Therefore, Defendants reason, because Congress was presumably aware of the Oct. 2017 memo when it passed the 2020 NDAA, it implicitly adopted the O-6 requirement in the legislation. *See* Defs.' MSJ 30–31. But that is illogical. "Congress says what it means and means what it says," *Simmons v. Himmelreich*, 136 S. Ct. 1843, 1848 (2016), and it did *not* codify the O-6 requirement. Indeed, it *rejected* the House version of the bill, which would have codified the requirement, *see* Pub. L. 116-92, § 526, and instead directed Defendants to designate the appropriate official through rulemaking.

Nothing in the 2020 NDAA stands in the way of judicial review of *subsequent* agency rulemaking to implement the authority delegated by Congress. Indeed, *all* agency action subject to judicial review under the APA consists of implementing authority delegated by Congress, since without such delegated authority, an agency has no power to do anything. Thus, for example, in *Izaak Walton League of Am. v. Marsh*, the D.C. Circuit reviewed agency action implementing an Army Corps of Engineers construction project under the arbitrary and capricious standard even where Congress had carefully considered and explicitly approved the project. 655 F.2d 346, 362 (D.C. Cir. 1981). Prior to the project's commencement, Congress held numerous hearings on the economic and environmental impacts of the construction and explicitly authorized the project. *Id.* at 353-54. The court nevertheless held that "the Corps' decision to implement an authorized project should be subject to judicial review, since it is a final agency decision." *Id*. at 361. It further explained that the agency's "post-authorization decision to implement the project after determining whether there have been significant changes in circumstances" was subject to arbitrary and capricious review. *Id*. at 362. Here, the Court's authority to review the O-6 requirement contained in the April 2020 memo under the arbitrary

and capricious standard is even stronger because Congress did not hold "extensive hearings" on the appropriateness of the memo, including the O-6 designation, *cf. Izaak Walton*, 655 F.2d at 353; the O-6 requirement contradicts DoD's prior practice of allowing a broad range of officials to certify Form N-426s; and the *post hoc* explanation provided by Defendants is undermined by their own representations and policies.

## CONCLUSION

For the foregoing reasons, Plaintiff's motion for summary judgment on the O-6 requirement should be granted and Defendants' cross-motion should be denied.

Dated: July 23, 2020

Respectfully submitted,

 */s/ Scarlet Kim*

Jennifer Pasquarella
Michelle (Minju) Cho
American Civil Liberties Union Foundation
   of Southern California
1313 West 8th Street
Los Angeles, CA 90017
(213) 977-5236
jpasquarella@aclusocal.org
mcho@aclusocal.org

Scarlet Kim (D.D.C. Bar No. NY0329)
Noor Zafar*
Jonathan Hafetz (D.D.C. Bar No. NY0251)
Brett Max Kaufman (D.D.C. Bar. No. NY0224)
American Civil Liberties Union Foundation
125 Broad Street, 18th Floor
New York, NY 10004
(212) 549-2500
scarletk@aclu.org
nzafar@aclu.org
jhafetz@aclu.org
bkaufman@aclu.org

Arthur B. Spitzer (D.D.C. Bar No. 235960)
American Civil Liberties Union Foundation
   of the District of Columbia
915 15th Street, NW, 2nd Floor
Washington, DC 20005
(202) 601-4266
aspitzer@acludc.org

*Admitted *pro hac vice*

*Counsel for Plaintiffs*