# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| ANGE SAMMA, et al., ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | Civil Action No. 1:20-cv-01104-PLF |
| ) | The Honorable Paul L. Friedman |
| UNITED STATES DEPARTMENT OF ) | |
| DEFENSE and Lloyd Austin, in his official ) | |
| capacity as Secretary of Defense, ) | |
| ) | |
| Defendants. ) | |
| ) | |

## MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO
## PLAINTIFFS' POST-JUDGMENT MOTION

**TABLE OF CONTENTS**

INTRODUCTION.......................................................................................................... 1

BACKGROUND............................................................................................................ 2

     A.      Noncitizen Service Members Who Have Served Honorably May
           Naturalize. ...................................................................................... 2

     B.      The Department of Defense Issues the Memorandum and Congress Enacts the
           2020 NDAA. ..................................................................................... 3

     C.      This Court Enjoins the Minimum Service Requirements...................................... 4

     D.      The Department of Defense Successfully Implements the Final Judgment and
           Responds to a Surge in Submission of Forms N-426........................................... 5

     E.      The Department Takes Additional Steps to Facilitate N-426 Certifications.......... 8

     F.      Plaintiffs' Motion to Enforce the Court's Final Order and Judgment .................15

ARGUMENT ...............................................................................................................16

I.     DEFENDANTS ARE IN SUBSTANTIAL COMPLIANCE WITH THIS COURT'S ORDER...............17

     A. Defendants Adopted Policies to Comply with the Court's Injunction, All of
          Which are Binding on Chains of Command. ......................................................17

     B. As New Information Has Come to Light, Defendants Have Addressed
          Individual Cases of Concern and Further Refined Their Policies to Ensure
          Compliance. .........................................................................................................18

II.    PLAINTIFFS HAVE NOT SATISFIED THEIR BURDEN TO DEMONSTRATE THAT THEIR
     REQUESTED REMEDIES ARE WARRANTED. ........................................................23

     A.      The Class Representatives Lack Standing to Seek Redress for Alleged
           Processing Delays. ..............................................................................................23

     B.      Plaintiffs Have Not Established Any of the Criteria for Obtaining the
           Mandatory Injunctive Relief that They Seek.......................................................28

           i.       Plaintiffs Have Not Established that the Secretary of Defense
                  Has a Clear Duty to Perform the Acts they ask the Court to
                  Compel Him to Take ...............................................................30

           ii.      Plaintiffs Have Not Established that There is No Other Adequate
                  Remedy Available to Address Their Allegations of Non-
                  Compliance ...............................................................................34

i

iii.       Plaintiffs' Reliance on *Kirwa* is Misplaced ..............................................35

C.       Plaintiffs Seek Specific Relief that Defendants Have Already Provided. ............38

CONCLUSION.....................................................................................................................38

# TABLE OF AUTHORITIES

## Cases

*Anderson v. Dunn,*
　6 Wheat. 204 (1821) ...........................................................34

*Anglers Conservation Network v. Ross,*
　387 F. Supp. 3d 87 (D.D.C. 2019) ...................................30

*Baptist Mem'l Hosp. v. Sebelius,*
　603 F.3d 57  (D.C. Cir. 2010) .........................................29

*Beyah v. Coughlin,*
　789 F.2d 986 (2d Cir. 1986) ...........................................21

*\*Blum v. Yaretsky,*
　457 U.S. 991 (1982) ...................................................23, 24

*\*Chappell v. Wallace,*
　462 U.S. 296 (1983) ...................................................31, 32

*\*Cobell v. Norton,*
　391 F.3d 251 (D.C. Cir. 2004) ......................................34

*Cobell v. Norton,*
　240 F.3d 1081 (D.C. Cir. 2001) ....................................34

*Council of and for the Blind of Delaware Cnty. Valley, Inc. v. Regan,*
　709 F.2d 1521 (D.C. Cir. 1983) ....................................38

*Conservation Force, Inc. v. Jewell,*
　733 F.3d 1200 (D.C. Cir. 2013) ....................................38

*Dolman v. United States,*
　439 U.S. 1395 (1978) .....................................................30

*Florida Steel Corp. v. NLRB,*
　648 F.2d 233 (5th Cir. 1981) .........................................23

*Gaines v. Thompson,*
　74 U.S. 347 (1868)..........................................................29

*Goff v. Menke,*
　672 F.2d 702 (8th Cir. 1982) .........................................31

*Grana v. Runyon,,*
   --- F. Supp. 3d ---, ---. 2020 WL 1508588 (D.D.C. Mar. 30, 2020)......................................21

*Heartland Reg. Med. Ctr. v. Leavitt,*
   415 F.3d 24 (D.C. Cir. 2005)..........................................................................................29

*In re Barr Laboratories, Inc.,*
   930 F.2d 72 (D.C. Cir. 1991)..........................................................................................27

*In re Cheney,*
   406 F.3d 723 (D.C. Cir. 2005)........................................................................................29

*In re Kelly,*
   401 F.2d 211 (5th Cir. 1968)..........................................................................................31

*Kirwa v. Department of Defense,*
   Case No. 17-CV-1793 (D.D.C.)................................................................................passim

*\*Lewis v. Casey,*
   518 U.S. 343 (1996)........................................................................................................23

*\*Lovitky v. Trump,*
   949 F.3d 753 (D.C. Cir. 2020) ..................................................................................29, 30

*Lujan v. Nat'l Wildlife Fed.,*
   497 U.S. 871 (1990)........................................................................................................28

*McCarthy v. Madigan,*
   503 U.S. 140 (1992)........................................................................................................31

*Miguel v. McCarl,*
   291 U.S. 442 (1934)........................................................................................................29

*Miriyeva v. USCIS,*
   9 F.4th 935 (D.C. Cir. 2021)...........................................................................................26

*Mionzillo v. Biller,*
   735 F.2d 1456 (D.C. Cir. 1984)......................................................................................38

*Muthana v. Pompeo,*
   985 F.3d 893 (D.C. Cir. 2021)........................................................................................29

*Nat'l Wildlife Federation v. United States,*
   626 F.2d 917 (D.C. Cir. 1980)........................................................................................29

*Norton v. S. Utah Wilderness,*
    *All.*, 542 U.S. 55 (2004) ............................................................................................30

*Oppeneimer Fund, Inc. v. Sanders,*
    437 U.S. 340 (1978) ...............................................................................................33

*Orloff v. Willoughby,*
    345 U.S. 83 (1953) .................................................................................................30

*Ortiz v. Sec'y of Defense,*
    41 F.3d 738 (D.C. Cir. 1994) ................................................................................31

*Patterson v. Lamb,*
    329 U.S. 539 (1947) ...............................................................................................26

*Power v. Barnhart,*
    292 F.3d 781 (D.C. Cir. 2002) ..............................................................................29

*\*Samma v. DoD,*
    2020 WL 4501000 (D.D.C. Aug. 4, 2020) .......................................4, 24, 27, 35

*\*Samma v. DoD,*
    486 F. Supp. 3d 240, 274 (D.D.C. 2020) .................................................... passim

*Sanchez-Espinoza v. Reagan,*
    770 F.2d 202 (D.C.. Cir. 1985) .............................................................................29

*Sellers v. M.C. Floor Crafters, Inc.,*
    842 F.2d 639 (2d. Cir. 1988) ................................................................................21

*Shillitani v. United States,*
    384 U.S. 364 (1966) ...............................................................................................34

*Taggart v. Lorenzen,*
    139 S. Ct. 1795 (2019) ...........................................................................................17

*United States ex rel. Dunlap v. Black,*
    128 U.S. 40 (1888) .................................................................................................30

*\*Washington Metro. Area Transit Comm'n [WMATC]  v. Reliable Limousine Serv., LLC,*
    985 F. Supp. 2d 23 (D.D.C. 2013) ........................................................ 16, 28, 34

*Watkins v. Washington,*
    511 F.2d 404 (D.C. Cir. 1975) ..............................................................................29

## INTRODUCTION

Plaintiffs brought this action to challenge a Department of Defense ("DoD") policy that imposed certain Minimum Service Requirements before a noncitizen service member could obtain a certification of honorable service to apply for naturalization. After this Court vacated the Minimum Service Requirements and enjoined their enforcement, DoD directed the military departments to comply,[1] the Department of the Army issued an order directing chains of command to process the certifications for all service members,[2] and DoD proceeded to rescind the portions of the policy challenged by Plaintiffs, pending further agency review.[3]

DoD's efforts have produced discernable results. Whereas only 4,223 service members submitted a naturalization application with a Form N-426 certification to U.S. Citizenship and Immigration Services ("USCIS") in 2019, 7,741 service members had submitted such an application through October 12 of this year. Despite this progress, during the implementation process, Plaintiffs have identified isolated instances in which individual service members have encountered delays or outdated information. It is the position of DoD that every eligible service member is entitled to timely N-426 certification, so counsel have worked with delayed applicants to correct errors in their applications and to facilitate certification. DoD has also undertaken a series of additional steps to minimize even occasional instances of human error—issuing (in August 2021) a renewed set of orders to reinforce the N-426 policies throughout the Army, conducting targeted training efforts at specific installations where Plaintiffs had raised concerns,

---

[1] *See* Memorandum from Matthew P. Donovan, to Secretaries of the Military Departments, Compliance with Court Order in the Case of *Ange Samma v. Department of Defense, et al.*, Case No. 20-01104. Exhibit A to Declaration of Lin. St. Clair ("St. Clair Decl.").

[2] Memorandum from E. Casey Wardynski, Updated Requirements for the Certification of Honorable Service Members of the Selected Reserve of the Ready Reserve and Members of the Active Component for Purposes of Naturalization. Exhibit B to St. Clair Decl..

[3] *See* Memorandum from Virginia S. Penrod, Acting Under Secretary of Defense for Personnel and Readiness, to Secretaries of the Military Departments and Commandant of the Coast Guard, Certification of Honorable Service for Members of the Selected Reserve of the Ready Reserve and Members of the Active Components of the Military or Naval Forces for Purposes of Naturalization (June 17, 2021). Exhibit D to St. Clair Decl.

and reinforcing the additional modes of redress for service members who might encounter difficulties when obtaining their certifications.

Plaintiffs have nevertheless returned to this Court, alleging that DoD is "defying" the Court's order. ECF No. 58, at 3. Plaintiffs seek relief that, collectively, would require a complete overhaul of Army's system for processing N-426 certifications. Plaintiffs' motion is problematic for many reasons. To begin, Plaintiffs have not met their burden to justify post-judgment intervention by this Court. Absent unusual circumstances not present here, a court may not modify its final judgment to provide relief not previously sought by the plaintiffs. Although Plaintiffs purport to seek redress for noncompliance with the injunction, Plaintiffs have not established a basis for reopening the litigation and requesting a new remedial order. The evidence shows that Defendants have taken appropriate steps to vacate the enjoined policy, to issue a new policy that complies with this Court's directives, and to educate military personnel as to their obligations under the new policy. The examples of certification delays highlighted by Plaintiffs do not prove otherwise. Moreover, Plaintiffs' desired relief is unavailable. Plaintiffs seek a mandatory injunction but have not satisfied the standards for such relief. Finally, Plaintiffs seek relief that is not directed at the injury that the certified class is permitted to contest. Accordingly, Plaintiffs' motion must be denied.

## BACKGROUND

### A.    Noncitizen Service Members Who Have Served Honorably May Naturalize.

Individuals who have served honorably in the armed forces of the United States during designated periods of war are entitled to naturalize as citizens. 8 U.S.C. § 1440(a).

Because the military must determine whether a soldier has served honorably, *see id.* § 1440(a) ("The executive department under which such person served shall determine whether persons haves served honorably in active-duty status[.]"), USCIS requires current service members applying for naturalization to obtain certification of their characterization of service using USCIS Form N-426. *See* 8 C.F.R. § 329.4. Certain sections of the forms are completed by the service member seeking naturalization, while others are filled out by military officials. A

Form N-426 provides an official testimonial as to the characterization of the service member's military service.   In Part 5 of the Form, the certifying official certifies whether the service member has earned a characterization of service as honorable.

**B.**    **The Department of Defense Issues the Memorandum and Congress Enacts the 2020 NDAA.**

On October 13, 2017, DoD issued three policy memoranda, including a memorandum regarding honorable service certification for purposes of naturalization (hereinafter referred to as "the October 13, 2017 Memorandum" or "Memorandum").   *See* SAMMA_0006-09.   The Memorandum established a "Military Training and Required Service" standard, specifying that a service member seeking honorable service certification must have "served in a capacity, for a period of time, and in a manner that permits an informed determination as to whether the member served honorably" (the "time-in-service requirements").   *Id*.   Under the terms of the Memorandum, a military official could not certify service as honorable on a Form N-426 until the service member had completed the minimum service, thereby precluding such individuals from naturalizing.   Active duty minimum service for earning an honorable characterization of service was 180 consecutive days of active-duty service, inclusive of the successful completion of basic training.   ECF No. 44 at 2.   And reservist minimum service for earning an honorable characterization of service was one year of satisfactory service toward non-regular retirement, inclusive of successful completion of basic training.   *Id*. at 3.

After the Memorandum was issued, Congress passed legislation addressing the issue of honorable service certification and clarifying DoD's broad discretion to establish and manage procedures for the "submission and processing of a completed . . . Form N-426.   *See* National Defense Authorization Act for Fiscal Year 2020 ("2020 NDAA"), Pub. L. 116-92, § 526.[4] Congress instructed that DoD "shall designate the appropriate level for the certifying officer as well as establish time requirements for the form to be returned to the" requesting service

---

[4] The 2020 NDAA is available at https://www.congress.gov/bill/116th-congress/senate-bill/1790.

member.  *Id*.  In response to this directive, on April 24, 2020, the Under Secretary of Defense for Personnel and Readiness issued a policy memorandum updating the October 13, 2017 Memorandum ("the April 24, 2020 Memorandum").  *See* SAMMA_0001-05.  The April 24, 2020 Memorandum left in place a requirement from the October 13, 2017 Memorandum that the certifying official be a commissioned officer serving in the pay grade of O-6 or higher and specifies that the certifying official will process an N-426 request for certification "with priority" and return it to the requesting service member within thirty days of submission.  *Id*.

**C.      This Court Enjoins the Minimum Service Requirements.**

Plaintiffs filed a putative class action lawsuit on April 28, 2020.  Compl., ECF No. 1. Plaintiffs are seven then-noncitizen soldiers who were serving in the Army.  Amended Compl., ECF No. 24, ¶¶ 19-28.  The Court granted Plaintiffs' motion for class certification in part, determining that the proposed class representatives had "standing to challenge the Minimum Service Requirements" but not other aspects of the October 2017 Policy or any other policy. *Samma v. DoD*, 2020 WL 4501000, at *9 (D.D.C. Aug. 4, 2020).  Accordingly, the Court limited the class "to individuals whose inability to obtain an N-426 is being caused by those requirements."  *Id*.

On August 25, 2020, the Court granted summary judgment for Plaintiffs, concluding that the Minimum Service Requirements were arbitrary and capricious and ordering them vacated. *Samma v. DoD*, 486 F. Supp. 3d 240, 274 (D.D.C. 2020).  The Court also ordered that (1) "defendants are enjoined from withholding certified Form N-426s from any class member[] based on a failure to complete the Minimum Service Requirements" and (2) "defendants shall endeavor to certify or deny a submitted Form N-426 expeditiously, but in no case shall it take longer than the 30 days allowed under DOD's April 24, 2020 update to the N-426 Policy." Order and Judgment, ECF No. 47 at 2-3.  Defendants noticed an appeal on October 23, 2020. ECF No. 51.  The appeal is being held in abeyance while DoD considers potential policy options. Clerk's Order, *Samma v. DoD*, No. 20-5320, (D.C. Cir. June 30, 2021) Document #1904468.

**D.    The Department of Defense Successfully Implements the Final Judgment and Responds to a Surge in Submission of Forms N-426.**

The Secretary took action to ensure compliance with the Court's Order immediately after the Court issued it.  On August 31, 2020, the Under Secretary of Defense for Personnel and Readiness, Matthew P. Donovan, issued a Memorandum for the Secretaries of the Military Departments with the Subject "Compliance with Court Order in the Case of *Ange Samma v. Department of Defense, et al.*, Case No. 20-01104."  Exhibit A to Declaration of Lin St. Clair ("St. Clair Decl."), Memorandum, SUBJECT: Compliance with Court Order in the Case of *Ange Samma v. Department of Defense, et. al.*, Case No. 20-01104.  Under Secretary Donovan directed the Military Departments "to immediately implement and comply with" the Court's August 25 Order.  *Id.*  He explained that "DoD is enjoined from withholding a USCIS Form N-426 . . . from any class member based on a failure to complete the Minimum Service Requirements" and that "in no case shall it take longer than the 30 days allowed under DoD's August 25, 2020 update to the N-426 Policy" to "certify or deny a submitted Form N-426."  *Id.*

In turn, and in compliance with the Under Secretary's Memorandum, the Department of the Army issued a memorandum on September 3, 2020, with the Subject "Updated Requirements for the Certification of Honorable Service for Members of the Selected Reserve of the Ready Reserve and Members of the Active Component for Purposes of Naturalization."  Exhibit B to St. Clair Decl., Memorandum, SUBJECT: Updated Requirements for the Certification of Honorable Service Members of the Selected Reserve of the Ready Reserve and Members of the Active Component for Purposes of Naturalization (Sept. 3, 2020).  The Memorandum provided that "[s]oldiers are authorized to request certification of honorable service for purposes of naturalization immediately upon entering active duty or attending drill with their Selected Reserve unit."  *Id.* at 2.  "The approval authority must certify or deny a Soldier's certification request, and return it to the Soldier, within 30 days of submission."  *Id.*

On October 6, 2020, the Department of the Army issued a fragmentary order ("FRAGO")[5] to all chains of command.  *See* Exhibit C to St. Clair Decl., Fragmentary Order 1 to its Execute Order for Certification of Honorable Service (Oct. 6, 2020) ("FRAGO 1").  Under this order, "[s]oldiers are authorized to request certification of honorable service for purposes of naturalization immediately upon entering active duty or attending drill with [] their selected reserve unit."  *Id*. at 4.  And "[u]pon request from a qualified applicant of the USCIS Form N-426, . . . the certifying official will process it with priority and return it to the service member concerned within 30 calendar days of submission."  *Id*.  On June 17, 2021, the Acting Under Secretary of Defense for Personnel and Readiness issued an order formally "rescinding its prior policy on minimum periods of service" as part of a process for reconsidering the underlying policy.

In addition to the Department-wide efforts, Army installations and units have taken additional actions to implement the memorandum dated September 3, 2020.  For example, the U.S. Army Maneuver Center of Excellence, Fort Benning, Georgia, published an order notifying commanders at Fort Benning of the memorandum on September 10, 2020.  Declaration of Col. Michael F. Tremblay ("Tremblay Decl.") ¶ 3.  Fort Eustis reports that, since October 2020, average N-426 processing time is 24-48 hours from the time the unit personnel office receives the request for certification to when the Brigade Commander signs it, with the form returned promptly thereafter.  *See* Declaration of Col. William J. Benner ("Benner Decl.") ¶ 3.

As Defendants were undertaking these policy changes, they were also contending with a surge in submissions of Form N-426.  Because Forms N-426 are processed through individual chains of command, Army does not maintain centralized statistics as to the number of certifications processed or the status of individual certification requests.  However, USCIS maintains records about citizenship applications—including which applications are from current

---

[5]A fragmentary order is "an abbreviated form of an operation order issued as needed after an operation order to change or modify that order or to execute a branch or sequel to that order." U.S. Dep't of Army, Field Manual, Commander and Staff Organization and Operations, Glossary-6 FM 6-0 C1 (May 11, 2015).

service members—that allows certain information about Forms N-426 to be inferred.   In particular, because every complete naturalization application that USCIS receives from a current service member must be accompanied by a certified Form N-426, looking to the total number of such applications from current service members provides a good sense of how many Forms N-426 Defendants have processed.[6]  *See* Declaration of Darya Kutovaya ("Kutovaya Decl."), ECF No. 65 ¶ 22 (showing that USCIS will not accept an application without a Form N-426 certified as required under USCIS regulations and will immediately inform the prospective applicant that a Form N-426 is required).  And the data from USCIS show that, since this Court entered its final order, naturalization applications from individuals currently serving in the military have increased substantially.  *See* Exhibit 1 to Declaration of Katherine J. Lotspeich ("Lotspeich Decl.").

In all of 2019, USCIS received 4,223 naturalization applications from current service members.  *Id*.  Although application volume increased in the first eight months of 2020, naturalization applications from current service members are on track to increase even further after this Court issued its final order and Defendants adjusted their policies in compliance.  *Id*. In the four months between September 1, 2020, and the end of the year, USCIS received 3,029 applications—after having received only 4,036 applications in the first eight months of 2020 before this Court's order issued.  *Id*.  And in the eight months between January 1, 2021 and October 12, 2021, USCIS received 7,741 applications from current service members.  *Id*.  USCIS is on pace this year to receive more than double the number of military naturalization applications from current service members that it received in 2019.

---

[6]That number does not reveal the exact number of Forms N-426 that Defendants have processed because it is possible that some service members did not include the required form when they submitted their applications.   USCIS will not accept a paper application for naturalization on the basis of current military service without a Form N-426.  However, in some cases, a military naturalization application will be accepted without the N-426, and USCIS will subsequently request a Form N-426 from the applicant.  This happens, in particular, when the application is filed online.  But the number of applications from current service members at least reflects the *scale* of the processing demands with which Defendants have had to contend.

**E.      The Department Takes Additional Steps to Facilitate N-426 Certifications.**

Since the Army issued its orders implementing the vacatur of the time-in-service requirement, the vast majority of N-426 certifications have been completed without incident. From time to time, however, Class Counsel has raised allegations of isolated instances of delay or inaccurate information communicated in the course of an N-426 certification.  Defendants have endeavored to resolve individual issues promptly and to take steps to ensure that human error is minimized.  As a result of those efforts, all of the individuals Class Counsel identified as being entitled to a certified Form N-426 have received one.  A close examination of five declarations that Plaintiffs provided from service members to support their claim that Defendants have imposed Minimum Service Requirements indicates that Defendants provided each service member with a certified Form N-426 long before they satisfied the vacated Minimum Service Requirements, and that any delays in the N-426 process were not attributable to hostility to the policy change regarding the Minimum Service Requirements.

First, Service Member Bonchan Goo claims that "[s]oon after [he] shipped to AIT at Fort Sill," on August 7, 2020, his drill sergeant declined to process his "N-426 form or help [Goo] obtain the certification and told [him] '[w]e don't do anything citizenship related here,'" Declaration of Bonchan Goo ("Goo Decl."), ECF No. 64 ¶¶ 9-10—a statement that (if accurate) either reflects general confusion with the citizenship-application process, rather than any adherence to a time-in-service policy, or may have been somewhat accurate, if it was made before this Court's final order.[7]  Goo also represents his drill sergeant did not process Goo's N-426 form "a few more times" "[o]ver the next few weeks" and that his "charge of quarters sergeant at AIT" would not process his N-426 Form.  *Id*. ¶¶ 11, 13, 14, 15.  But the record is silent about why these individuals did not provide Goo with a certification of honorable service

---

[7] The record is silent as to how "soon" after Goo's August 7, 2020 arrival at Fort Sill this incident took place, and so it may have occurred before the injunction was issued on August 25, 2020.  With some exceptions, Minimum Service Requirements for active duty service members were 180 days of active duty service or one year of service in the reserves, both inclusive of basic training.  So Service Members would not have obtained a Form N-426 with a certification of "honorable" service until after they completed BCT and AIT.

on his N-426. And in fact, Goo reports that Defendants provided him with a certification of honorable service on a Form N-426 on September 18, 2020, Goo Decl. ¶ 17—less than a month after the Court's injunction and well before Goo would have satisfied the vacated Minimum Service Requirements, which would otherwise have required him to complete basic training (180 days of service) and become fully and finally absorbed into the Army. *See* ECF No. 47 at 1.[8] To be sure, Goo reports that after obtaining this certification of honorable service on a Form N-426, USCIS declined to accept it because of the level of the officer that had certified the form. *Id*. at ¶ 25. But Plaintiffs do not allege that the administrative issues Goo subsequently encountered were the result of any effort to adhere to the vacated Minimum Service Requirements.

Second, Service Member Darya Kutovaya alleges that, on September 24, 2020, one drill sergeant at Fort Jackson informed her that she must complete BCT and AIT before "beginning citizenship processing," and she further alleges that "[o]ver the next few weeks . . . multiple" drill sergeants "refused to help [her]." Kutovaya Decl. ¶¶ 13-15. Defendants provided Kutovaya with a certified Form N-426 on November 2, 2020, and Kutovaya became a United States Citizen on January 6, 2021. *Id*. ¶¶ 21, 27. When Defendants provided her with a certified Form N-426 on November 2, 2020, Kutovaya did not yet satisfy the vacated Minimum Service Requirements. *See* ECF No. 47, at 1.[9] Moreover, Defendants provided the requested certification even though Kutovaya initially gave DoD a form that USCIS would not accept because, under USCIS's rules, the form was expired. Kutovaya Decl. ¶ 22; Exhibit C to Declaration of Liam Holland ("Holland Decl.").[10]

---

[8] Goo's active duty service began on May 30, 2020, when he shipped to BCT. Goo Decl. ¶ 6. So he received a certified N-426 after 111 consecutive days of active duty service.

[9] Kutovaya's active duty service began on September 21, 2020, when she shipped to BCT. Kutovaya Decl. ¶ 13. So Kutovaya received her certified N-426 after 42 consecutive days of active duty service.

[10] Kutovaya testifies that "during the period from when [she] first sought N-426 certification to when [she] obtained the certification, USCIS had published a new N-426 form, rendering the one [she] had used to seek certification invalid." Kutovaya Decl. ¶ 22. In fact, the Form she provided to DoD stated in the top left corner that it "[e]xpires 07/31/2019," *see* Holland Decl., Exhibit C at 1, well before she ever sought an N-426 from DoD., Kutovaya Decl.

Third, Service Member Hemalatha Lingamaneni contends that, on or about March 10, 2021, a company commander at Fort Jackson told her that she would not receive her N-426 certification until she had completed Basic Combat Training ("BCT") and Advanced Individual Training ("AIT").[11]   Declaration of Hemalatha Lingamaneni, ("Lingamaneni Decl."), ECF No. 67 ¶ 8.   Even though Lingamaneni reports that her company "could not" assist her with the N-426 process after she asked on April 18, 2021, she then says that, in May, her "chain of command accepted [her] N-426 paperwork" and on about May 25, 2021, they gave her "a signed N-426 form."  *Id*. ¶¶ 9, 10.   When Defendants provided her with a certified Form N-426 on May 25, 2021, Lingamaneni did not yet satisfy the vacated Minimum Service Requirements.  *See* ECF No. 47, at 1.[12]   Lingamaneni notes that her chain of command regrettably committed a clerical error in forgetting to complete Part 5 of the form, Lingamaneni Decl. ¶ 10, but Plaintiffs do not allege that this administrative issue was the result of any effort to adhere to the vacated Minimum Service Requirements.  In any event, Defendants provided Lingamaneni with a corrected Form N-426 on June 30, 2021, when she had still not satisfied the vacated Minimum Service Requirements.  *Id*. ¶ 12.

Fourth, Service Member Yiyi Yu's allegations stem from interactions with the same company commander at Fort Jackson that Lingamaneni describes. Declaration of Yiyi Yu ("Yu Decl."), ECF No. 71 ¶ 8.   Yu reports that, despite her initial encounter with the company commander who allegedly purported to impose the vacated Minimum Service Requirements, her chain of command did provide her with a certified Form N-426 on June 8, 2021.  Yu Decl. ¶ 11.

---

¶ 7.   Kutovaya's signature on the Form N-426 request that expired in 2019 is dated July 10, 2020.  Holland Decl., Exhibit C at 2.

[11] BCT and AIT together comprise Initial Entry Training ("IET"), commonly known as basic training.

[12] Lingamaneni's active duty service began on March 1, 2021, when she shipped to BCT. Lingamaneni Decl. ¶ 6.  So Lingamaneni received her certified N-426 after 85 consecutive days of active duty service.

When her chain of command provided Yu with a certified Form N-426 on June 8, 2021, Yu did not satisfy the vacated Minimum Service Requirements.  *See* ECF No. 47 at 1.[13]

Fifth, Service Member Jianping Liu alleges that, on May 11, 2021, he "emailed [his attorney's] office and informed them that [his] drill sergeant [at Fort Jackson]" "stated that my AIT unit would not be able to sign [his] N-426 form because they are following the active duty 180-day rule."  Declaration of Jianping Liu ("Liu Decl."), ECF No. 68 ¶ 15.[14]  The following day, he shipped to his duty station at Fort Bragg, North Carolina.  *Id.* ¶ 16.

There, he requested a certified N-426, but when asked by his sergeant to provide a naturalization application, he declined to do so, speculating that "[t]he process [his] current unit is requesting may take weeks or months to complete."  *Id.*  It is not clear whether the sergeant needed to request the naturalization application, but that administrative question is separate from any allegations about adherence to the vacated Minimum Service Requirements.  In any event, Defendants provided Liu a certified N-426 on August 12, 2021, promptly after the service member escalated this issue.  ECF No. 58 at 10 n. 7.

Beyond their efforts to address the concerns of individual service members, Defendants have adopted additional policies to ensure continued compliance with the Court's injunction.  In particular, on August 19, 2021, the Department of the Army issued a second fragmentary order.  *See* Exhibit F to St. Clair Decl., FRAGO 2 to HQDA EXORD 219-20 Certification of Honorable Service (Aug. 19, 2021) ("FRAGO 2").  FRAGO 2 reiterated that, in order to certify honorable service for purposes of naturalization, "[t]here is no required wait period; one day of military service suffices for the soldier to submit the request."  *Id.* at 4.  It restated that "[t]he prior guidance requiring a soldier to complete 180 consecutive days of active duty service, or to

---

[13] Yu's active duty service began on March 1, 2021, when she shipped to BCT.  Yu Decl. ¶ 6.  So Yu received her certified N-426 after 99 consecutive days of active duty service.

[14] Liu does not actually testify that he asked his chain of command for an honorable characterization of service on a Form N-426 or that his drill sergeant or anyone told him that he could not obtain one because of the Minimum Service Requirements.  He only testifies that this is what he told his attorney.  Lieu Decl. ¶ 15.

complete at least one (1) year of satisfactory service towards non-regular retirement, no longer applies." *Id*. In addition to explaining that a Form N-426 must be returned to a soldier within 30 calendar days of submission, it provided that "[t]he 30-day time period begins upon submission of the document to the first person in the chain of command. Commanders and certifying officials may not decline to process or act on the request, or deny the request, on the basis of the soldier's time in service." *Id*. Additionally, the policy makes clear that "[c]ommanders and certifying officials are not permitted to impose local restrictions or prerequisites, such as minimum training or service requirements, as a condition of certifying honorable service." *Id*.

FRAGO 2 went further than prior efforts to ensure Form N-426 processing policies are effectively communicated to responsible officers. FRAGO 2 provided that "Commanders at all levels are required to disseminate the information contained in FRAGO 2 to the lowest levels, and ensure that all leaders, including squad leaders and drill sergeants, understand their responsibilities to process and route these actions as expeditiously as possible to their commanders." *Id*.

On August 23, 2021, the Department of the Army issued a third Army-wide FRAGO, which went even further to confirm that Form N-426 processing polices are communicated to responsible officers. *See* Exhibit G to St. Clair Decl., FRAGO 3 to HQDA EXORD 219-20 Certification of Honorable Service ("FRAGO 3"). FRAGO 3 orders that "all brigade-level commanders must confirm receipt of FRAGO 2 and confirm that their company and battalion command teams . . . have read and understood their obligations." *Id*. at 4. FRAGO 3 provided that "commanders at all levels must affirmatively acknowledge" their obligation to "disseminate the information contained in FRAGO 2 to the lowest levels [of the chain of command] and ensure that all leaders, including squad leaders and drill sergeants, understand their responsibilities to process and route these actions as expeditiously as possible to their commanders" and then " report their understanding to the [Rank of O-6 Level Colonel who has N-426 approval authority] who will report compliance to the senior leader of their organization." *Id*. Commanders at basic training installations have reported that their subordinate commanders

have affirmatively acknowledged their responsibilities in accordance with FRAGO 3.  Tremblay Decl. ¶ 5; Declaration of Col Timothy R. Frambes ("Frambes Decl.") ¶ 12.

In addition to these orders, Army has also undertaken education and remediation efforts at specific installations where Plaintiffs had expressed concerns.  Frambes Decl. ¶¶ 3-10; Declaration of Lekisha N. Hogg ("Hogg Decl"). ¶¶ 3-10; Declaration of Col Ball ("Ball Decl.") ¶¶ 3-6; Tremblay Decl. ¶ 4.[15]  For example, on July 15, 2021, Col. Timothy R. Frambes, Chief of Staff for the U.S. Army Training Center at Fort Jackson, was made aware of allegations concerning Form N-426 processing at Fort Jackson.  Frambes Decl. ¶ 2.  Col. Frambes notified the commanders of each unit operating out of Fort Jackson, the Soldier Support Institute, as well as others at the installation, of their obligations regarding Form N-426 processing.  *Id*. ¶ 3.  Col. Frambes advised Fort Jackson unit commanders, commandants, among others to educate and inform leaders at all levels of the requirement to expeditiously process the N-426 form as quickly as possible.  *Id*. ¶ 4.  Col. Frambes ensured that Fort Jackson commanders, commandants, among others were informed specifically about the vacatur of the Minimum Service Requirements and the requirement that Forms N-426 be turned around with 30 days of submission, *id*. ¶ 5, and Fort Jackson unit commanders subsequently shared the material with their subordinate leaders, *id*. ¶ 6.

Since those actions, Fort Jackson units have exercised their discretion to implement systems for regulating Form N-426 processing and, between July 15, 2021 and October 15, 2021, have successfully processed over 588 Form N-426 forms from entry-level soldiers who do not meet the vacated Minimum Service Requirements.  *Id*. ¶ 9.  Continuing education efforts at Fort Leonard Wood occurred on July 22, 2021.  Ball Decl. ¶ 3.  On that date, Fort Leonard Wood Chief of Staff Col. Ball messaged all Commanders at the installation at the rank of Colonel, which includes the three training brigade commanders, and provided them with a copy of current military policies, including FRAGO 1.  *Id*.  The colonels receiving the message were instructed

---

[15] These education and remediation efforts were in addition to the unit-specific efforts occurring throughout the last year each time Plaintiffs raised an allegation of noncompliance with Defendants.

to confirm that their subordinate battalion and company commanders understood the requirement to process Forms N-426 expeditiously.  *Id*.  All commanders confirmed completion of the task by the following day.  *Id*.  On or about July 27, 2021, Fort Benning published an order informing commanders of the N-426 processing requirements and reminding them that "they must be certified within 30 calendar days of submission."  Tremblay Decl. ¶ 4.

Finally, to address the circumstances in which—despite the policies outlined above—a service member may still require assistance in obtaining an N-426 certification, numerous avenues of redress are available to service members.  Any service member encountering an issue obtaining a certified N-426 from an immediate superior officer may take advantage of their Commander's open door policy.[16]  Pursuant to Army Regulation 600-20, paragraph 2-2, service members are responsible for ensuring that commanders are made aware of problems, including undue difficulty obtaining a certified N-426.  The open door policy allows members of the command to present facts, concerns, and problems that the service member has been unable to resolve.

Open door policies are the Army's primary means for the informal resolution of concerns.  All personnel assigned to a command—soldiers, civilians, and family members—have the right to have their issues or concerns addressed by their commanding officer.  Declaration of LTC Adam W. Grein, II ("Grein Decl.") ¶ 3.  Utilizing open door to resolve grievances efficiently is a core requirement of training.  Frambes Decl. ¶ 11.  Service members must utilize

---

[16] Military Services regulations provide that service members "are responsible for ensuring that the commander is made aware of problems that affect discipline, morale, and mission effectiveness[.]"  *See, e.g.*, Army Regulation 600-20, paragraph 2-2.  "Commanders [must] publish an open door policy statement within their commands" and "are responsible for ensuring that Soldiers are aware of the command's open door policy."  *Id*.  The "open door policy allows members of the command to present facts, concerns, and problems of a personal or professional nature or other issues that a Soldier has been unable to resolve."  *Id*.  Army service members are required by valid and binding regulations to "use the chain of command when communicating issues and problems to their leaders and commanders."  *Id*., paragraph 2-1(c).

the policy to make commanders aware of problems in the chain of command; drill sergeants do not have absolute discretion to grant or deny requests to utilize open door policy. *Id.*

If utilizing the open door policy does not redress the issue, other avenues of redress are available to service members as well. Congress has provided a system of grievance resolution under Article 138 of the Uniform Code of Military Justice, 10 U.S.C. § 938. Class members may also seek redress from the Inspector General ("IG"). Other avenues of relief are available at the installation level, such as Commanding General hotlines. For example, at Fort Jackson, phones are located throughout the battalion as well as in BCT Battalion providing service member with direct access to the Inspector General, Equal Opportunity, Chaplain, and Sexual Harassment, Assault Response and Prevention Advocates. Grein Decl. ¶ 5.

Service members seeking assistance utilizing any of these mechanisms may visit Legal Assistance Offices to facilitate their certifications. *See* Declaration of Captain Hernandez ("Hernandez Decl.") ¶ 3-4. Army Legal Assistance offices are available worldwide to provide advice to soldiers and other eligible clients. Such Offices are on site, for example, at each of the installations used by Army to conduct basic combat training. *Id.* ¶ 3. On July 21, 2021, the Head of Army Legal Assistance Policy distributed a practice note to provide guidance to Legal Assistance offices throughout the Army on Form N-426 processing. *Id.* ¶ 3 n.1.

Not only do trainees have access to Legal Assistance Offices, but they utilize them frequently. For example, at Fort Jackson, service members utilize Legal Assistance on a weekly basis. Frambes Decl. ¶ 11. Since the beginning of the year, Fort Jackson's Legal Assistance Office has provided services for hundreds of trainees. *Id.* Legal Assistance Office personnel are available to help informally resolve any certification issue before assisting a service member in invoking the avenues of redress described above. Hernandez Decl. ¶ 3-4.

**F.    Plaintiffs' Motion to Enforce the Court's Final Order and Judgment**

Shortly before the date on which FRAGOs 2 and 3 were set to be issued, on August 17, 2021, Plaintiffs filed a "Motion to Enforce Court Order." ECF Nos. 58-73. Plaintiffs ask the

Court to make two findings: (1) that the Department of the Army is in wholesale violation of this Court's Order vacating the Minimum Service Requirements and enjoining DoD from withholding certified Forms N-426 from class members based on a failure to complete the Minimum Service Requirements; and (2) that the Department of the Army is in wholesale violation of this Court's order requiring DoD to certify or deny submitted Forms N-426 within 30 days of submission.  ECF No. 58 at 1-2.  Plaintiffs then set forth a list of requested injunctive relief as a remedy for the Department of the Army's purported ongoing noncompliance.  *Id*. at 2-3.

## ARGUMENT

Plaintiffs' motion seeks relief that is breathtaking in its scope—relief that would wrest control of the N-426 certification process from Army and place it under the supervision of this Court.  The Army shares the objective of facilitating efficient certifications for soldiers who are entitled to naturalize as citizens.  But the judicial supervision that Plaintiffs have requested is not warranted by the facts that Plaintiffs have adduced, and is not available under the governing legal standard.

Indeed, Plaintiffs' motion does not even mention that standard.  Plaintiffs invoke the uncontroversial proposition that a district court may act to preserve the status quo pending an appeal, ECF No. 58 at 35, but they fail to describe *when* a district court should exercise that authority by modifying an existing injunction—and they certainly do not establish that this case rises to that standard.  As summarized in one of the few cases cited by Plaintiffs, the "essential inquiry . . . is whether modification or clarification is *necessary* to achieve the intended result of" the original injunction.  *Washington Metro. Area Transit Comm'n [WMATC] v. Reliable Limousine Serv., LLC*, 985 F. Supp. 2d 23, 28 (D.D.C. 2013) (emphasis added).  Plaintiffs have not made—and cannot make—that showing.

First, the premise that Defendants are violating this Court's injunction is incorrect. Defendants have implemented the Court's order and have taken substantial steps to ensure that any errors in the processing of Forms N-426—whether originating from mistakes by soldiers or

mistakes by their commanding officers—are minimized.   Plaintiffs do not dispute that Defendants have adopted policies that comply with the vacatur of the Minimum Service Requirements, and the isolated incidents where individuals did not receive a certified Form N-426 have been addressed.  If there were any doubts about Defendants' compliance, those doubts are resolved by the additional policies Army adopted in August and the further steps Army took to ensure everyone in the chain of command complies.

Second, even if Plaintiffs could establish that defendants are not complying with the injunction, they have not demonstrated that they are entitled to any of their requested remedies— much less that such remedies are *necessary* to achieve the result of the initial injunction.[17]

## I.   DEFENDANTS ARE IN SUBSTANTIAL COMPLIANCE WITH THIS COURT'S ORDER.

### A. Defendants Adopted Policies to Comply with the Court's Injunction, All of Which Are Binding on Chains of Command.

As described in detail above, the Secretary took immediate action to ensure compliance with the Court's August 25, 2020 Order.  Those actions include the DoD-wide Memorandum— issued on August 31, 2020—directing the Military Departments "to immediately implement and comply with" the Order, St. Clair Decl. ¶ 3, and Army's September 3, 2020 Memorandum, which authorized soldiers to request certification of a Form N-426 "immediately upon entering active duty or attending drill with their Selected Reserve unit" and required that the form be certified or denied (and returned to the soldier) "within 30 days of submission," *id*. ¶ 4.

Of particular note, the Army's October 6, 2020 fragmentary order—which made the new policy a military order—highlights the seriousness with which Defendants took their compliance obligations, because "all personnel in the Army are required to strictly obey and promptly execute the legal orders of their lawful seniors."  A.R. 600-20, paragraph 4-2.

Together, these steps were timely, reasonable responses to the injunction.  *Cf. Taggart v. Lorenzen*, 139 S. Ct. 1795, 1802 (2019) (quoting 11A C. Wright, A. Miller, & M. Kane, Federal

---

[17] Plaintiffs have not sought any determination that Defendants are in contempt of the Court's Order; rather, they have focused their request for relief on *modifications* to the injunction the Court already entered.

Practice and Procedure § 2960 pp.430-31 (2013)) (noting that relief crafted to coerce compliance with a court order "may be improper if a party's attempt at compliance was 'reasonable.'").

**B. As New Information Has Come to Light, Defendants Have Addressed Individual Cases of Concern and Further Refined Their Policies to Ensure Compliance.**

Since this Court's August 25, 2020 Order, nearly all former class members have been able to obtain a certification of service as honorable on a Form N-426 from his or her chain of command without issue. Defendants have accomplished this result despite the size of the class, which includes every noncitizen service member subject to Section I of the October 13, 20217 N-426 Policy who enters into the service in any of the Military Departments for the first 180 days of continuous active duty service or first year of service in the reserves, unless he or she receives a certified N-426. ECF No. 45 at 21-22. For a sense of the scale of the class, 2,102 noncitizens began active duty service in the six-month period between March 1, 2021 and August 31, 2021. Declaration of Scott L. Seggerman ("Seggerman Decl.") ¶ 3.[18] 1,146 noncitizens began National Guard service in the one-year period between September 1, 2020 and August 31, 2021. *Id*. And 1,209 noncitizens began service in the reserves in that one-year period. *Id*.[19] As outlined above, USCIS had already received 7,741 applications from current service members in just the first eight months of this year—on track to be more than double the naturalization applications in calendar year 2021 compared with 2019. Lotspeich Decl., Exhibit 1. The extraordinary number of noncitizen service members who are all class members when they begin military service, and the thousands of service members who have received certified Forms N-426 before submitting a naturalization application to USCIS, places the comparably small number of issues raised by Plaintiffs in perspective.

---

[18] Active Subclass members are non-citizen service members during the entry-level time period when they have not completed at least 180 consecutive days of active duty service, inclusive of the successful completion of basic training. ECF No. 44 at 2.

[19] Reservist Subclass members are lawful permanent residents serving in the Selected Reserve of the Ready Reserve during the entry-level time period when they have not completed at least one year of satisfactory service toward non-regular retirement. ECF No. 44 at 3.

To be sure, Plaintiffs have identified instances where service members were told incorrect information—and experienced delays—notwithstanding the Army's order and regulations directing officers not to impose Minimum Service Requirements in compliance with the Court's order. Yet across all of the declarations and exhibits submitted in support of their motion, ECF Nos. 59-73, Plaintiffs have provided witness declarations from just five current or former members of the Active Subclass who have purportedly encountered officers professing to withhold honorable characterizations of service on a Form N-426 because of the vacated Minimum Service Requirements.[20] Plaintiffs claim that "with respect to the individual cases of non-compliance that class counsel brought to Defendants' attention from September 2020 to June 2021, Defendants rectified only one such case[.]" ECF No. 58 at 18; *see also id.* at 4 ("Many of these cases remain unresolved."). But each of the individual instances Plaintiffs identified have been addressed. Between September 25, 2020 and today, Plaintiffs' counsel identified approximately twenty-eight allegations of instances that they believed to be instances of noncompliance (few of which involved an allegation that an officer professed to withhold honorable characterizations of service on a Form N-426 because of the vacated policy). In each instance, acting in good faith and with the desire to fulfill our obligations to meet and confer with Plaintiffs' counsel to resolve issues, the matter was referred to the appropriate Army unit for consideration and action. And in each case, the chain of command certified the N-426.

All five service members providing declarations purporting to support Plaintiffs' claims that Defendants imposed the Minimum Service Requirements received their certified N-426 before they would have satisfied those requirements. *See supra* at 8-11. Nearly all of the incidents Plaintiffs describe reflect general administrative difficulties that accompany the

---

[20] Plaintiffs submitted several "Notices" after they filed their "Motion to Enforce" disclosing the parties' Local Rule 7(m) correspondence. ECF Nos. 77-79. To the extent these papers are intended to supplement the materials they filed in support of their motion, Plaintiffs did not request leave of Court to do so while Defendants were preparing their response. Plaintiffs' counsel have received a copy of a Form N-426 that was certified for each service member identified in these notices.

processing of thousands of forms in short order—including an officer's failure to complete a section, the submission of an out-of-date form, and confusion over the rank at which certification was required, *see, e.g., id*.  Defendants do not minimize the importance of avoiding these difficulties, but the existence of these challenges is not evidence of an attempt to circumvent this Court's injunction.

Moreover, unlike Plaintiffs' largely dated allegations, *current* data from units that have exercised their discretion to track requests for Forms N-426 highlights the progress Defendants have made.  For example, the 193d Infantry Brigade at Fort Jackson, South Carolina—which consists entirely of entry-level service members in basic training—has made substantial reforms to its operations for processing Forms N-426 since becoming aware of Plaintiffs' allegations earlier in the summer.  The unit's procedures for addressing Forms N-426 ensure that the forms are signed within approximately five days of the time the form is initiated, and returned to the service member shortly thereafter.  Grein Decl. ¶ 6.  Since July alone, the 193d Infantry Brigade has processed over 362 requests for certified N-426 from class members.  Declaration of Lekisha N. Hogg ¶ 9.  In total, since July 15, 2021, units at Fort Jackson have processed 588 N-426 Forms and return them to soldiers.  Frambes Decl. ¶ 9.  Similarly, at Fort Leonard Wood, two training brigade commanders report that they have combined to sign 187 Forms N-426 for service members in their units since July 2021.  Ball Decl. ¶ 6.

In addition to the five service members providing declarations purporting to support Plaintiffs' claims that Defendants have continued to impose the vacated Minimum Service Requirements, Plaintiffs' brief raises a few additional allegations that some officials have purported to tell some service members that they must complete Minimum Service Requirements before earning an honorable service characterization to be certified on a Form N-426.  ECF No. 58 at 9-13.  But Plaintiffs fail to support these allegations with anything more than hearsay affidavits.[21]

---

[21] The Court should decline to base findings of noncompliance on hearsay affidavits from attorneys.  "[A] hearsay affidavit is not a substitute for the personal knowledge of a [class

Plaintiffs also allege that "Defendants have also imposed the vacated Minimum Service Requirements on active duty class members deployed to their duty stations after completing training."   ECF No. 58 at 13.   But that allegation makes little sense because basic training and the Minimum Service Requirements last roughly the same amount of time.   *See* ECF No. 34 at 3 ("[T]ime spent completing [Initial Entry Training] constitutes active-duty service, with BCT and AIT each lasting roughly 90 days").   By the time a service member completes basic training and is deployed to a duty station, the Minimum Service Requirements are unlikely to have any bearing on N-426 certification (and, indeed, individuals seeking N-426 certification would not be members of the *Samma* class).   It is, thus, unsurprising that Plaintiffs support this allegation only with evidence from a non-class member.   *See* Declaration of Matthew Rinaldi ("Rinaldi Decl."), ECF No. 69.[22]

In addition to their concerns about active-duty service members at basic training, Plaintiffs also allege that "Defendants have also imposed the vacated Minimum Service

---

member.]"   *Sellers v. M.C. Floor Crafters, Inc.*, 842 F.2d 639 (2d Cir. 1988), *Grana v. Runyon*, --- F. Supp. 3d ---, ---. 2020 WL 1508588, at *5 (D.D.C. Mar. 30, 2020).   *Beyah v. Coughlin*, 789 F.2d 986, 989-90 (2d Cir. 1986).   Recent correspondence between the parties underscores these important evidentiary policies.   On August 23, 2021, Class Counsel wrote undersigned counsel alleging that a service member requested a Form N-426 from her unit on Mary 14, 2021, received it on July 18, 2021, and in the time it took to process the form expired.   *See* Holland Decl., Exhibit A.   This service member's particular unit maintained copies of her N-426 demonstrating that, in fact, the Form N-426 was certified in two days.   *See* Holland Decl., Exhibit B.   On September 14, and 15, Class Counsel admitted that they relied on representations of an attorney that were later discovered to be inaccurate.   *See* Holland Decl., Exhibit A.

In any event, in at least one hearsay affidavit, there is no hearsay evidence that the service member even asked his chain of command for a Form N-426.   *See* Declaration of Danielle Quail ("Quail Decl."), ECF No. 62.   The Office of the Staff Judge Advocate at Fort Jackson correctly told a paralegal for Service Member Zhen Pang's law firm that "the Soldier has to process" this request by seeking the Form N-426 from his chain of command.   ECF No. 62-1 at 2.   But neither Class Counsel nor Pang's counsel even bothered, and instead demanded one from counsel for Defendants.   ECF No. 60-6 at 2; *see also* Quail Decl. ¶ 10.   Defendants did not realize that this service member never asked for a Form N-426 from his chain of command before Class Counsel escalated this issue, and Defendants promptly processed Service Member Pang's Form N-426 within only 10 days after it was requested from undersigned counsel.

[22] Service Member Rinaldi   "shipped to [BCT] . . . on April 11, 2018," so his status as a class member terminated on or about October 8, 2018, about two years before a class was certified in this case.   *See* Rinaldi Decl. ¶ 5-7.

Requirements on [Reserve Subclass] members[,]" but support that claim with evidence of only a single incident.   This evidence is, again, from Service Member Kutovaya, ECF No. 58 at 14. She testifies that, on September 22, 2020, a California National Guard Lieutenant Colonel[23] told her husband that the National Guard was not bound by the *Samma* opinion.   Kutovaya Decl. ¶¶ 9.   At the time, Kutovaya had shipped to basic training, so was not a Reserve Subclass member.   *Id*. ¶ 12.   In any event, Defendants reached out to the California National Guard and addressed this issue a year ago.

Beyond their response to the individual concerns Plaintiffs have identified, Defendants have also made engaged in extensive efforts at the policy level.   As detailed above, Army issued new orders (FRAGO 2 and FRAGO 3) requiring commanders to ensure and confirm that current policy is disseminated to the lowest levels of the chain of command—including squad leaders and drill sergeants.   *See supra* at 11-13.   Of particular note, FRAGO 2 required all Commanders—Army-wide—"to disseminate the information contained in FRAGO 2 to the lowest levels, and ensure that all leaders, including squad leaders and drill sergeants, understand their responsibilities to process and route these actions as expeditiously as possible to their commanders."   FRAGO 2 at 4.   And FRAGO 3 further required "commanders at all levels . . . to disseminate the information contained in FRAGO 2 to the lowest levels and ensure that all leaders, including squad leaders and drill sergeants, understand their responsibilities[.]"   FRAGO 3 at 4.   Commanders at all levels "must affirmatively acknowledge this responsibility."   *Id*.

In addition to these orders, Army has paid particular attention to installations, like Fort Jackson and Fort Leonard Wood, that were the subjects of Plaintiffs' allegations.   *See supra* at 13-14.   And commanders at the installations where Plaintiffs have identified concerns have

---

[23] Plaintiffs raise a number of allegations of noncompliance occurring in National Guard reserve units operated by States, which are not named as defendants.   Defendants nonetheless have reached out informally to National Guard units in order to resolve the small number of issues that Plaintiffs have raised stemming from these units.

attested to compliance with the specific dissemination requirements of FRAGO 3.   Frambes Decl. ¶ 12; Tremblay Decl. ¶ 5; Ball Decl. ¶ 4; Benner Decl. ¶ 4.

In sum, Defendants have taken comprehensive steps to ensure compliance with this Court's injunction and to address the concerns Plaintiffs have raised.   As a result of these steps, even if Plaintiffs' allegations could establish past obstacles that some service members had to overcome, class member Forms N-426 are now being processed appropriately.   *See* Hogg Decl. ¶ 9.   Because Defendants have "manifested a willingness to comply" by taking all of the above-described actions, "prospective" relief "is not mandated."   *Florida Steel Corp. v. NLRB*, 648 F.2d 233, 240 (5th Cir. 1981).   Accordingly,  the Court should deny Plaintiffs' motion.

II.   **P**LAINTIFFS **H**AVE **N**OT **S**ATISFIED **T**HEIR **B**URDEN TO **D**EMONSTRATE THAT **T**HEIR **R**EQUESTED **R**EMEDIES **A**RE **W**ARRANTED.

A.   **The Class Representatives Lack Standing to Seek Redress for Alleged Processing Delays.**

Even if Plaintiffs had met their burden to demonstrate that DoD was out of compliance, Plaintiffs seek inappropriate  remedies for the supposed noncompliance.

As an initial matter, Plaintiffs may seek only remedies that would redress the injuries that they have been authorized to pursue on behalf of the class.   Plaintiffs may not, therefore, request relief solely in order to expedite the processing of Forms N-426, if the delays do not result from application of the Minimum Service Requirements.   "[A] plaintiff who has been subject to injurious conduct of one kind [does not] possess by virtue of that injury the necessary stake in litigating conduct of another kind, although similar, to which he has not been subject."   *Blum v. Yaretsky*, 457 U.S. 991, 999 (1982).   "[S]tanding is not dispensed in gross.   If the right to complain of *one* administrative deficiency automatically conferred the right to complain of *all* administrative deficiencies, any citizen aggrieved in one respect could bring the whole structure of state administration before the court for review.   That is of course not the law."   *Lewis v. Casey*, 518 U.S. 343, 358 n.6 (1996).

Much of Plaintiffs' motion reflects an effort to broaden the scope of this case—after final judgment—beyond the  parameters  of the  limited  policy  that  this  Court  certified  a  class  to

challenge.   The Plaintiffs in this case were eight noncitizens serving in the military: Ange Samma, Abner Bouomo, Ahmad Isiaka, Micael Perez, Sumin Park, Yu Min Lee, Timotius Gunawan, and Rafael Leal Machado.   Amended Complaint, ECF No. 24.   On August 4, 2020, the Court issued an order certifying Plaintiffs Isiaka, Gunawan, and Machado as class representatives.   *Samma v. DoD*, 2020 WL 4501000, at *10 (D.D.C. Aug. 4, 2020).   Plaintiffs Gunawan and Machado are class representatives for the Active Subclass "and this subclass is certified to challenge the Active Minimum Service Requirement in Section 1.3.a of the N-426 Policy."   *Id*.   Plaintiff Isiaka is the class representative for the Reservist Subclass "and this subclass is certified to challenge the Reservist Minimum Service Requirement in section 1.3.b of the N-426 Policy."   *Id*.   "[G]iven that the Court has concluded that the proposed class representatives only have standing to challenge the Minimum Service Requirements, it follows that the class must be limited to individuals whose inability to obtain an N-426 *is being caused by those requirements*."   *Id*. at *8 (emphasis added).   Because "a plaintiff who has been subject to injurious conduct of one kind [does not] possess by virtue of that injury the necessary stake in litigating conduct of another kind, although similar, to which he has not been subject," *Blum*, 457 U.S. at 999, it also follows that the class representatives lack standing to seek relief from this Court redressing instances where class members did not receive a certified Form N-426 within 30 days, unless the reason for that delay was improper imposition of the vacated Mandatory Service Requirements .

Yet most of Plaintiffs' grievances fall outside this category.   By their own admission, Plaintiffs are seeking relief on behalf of the class in order to remedy "Defendants' [purported failure] to process their forms within 30 days," ECF No. 58 at 14, regardless of whether their "inability to obtain an N-426 *is being caused by*" the Minimum Service Requirements, *Samma*, 2020 WL 4501000, at *8.   Plaintiffs allege that in "some instances," ECF No. 58 at 14-15, class

members have waited more than 30 days for DoD to process a request for an N-426 certification. ECF No. 58 at 14-15.[24]

Plaintiffs' own evidence indicates that the reasons for delay in most of these cases typically have nothing to do with the challenged Minimum Service Requirements.  For example, Plaintiffs' allegations focus primarily on Service Member Goo.  *Id*. at 15-16.  But again, the reason for that delay is largely attributable to a separate administrative issue: the level of the officer who issued the certified form, which prompted USCIS not to accept the N-426 that Goo received.  *See* Goo Decl. ¶¶ 19, 25.  Goo admits that he received a certified Form N-426 on September 18, 2020, less than 30 days after the Court issued final judgment in this case, regardless of the fact that he was still in entry-level status.  *Id*. ¶ 17.

Similarly, Plaintiffs point out that former class member Tae Hun Yi waited for a prolonged period for an N-426, but there is no evidence that any Army officer withheld a Form N-426 certification from Yi under the vacated Minimum Service Requirements.  *See* Declaration of Tae Hun Yi ("Yi Decl."), ECF No. 70 ¶¶ 12-17.  In fact, at least some delay was due to clerical error.  *Id*. ¶ 19.  Plaintiffs also describe Service Member Juan Zapata Saucedo's experience requesting an N-426 in June 2020, ECF No. 58 at 16, but he never submitted an N-426 while a class member.[25]

Plaintiffs claim that Service Member Shaui Zong waited for more than 30 days for a certified N-426 while at basic training at Fort Benning.  ECF No. 58 at 16.  But Zong apparently never submitted her request to her chain of command at Fort Benning at all.  *See generally* Declaration of Shauzi Zong ("Zong Decl."), ECF No. 73.  Instead, her attorney requested a certification from the U.S. Army Reserve 117th Legal Operations Detachment.  *Id*. ¶ 6.  But

---

[24] Plaintiffs admit that Defendants have already provided a certified Form N-426 to each of the individuals they describe.  ECF No. 58 at 16.

[25] Zapata Saucedo submitted an N-426 in July 2020, before the Court issued its final order.  Declaration of Juan Zapata Saucedo ("Zapata Saucedo Decl."), ECF No. 72 ¶ 10.  Zapata Saucedo's membership in the Reservist Subclass ended once he "satisfied the Minimum Service Requirements in Section I.3.b of the N-426 Policy," ECF No. 44 at 2, in September 2020, *see* Zapata Saucedo Decl. ¶ 6.

Zong was in active duty for training at Fort Benning at the time, not in the reserves. *Id.* ¶ 5. Once Zong's attorney submitted the request to Zong's chain of command at Fort Benning, on May 21, 2021, Zong received her certified N-426 eleven days later. *Id.* at ¶¶ 13-15. Zong's eleven-day turnaround time is typical for N-426 requests submitted to the chain of command.[26] For service member Zong, any "delay" appears to stem from the service member's lawyer requesting certifications from units that were unaffiliated with her. *See, e.g., id.* ¶¶ 5-13.

Plaintiffs also rely on the experience of Ju Hwa Lee, even though she has never been a class member. Lee shipped to basic combat training, beginning active duty, on January 16, 2020. Declaration of Ju Hwa Lee ("Lee Decl.") ¶ 6. So Lee "satisfied the Minimum Service Requirements in Section 1.3.a of the N-426 Policy," terminating her membership in the class, ECF No. 47 at 44, on or about July 14, 2020, before the class was even certified to exist.

When a delay in processing a Form N-426 has nothing to do with the vacated Minimum Time-in-Service Requirements,[27] it is beyond the scope of this class action, and the class representatives lack standing to seek redress in the context of this case.

_____

[26] Nothing in the Court's final order modifies DoD Policy that "the 30-day time period contemplated by the April 24, 2020 policy update begins when the first person *in the chain of command receives the N-426 request*." ECF No. 42 at 1 (emphasis added).

[27] Nothing in the October 13, 2017 Memorandum authorized or directed military officers to withhold certified Forms N-426 from entry-level service members that did not meet the Minimum Service Requirements. Instead, the October 13, 2017 Memorandum addressed only "the certification of *honorable* service of members of the Selected Reserve of the Ready Reserve and members of the active components of the military or naval forces of the United States for the purpose of supporting Service Member applications for naturalization under section 1440 of Title 8, U.S. Code." SAMMA_0006 (emphasis added). Accordingly, under the October 13, 2017 Policy, it was proper for a certifying official to return a Form N-426 to an entry-level service member certified with Part 5 of the Form checked "No" indicating that, looking backward, the service member had not earned a characterization of service as honorable due to her entry-level status. *See Miriyeva v. USCIS*, 9 F.4th 935, 938 (D.C. Cir. 2021) (describing Army characterization of service policy). A failure to return the form so certified, however, would not be prejudicial to the service member, who under the policy, would not earn an honorable characterization until becoming fully and finally absorbed into the Army by completing the Minimum Service Requirements (with some exceptions). *See Patterson v. Lamb*, 329 U.S. 539, 542 (1947).

By way of further example, Plaintiffs submit a declaration from service member Matthew Rinaldi who provides testimony about a delay in receiving a Form N-426.  Rinaldi Decl. ¶¶ 8-10.  But given the length of Rinaldi's service at the time he requested a Form N-426 certification, he was not a class member at the time and was not subject to the Minimum Service Requirements.  *See id*. ¶¶ 5-7; *supra* at 21 n.22.  Thus, his testimony is evidence that, although Army is committed to ensuring all N-426s are certified in less than 30 days within its current policy, delays were rarely, if ever, caused by impositions of the vacated Minimum Service Requirements that the class is certified to address.  Delays unrelated to the Minimum Service Requirements are beyond the scope of this motion and this case.

Unless tied to an improper imposition of the vacated Minimum Service Requirements, delays in processing Forms N-426 beyond 30 days do not meet Rule 23's commonality requirement.  The Court's class certification opinion recognizes as much, as it limits the commonality analysis to "the Active Minimum Service Requirement in the N-426 Policy [which] is a uniform policy that applies to all members of the Active Subclass and the Reservist Minimum Service Requirement in the N-426 Policy [which] is a uniform policy that applies to all members of the Reservist Subclass."  *Samma*, 2020 WL 4501000, at *8.

Aside from errors in the form submitted by the applicant, the time period for processing a Form N-426 may differ greatly from one unit to another, depending on factors such as training cycles, missions of the unit, geographic locations of the commands, changes in work locations and schedules due to COVID-19 safety protocols, the resources of the unit and the tasks pending before the chain of command at the time certification is requested.  *See In re Barr Laboratories, Inc.*, 930 F.2d 72, 74 (D.C. Cir. 1991) ("[R]espect for the autonomy and comparative institutional advantage of the executive branch has traditionally made courts slow to assume command over an agency's choice of priorities.").  Factors affecting time to process a Form N-426 can be even more diverse in reservist units, where service members and many personnel serve only part time and drills may occur as infrequently as one day per month.  As no two units are the same, there is no commonality among class members on this question, which the class

representatives are not certified to address. "The case-by-case approach that this requires is understandably frustrating" to Class Counsel, "[b]ut this is the traditional, and remains the normal, mode of operation of the courts." *Lujan v. Nat'l Wildlife Fed.*, 497 U.S. 871, 894 (1990). For these reasons, class representative Plaintiffs Gunawan, Machado, and Isiaka lack standing to seek an "order compelling Defendants to certify or deny N-426 certification requests for all class members in the Army whose requests have been pending for over 30 days," ECF No. 58 at 3, even if those class members were not injured by an officer's purported imposition of the Minimum Service Requirements. Nor may they seek the other relief that they seek to the extent it is not tailored to preventing the imposition of the challenged Minimum Service Requirements.

## B. Plaintiffs Have Not Established Any of the Criteria for Obtaining the Mandatory Injunctive Relief that They Seek.

Plaintiffs seek to modify this Court's Order by adding *nine* additional prongs to the injunction that is already in place. *See* ECF No. 58 at 36-37 (requests (2) through (10)). But they cite no case in which a court has ordered comparable modifications to an injunction in response to a motion for enforcement. Indeed, in the one case that Plaintiffs cite with a comparable procedural posture, *WMATC*, the request at issue was for a straightforward modification to an injunction in order to prevent an obvious attempt at evasion. Specifically, the court had enjoined the defendant (an individual named Paul Benjamin Rodberg) and his companies (Reliable Limousine Service, LLC) from transporting passengers in a certain geographical area without proper authorization. *WMATC*, 985 F. Supp. 2d at 26. But Rodberg then used a *different* entity—the similarly named Reliable Limousine and Bus Service, LLC—to transport passengers in a manner that violated the injunction. *Id.* Accordingly, the Court modified its injunction "to make explicit" that Rodberg could not use the second entity, or "any other entity [he] created or controlled," to impermissibly transport passengers. *Id.*; *cf.* Fed. R. Civ. P. 65(d)(2) (providing that injunctions bind persons "who are in active concert" with a party. Plaintiffs have not identified any similar allegations of non-compliance that would require

modifying the terms of this Court's injunction, much less allegations that could support the burdensome oversight Plaintiffs have requested here.

Each of the modifications Plaintiffs request would compel the Secretary of Defense (or officials over whom he has authority) to take a specific action, and thus would constitute a mandatory injunction. "[A] mandatory injunction against a federal official is analyzed as one requesting mandamus." *Nat'l Wildlife Federation v. United States*, 626 F.2d 917, 918 n.1 (D.C. Cir. 1980); *see also Miguel v. McCarl*, 291 U.S. 442, 452 (1934) ("The mandatory injunction here prayed for is in effect equivalent to a writ of mandamus, and governed by like considerations."); *Gaines v. Thompson*, 74 U.S. 347, 352 (1868) (explaining that "doctrine" applicable to "relief sought . . . through the writ of mandamus . . . is as applicable to the writ of injunction[.]"); *In re Cheney*, 406 F.3d 723, 729 (D.C. Cir. 2005) (en banc) (quoting *Sanchez-Espinoza v. Reagan*, 770 F.2d 202, 207 n.7 (D.C. Cir. 1985)) ("'The principles that governed the former writ now govern attempts to secure similar relief,' such as a mandatory injunction ordering a government employee or agency to perform a duty owed to the plaintiff"). "A court may grant mandamus relief only if: (1) the plaintiff has a clear right to relief; (2) the defendant has a clear duty to act; and (3) there is no other adequate remedy available to plaintiff." *Muthana v. Pompeo*, 985 F.3d 893, 910 (D.C. Cir. 2021) (quoting *Baptist Mem'l Hosp. v. Sebelius*, 603 F.3d 57 62 (D.C. Cir. 2010)). "[T]he 'party seeking mandamus has the burden of showing that its right to issuance of the writ is clear and indisputable.'" *Lovitky v. Trump*, 949 F.3d 753, 759-60 (D.C. Cir. 2020) (quoting *Power v. Barnhart*, 292 F.3d 781, 784 (D.C. Cir. 2002)). Plaintiffs have failed to make any of these showings for any of their numerous requests for relief in the nature of mandamus.

Instead, Plaintiffs provide a list of policies that they think are wise and would like this Court to compel the Secretary of Defense to adopt. But the D.C. Circuit has made clear that "'[s]uccess on a motion to enforce a judgment gets a plaintiff only 'the relief to which the plaintiff is entitled under its original action and the judgment entered therein,'" *Heartland Reg. Med. Ctr. v. Leavitt*, 415 F.3d 24, 29 (D.C. Cir. 2005) (quoting *Watkins v. Washington*, 511 F.2d

404, 406 (D.C. Cir. 1975)); *see also Anglers Conservation Network v. Ross*, 387 F. Supp. 3d 87, 93 (D.D.C. 2019) (same), not additional relief requiring fundamentally new actions by the Army. Moreover, the specific relief that Plaintiffs have requested here is particularly inappropriate in light of the Supreme Court's repeated refusal to sanction judicial intrusion into the realm of military administration. *See, e.g.*, *Orloff v. Willoughby*, 345 U.S. 83, 93 (1953). ("[J]udges are not given the task of running the Army.").

> ### i. Plaintiffs Have Not Established that the Secretary of Defense Has a Clear Duty to Perform the Acts they ask the Court to Compel Him to Take.

Courts often discuss the first two "elements for mandamus-type relief—clear right to relief and clear duty to act—concurrently[.]" *Lovitky*, 949 F.3d at 760. Plaintiffs must establish that this Court's final judgment "imposes a clear and indisputable duty" on the Secretary of Defense to take each of the specific actions that they seek the Court to compel him to take. *See id*. They have not and cannot make this showing.

Without doubt, the Department of Defense has a duty to comply with this Court's final order. *See Dolman v. United States*, 439 U.S. 1395, 1395, 1397 (1978). But the Court must determine if each of Plaintiffs' requests constitute the "ordering of a 'precise, definite act about which an official had no discretion whatever[.]" *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 63 (2004) (quoting *United States ex rel. Dunlap v. Black*, 128 U.S. 40, 46 (1888). Plaintiffs have failed to meet that standard for the relief they request.

*First*, Plaintiffs ask this Court for a mandatory injunction "compelling Defendants to [commission and] identify a point of contact in the Army, with authority to take appropriate action, for class members who experience problems submitting their N-426 certification requests to their commands or who have not received their N-426 certification or denial within 30 days of submission to their commands." ECF No. 58 at 2-3. But that remedy, which would require Army to commission an officer to administer inquiries about alleged violations, is not appropriate. The military executes its operations through the chain of command, which "extends upward" from the lowest levels to the highest levels "for matters" like Forms N-426 certification

"requiring official communication from subordinate to senior." Army Regulation 600-20, paragraph 2-1(a). The Army does not have a clear duty to upend its system—"vital to the overall effectiveness of the Army," *id.*, paragraph 2-1(c)—for processing Forms N-426. St. Clair Decl. ¶ 11-12. To the contrary, "[t]he Army, of course, is bound to follow its own regulations." *Ortiz v. Sec'y of Defense*, 41 F.3d 738, 741 (D.C. Cir. 1994). "Civilian courts must, at the very least, hesitate long before entertaining a suit that asks the court to tamper with the established relationship between enlisted military personnel and their superior officers; that relationship is at the heart of the necessarily unique structure of the military establishment." *Chappell v. Wallace*, 462 U.S. 296, 300 (1983).

Instead, a class member's remedy for addressing an allegation that Defendants have violated an obligation to her arising from the injunction is to "seek the cooperation of the class representative . . . or to intervene in [this] action" to ensure compliance with the injunction. *See Goff v. Menke*, 672 F.2d 702, 704 (8th Cir. 1982). Those avenues are in addition to the existing administrative remedies that class members who encounter concerns with compliance already have available. Such avenues ensure that Army principals are made aware of any issues and that the Department of Defense has "an opportunity to correct its own mistakes with respect to the programs it administers before it is haled into federal court." *See McCarthy v. Madigan*, 503 U.S. 140, 145 (1992); *In re Kelly*, 401 F.2d 211, 213 (5th Cir. 1968) ("We are unwilling to presume in this case that the military courts will not fully and fairly consider claims by petitioner of the . . . failure of the Army to abide by its own regulations."). Administrative remedies include taking advantage of their Commander's open door policy, *see* A.R. 600-20, paragraph 2-2; utilizing commanding general hotlines, inspector general complaints, or complaints under Article 138 of the Uniform Code of Military Justice, 10 U.S.C. § 938,[28] *see Chappell*, 462 U.S.

---

[28] In Article 138 of the Uniform Code of Military Justice, 10 U.S.C. § 938, Congress "provides for the review and remedy of complaints and grievances" brought by service members against officers in their chains of command as part of Congress's "comprehensive internal system of justice to regulate military life, taking into account the special patterns that define the

at 302.   Legal assistance offices are available to soldiers to assist them in exhausting these remedies in the extraordinary and unanticipated case that they are needed.   Although Plaintiffs dismiss these options, utilizing military remedies is the most prompt and effective way to correct any noncompliance.

*Second*, Plaintiffs request an "order compelling Defendants to serve a list containing names of all class members in the Army who have requested N-426 certification, the dates they submitted their requests, and the dates (if any) on which they received their N-426 certifications."   ECF No. 58 at 3.   They also seek an "order compelling [the Secretary] to serve monthly status reports" that include "the names of all class members in the Army who have requested an N-426 certification since the previous report, the dates they submitted the requests, and the dates (if any) on which they received their N-426 certifications."   *Id*.   Because the Secretary has no universal system of records for tracking when service members in decentralized units throughout the Army ask their chains of command to certify a Form N-426, granting this request would require the Secretary to establish such a system.   St. Clair Decl. ¶ 11.   Establishing such a system would "require repurposing fiscal resources from current priorities and significant costs in terms of time, training, and personnel at every echelon of the chain of command across all of our Active, Reserve, and National Guard Components."   *Id*.   But nothing in the Court's injunction nor any statute clearly directs the Secretary to establish this kind of system of records.   *See* 2020 NDAA § 526.   Because Plaintiffs' request would require implementing a system to

---

military structure."   *See Chappell v. Wallace*, 462 U.S. 296, 302 (1983).   Specifically, Article 138 provides:

> Any member of the armed forces who believes himself wronged by his commanding officer, and who, upon due application to that commanding officer, is refused redress, may complain to any superior commissioned officer, who shall forward the complaint to the officer exercising general court-martial jurisdiction over the officer against whom it is made. The officer exercising general court-martial jurisdiction shall examine into the complaint and take proper measures for redressing the wrong complained of; and he shall, as soon as possible, send to the Secretary concerned a true statement of that complaint, with the proceedings had thereon.

10 U.S.C. § 938.

collect and compile information in order to produce the requested reports, it is far more burdensome than the reports for readily ascertainable information that other courts in this district have ordered (in cases that had not reached final judgment).  *See* ECF No. 58 at 37.

*Third*, Plaintiffs seek an "order compelling Defendants to distribute [a] Court-approved joint communication on a monthly basis to individuals who have become class members since the previous distribution."  ECF No. 58 at 3.  Again, this is not proper mandamus relief.  When Congress intends to impose a duty on the Department of Defense to provide legal education to service members, it does so clearly.  *See, e.g.*, 10 U.S.C. § 937.  Without any such duty, the Court cannot now order the Secretary to exercise his discretion to educate class members about the proper procedures for submitting  a Form N-426.

Nor can Plaintiffs reasonably argue that this request—made one year after final judgment—bears some relationship to Federal Rule of Civil Procedure 23(c)(2).  Rule 23(c)(2) class notice is typically issued by Class Counsel, not Defendants, "because it is [they] who seek[] to maintain the suit as a class action."  *Oppeneimer Fund, Inc. v. Sanders*, 437 U.S. 340, 359 (1978).  Moreover, a Rule 23 notice "must be sent long before the merits of the case are adjudicated" and "as soon as practicable[] after the court determines that the class action is proper under subdivision (c)(1)."  7AA C. Wright, A. Miller, & M. Kane, Federal Practice and Procedure § 1788 (3d ed.).  Neither of these criteria are met here.  Plaintiffs filed their "Motion to Enforce Court Order" on August 17, 2021—nearly a year after final judgment and more than a year after class certification.

*Fourth*, Plaintiffs also suggest that DoD's duty not to enforce the Minimum Service Requirements on class members translates into a requirement that it scrub its website of archival press releases.  ECF No. 58 at 28 & n.22 (describing the availability of two press releases dated October 13, 2017, as "[d]istburing[]").  But the website that Plaintiffs highlight includes *every* press release issued by DoD.  And it already clearly notes: "You have accessed a part of a historical collection on defense.gov.  Some of the information contained within may be

outdated[.]"[29]   Plaintiffs have identified no authority suggesting that DoD has a mandatory duty to scrub its website of historical and archival materials that are clearly annotated to be potentially outdated.

### ii. Plaintiffs Have Not Established that There is No Other Adequate Remedy Available to Address Their Allegations of Non-Compliance.

If the Court determines that Defendants are in violation of the injunction, Plaintiffs also fail to demonstrate that there are no adequate alternative remedies—*i.e.*, remedies other than each of their nine requests for mandatory injunctive relief—that would suffice.   *See also WMATC*, 985 F. Supp. 2d at 28 ("essential inquiry . . . is whether modification or clarification is necessary to achieve the [injunction's] intended result").   To the contrary, there are alternative remedies that would not encroach upon the Secretary's discretion to address the "submission and processing of a completed [USCIS] Form N-426, by a member of the Armed Forces."   2020 NDAA § 526.   For example, "the district court ha[s] the authority to require the Secretary to propose a workable plan" tailored to the specific Army units that the Court finds noncompliant, "in order to 'ensure that its instructions are followed,'" *Cobell v. Norton*, 391 F.3d 251, 258 (D.C. Cir. 2004) (quoting *Cobell v. Norton*, 240 F.3d 1081, 1109 (D.C. Cir. 2001)).   And because "a court must exercise 'the least possible power adequate to the end proposed,'" *Shillitani v. United States*, 384 U.S. 364, 371 (1966) (quoting *Anderson v. Dunn*, 6 Wheat. 204, 231 (1821), requiring the Secretary to exercise his discretion and submit a unit-specific plan for ensuring that officers in the field are not imposing Minimum Service Requirements is more consistent with the requirements of equity than the measures Plaintiffs demand.[30]

---

[29] *See, e.g.*, https://www.defense.gov/Explore/News/Article/article/1342430/

[30] Of course, any such plan might well reflect many of the steps Defendants have already taken—in some cases at specific installations—to ensure officer compliance. *See supra* at [8, 11-14].   But that just reinforces why ordering *any* modification to the existing injunction is inappropriate at this juncture.

### iii.  Plaintiffs' Reliance on *Kirwa* is Misplaced.

Plaintiffs' brief lacks authority to support the proposition that this Court should superintend the details of the Army's process for certifying Forms N-426.   In particular, Plaintiffs' heavy reliance on *Kirwa v. Department of Defense*, No. 17-CV-1793 (D.D.C.), is misplaced.

Plaintiffs claim that the *Kirwa* court "ordered nearly identical relief . . . in response to similar non-compliance by Defendants in that action."   ECF No. 58 at 37 (citing Ex. 17, Ex. 18, and Ex. 19).   But that is not correct.   The *Kirwa* court did not adjudicate the *Kirwa* plaintiffs' motion to enforce the preliminary injunction in that case; it denied that motion as moot in light of its Class Notice order.   *See* Minute Order, *Kirwa v. DoD*, No. 17-CV-1793 (D.D.C. Dec. 15, 2017).   The *Kirwa* Class Notice order was issued on December 14, 2017, only thirteen days after the Court issued an order granting class certification, *see* Order, ECF No. 48, *Kirwa*, No. 17-CV-1793 (D.D.C. Dec. 1, 2017).   The *Kirwa* Class Notice was not issued as a remedy for noncompliance with an injunction, but under Rule 23.   *Compare* ECF No. 59-18 (*Kirwa* Class Notice Order) ("The Court finds that the dissemination of the Notice under the terms and in the format provided for herein constitutes the best notice practicable under the circumstances"), *with*, Fed. R. Civ. P. 23(c)(2).   In this case, which was litigated to final judgment over a year ago, Plaintiffs did not seek class notice, and the Court declined to exercise its discretion to issue any. *Samma*, 2020 WL 4501000, at *8-10.   Again, Rule 23 notice "must be sent long before the merits of the case are adjudicated" and "as soon as practicable[] after the court determines that the class action is proper under subdivision (c)(1)," 7AA C. Wright, A. Miller, & M. Kane, Federal Practice and Procedure § 1788 (3d ed.), which is what happened in *Kirwa*.   But Plaintiffs in this case cannot seek a Rule 23 class notice nearly a year after the Class's claims have been adjudicated and the Court issued its final judgment.   *See id*.

Moreover, unlike the limited and defined class in *Kirwa*, the *Samma* class is both larger and indefinite.   The *Samma* class consists of (1) *all* "non-citizens serving in the U.S. military;" (2) who are "subject to section I of the October 13, 2017 N-426 Policy,"—which is still in

effect;[31] (3) who "have not received a certified N-426;" (4) who are not *Kirwa* class members; and (5) who "have not satisfied the Minimum Service Requirements" of the N-426 Policy.  ECF No. 44 at 1-2 (emphasis added).  In *Kirwa*, the class was limited to reservist MAVNIs who entered military service *before* October 2017.  Order, *Kirwa*, ECF No. 48 at 1.  By contrast, because there is no date cutoff, the class here continues to grow.  So Defendants cannot moot the class in the same matter the parties attempted in *Kirwa*.

In *Kirwa*, as of July 21, 2020, Army had received a total of approximately 1,695 requests for N-426 certification from individuals who were class members before they received the N-426s.  *See* St. Clair Decl. ¶ 2, *Kirwa*, ECF No. 230-1.[32]  Again, to provide a sense of the scale of the *Samma* class, during a 180-day period from March 1, 2021, to August 31, 2021, 2,102 noncitizens became active duty service members.  Seggerman Decl. ¶ 3.  During a one-year period from September 1, 2020, to August 31, 2021, 2,355 noncitizens became reservists.  *Id*. The nature of the *Samma* class means that an entirely different set of approximately 2,000 service members may be Active Subclass members in the 180-day period after that.  The same reasoning applies for the Reservist Subclass.  New service members become class members each day.

The *Kirwa* court did order reporting requirements.  ECF No. 59-17 at 2-3; Order, ECF No. 37, *Kirwa*, No. 17-CV-1793 (D.D.C. Nov. 16, 2016).  But it did not do so in response to an adjudication of noncompliance of a court order as Plaintiffs' represent.  ECF No. 58 at 37. Given the posture of that case and the unique equities of the *Kirwa* class,[33] Defendants

---

[31] The Minimum Service Requirements that were vacated in this case and then rescinded are a subset of Section I of the Policy.

[32] Defendants may not have ascertained the full scope of the *Kirwa* class, but by the time applications from *Kirwa* class members slowed to very few, Army was able to report that it certified N-426s for this many *Kirwa* class members through the procedures developed over the course of that litigation.

[33] As Judge Huvelle previously explained in this case: "You [class counsel] say this is no different than *Kirwa*.  But [in] *Kirwa*, these people were sitting three to four years waiting to get an N-426 [in light of a prolonged security screening process at issue in that case].  And they were subject to deportation.  They didn't have any protection whatsoever."  Transcript (July 16, 2020) at 37:7-10, ECF No. 37.  The *Kirwa* court also found that when *Kirwa* class members "enlisted,

determined that the best way to resolve it would be for the parties "to work together to try and moot out the class[.]"  Transcript, at 5:15-18 (June 17, 2019), ECF No. 167, *Kirwa*, 17-cv-1793 (D.D.C. July 19, 2019).  Defendants voluntarily decided to "go through the records DoD has in order to build a comprehensive list of potential class members.  Then work *with plaintiffs' counsel* to identify those that have not yet submitted an N-426."  *Id*. at 6:14-19 (emphasis added).  Again, mooting the class is not similarly possible in this case because the *Samma* class does not have a cutoff date for class membership.  ECF No. 44.  In *Kirwa*, the class consisted of all reservists who enlisted in the military through the MAVNI program *prior to October 13, 2017* who have not received a completed and duly authenticated Form N-426.  Order, *Kirwa*, ECF No. 48 at 1 (emphasis added).  Because no new class members were added to the *Kirwa* class after October 13, 2017, the parties believed it possible to moot the class by trying to identify each class member and then working with Plaintiffs' counsel to see whether or not they submitted a Form N-426.  While the procedures developed in the course of the litigation in *Kirwa* provided a separate mechanism for a small subset of noncitizen service who had provided years of service in the reserves to obtain years-overdue N-426s, the *Samma* Plaintiffs now seek to have the Court impose those procedures on DoD by way of a mandatory injunction that would apply to every new noncitizen service member; entirely transforming DoD's desired approach to Form N-426 certification.

Nor was Judge Huvelle pleased with the implications of the system that developed in *Kirwa*.  Because of Defendants' status reports, the *Kirwa* class counsel repeatedly raised issues that Judge Huvelle labeled as "minutia."  Transcript (Jan. 23, 2018), at 28.  As Judge Huvelle explained, the relief sought again and again by the *Kirwa* class counsel "is not the way litigation can go."  *Id*.  The Court expressed consternation with Plaintiffs' continued efforts to "have a hearing on every 10 people because there are thousands of people out there."  *Id*.  As Judge

---

the government told them they would receive N-426s either after just one day of qualifying service (e.g., a drill with their Selected Reserve unit), or within around 180 days when they shipped to basic training.

Huvelle explained, "[t]he Court does not exist to say well, Mr. MAVNI here doesn't have this form." *Id.* at 30.  Judge Huvelle explained that the reporting she had ordered "causes more problems than it solves."  Transcript (Oct 3, 2018), at 5.  For these reasons as well, the Court should not "act as supreme supervisor of the [Army's Form N-426 processing] activities." *Council of and for the Blind of Delaware Cnty. Valley, Inc. v. Regan*, 709 F.2d 1521, 1532 (D.C. Cir. 1983).

In short, *Kirwa* has no bearing on the instant motion.  The *Kirwa* court never adjudicated a request to modify an injunction, while an appeal is pending, that would have required federal officials to assume a series of new, detailed duties.   Accordingly, *Kirwa* does not alter the conclusion that Plaintiffs have failed to demonstrate their entitlement to any of their requested relief.

### C.  Plaintiffs Seek Specific Relief that Defendants Have Already Provided.

Plaintiffs seek an "order compelling Defendants to file and serve a report of their efforts to comply with the Order."  ECF No. 58 at 2.  Defendants have provided this information in this memorandum and the attached declarations.   Plaintiffs also seek an "order compelling Defendants to require all O-6 commanders at the Army's basic training bases and other installations where class counsel have identified cases of non-compliance to confirm receipt of the September 3, 2020 Army implementing memorandum and to confirm that all officers below them in their chains of command have read and understood their obligations under the memorandum."  ECF No. 58 at 2-3.  FRAGOs 2 and 3 provide the relief requested in the latter request.  *See* FRAGO 2; FRAGO 3.  Because Plaintiffs have "already 'obtained all the relief that [they have] sought'" in requesting this relief, these requests are moot.  *See Conservation Force, Inc. v. Jewell*, 733 F.3d 1200, 1204 (D.C. Cir. 2013) (quoting *Mionzillo v. Biller*, 735 F.2d 1456, 1459 (D.C. Cir. 1984)).

### CONCLUSION

For the foregoing reasons, the Plaintiffs' Motion to Enforce should be denied.

Dated: October 18, 2021

Respectfully submitted,

BRIAN M. BOYNTON
Acting Assistant Attorney General

ANTHONY J. COPPOLINO
Deputy Branch Director
Federal Programs Branch

*/s/ Liam C. Holland*
LIAM C. HOLLAND
Trial Attorney
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street NW
Washington, DC 20530
Tel: (202) 514-4964
Fax: (202) 616-8470
Email: liam.c.holland@usdoj.gov

*Attorneys for Defendants*