# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

<table>
<tr><td>

ANGE SAMMA *et al.*, on behalf of
themselves and others similarly situated,

     *Plaintiffs,*

   v.

UNITED STATES DEPARTMENT OF
DEFENSE *et al.*,

     *Defendants.*

</td><td>

No. 20-cv-01104-PLF

</td></tr>
</table>

## REPLY MEMORANDUM IN SUPPORT OF
## PLAINTIFFS' MOTION TO ENFORCE COURT ORDER

Jennifer Pasquarella
American Civil Liberties Union Foundation
 of Southern California
1313 West 8th Street
Los Angeles, CA 90017
(213) 977-5236
jpasquarella@aclusocal.org

Scarlet Kim (D.D.C. Bar No. NY0329)
Sana Mayat*
Brett Max Kaufman (D.D.C. Bar. No. NY0224)
American Civil Liberties Union Foundation
125 Broad Street, 18th Floor
New York, NY 10004
(212) 549-2500
scarletk@aclu.org
smayat@aclu.org
bkaufman@aclu.org

Arthur B. Spitzer (D.C. Bar No. 235960)
American Civil Liberties Union Foundation
 of the District of Columbia
915 15th Street, NW, 2nd Floor
Washington, DC 20005
(202) 601-4266
aspitzer@acludc.org

*Admitted *pro hac vice*

*Counsel for Plaintiffs*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................................... ii

INTRODUCTION ................................................................................................... 1

ARGUMENT ......................................................................................................... 2

   I.    DEFENDANTS HAVE NOT COMPLIED WITH THIS COURT'S ORDER................. 2

      A.    Defendants Have Continued to Impose the Minimum Service Requirements Vacated by the Order. ................................................................................. 2

      B.    Defendants Have Failed to Process N-426 Forms Within 30 Days of Submission, as Required by the Order. ...................................................... 7

      C.    Defendants Provide No Contrary Evidence of Actual Compliance with the Court's Order. ................................................................................... 10

   II.   PLAINTIFFS SEEK ENFORCEMENT OF THE COURT'S AUGUST 25, 2020 ORDER, NOT A NEW INJUNCTION OR A WRIT OF MANDAMUS. ............. 14

   III.  PLAINTIFFS MAY MOVE TO ENFORCE THIS COURT'S ORDER ON BEHALF OF THE CLASS........................................................................... 16

   IV.  THE COURT SHOULD ENFORCE ITS ORDER BY ORDERING DEFENDANTS TO UNDERTAKE THE MEASURES REQUESTED BY PLAINTIFFS. ..................................................................................... 17

      A.    The Court Has Broad Discretion to Order Specific Actions in Response to a Party's Non-Compliance with a Prior Order. ...................................... 17

      B.    Plaintiffs Seek the Same Measures this Court Ordered in *Kirwa*, which Ensured Defendants' Compliance with a Similar Order. ........................... 20

CONCLUSION..................................................................................................... 24

# TABLE OF AUTHORITIES

**Cases**

*Adem v. Bush*,
No. 05-cv-723, 2006 WL 1193853 (D.D.C. Apr. 28, 2006) ...................................... 7

*Anderson v. Dunn*,
6 Wheat. 204 (1821) ...................................... 14

*\*Berger v. Heckler*,
771 F.2d 1556 (2d Cir. 1985) ...................................... 17, 18

*Cent. of Georgia R.R. Co. v. United States*,
410 F. Supp. 354 (D.D.C. 1976) ...................................... 18

*Chambers v. NASCO, Inc.*,
501 U.S. 32 (1991) ...................................... 14

*\*Class v. Norton*,
376 F. Supp. 496 (D. Conn. 1974), *aff'd in part, rev'd in part*,
505 F. 2d 123 (2d Cir. 1974) ...................................... 5, 18, 19, 20

*Cobell v. Norton*,
391 F.3d 251 (D.C. Cir. 2004) ...................................... 20

*Daskalea v. District of Columbia*,
227 F.3d 433, 442 (D.C. Cir. 2000) ...................................... 12

*Davis v. Soc. Serv. Coordinators, Inc.*,
No. 10-cv-2372, 2012 WL 3744657 (E.D. Cal. Aug. 28, 2012) ...................................... 2

*Flaherty v. Pritzker*,
17 F. Supp. 3d 52 (D.D.C. 2014) ...................................... 15

*Ford Motor Co. v. Summit Motor Prods., Inc.*,
930 F.2d 277 (3d Cir. 1991) ...................................... 8

*\*Glymph v. District of Columbia*,
No. 01-cv-1333, 2018 WL 10715454 (D.D.C. Apr. 17, 2018) ...................................... 7

*Hammon v. Kelly*,
830 F. Supp. 11 (D.D.C. 1993) ...................................... 17

*Heartland Hosp. v. Thompson*,
328 F. Supp. 2d 8 (D.D.C. 2004) ...................................... 16

*Int'l Ladies' Garment Workers' Union v. Donovan,
    733 F.2d 920 (D.C. Cir. 1984) ...................................................................... 15, 16, 17

Kifafi v. Hilton Hotels Ret. Plan,
    79 F. Supp. 3d 93 (D.D.C. 2015) ........................................................................ 18

Luevano v. Horner,
    No. 79-cv-271, 1988 WL 147603 (D.D.C. June 27, 1998) ..................................... 17

*Mass. Union of Public Housing Tenants, Inc. v. Pierce,
    No. 78-cv-1895, 1983 WL 150 (D.D.C. Jan. 17, 1984) ......................................... 14

*Nat'l Law Ctr. on Homelessness & Poverty v. U.S. Veterans Admin.,
    98 F. Supp. 2d 25 (D.D.C. 2000) ......................................................................... 18

Rodriguez v. Swank,
    496 F.2 1110 (7th Cir. 1974) ............................................................................... 18

Samma v. Dep't of Def.,
    486 F. Supp. 3d. 240 (D.D.C. 2020) ............................................................... 17, 23

Samma v. U.S. Dep't of Defense,
    No. 20-cv-1104, 2020 WL 4501000 (D.D.C. Aug. 4, 2020) .................................... 8

Shillitani v. United States,
    384 U.S. 364 (1966) ............................................................................................ 14

Spain v. Mountanos,
    690 F.2d 742 (9th Cir. 1982) .............................................................................. 18

United States v. Spallone,
    399 F.3d 415 (2d Cir. 2005) ................................................................................. 7

Wash. Metro. Area Transit Comm'n v. Reliable Limousine Sers., LLC,
    985 F. Supp. 2d 23 (D.D.C. 2013) ...................................................................... 19

*WildEarth Guardians v. Bernhardt,
    No. 16-cv-1724, 2019 WL 3253685 (D.D.C. July 19, 2019) .................................. 16

Woodward v. Corr. Med. Servs. of Ill., Inc.,
    368 F.3d 917 (7th Cir. 2004) .............................................................................. 12

**Statutes**

10 U.S.C. § 10145(b) .............................................................................................. 5

**Other Authorities**

*Order, *Damus v. Wolf*, No. 18-cv-578, ECF No. 127 (D.D.C. Feb. 7, 2020) ...................... 18, 20

Amended Order, *Kirwa v. U.S. Dep't of Def.*, No. 17-cv-1793, ECF No. 28 (D.D.C. Oct. 25, 2017) ............................................................................................................................. 21

*Order, *Kirwa v. U.S. Dep't of Def.*, No. 17-cv-1793, ECF No. 55 (D.D.C. Dec. 15, 2017) ...... 21

*Order, *Kirwa v. U.S. Dep't of Def.*, No. 17-cv-1793, ECF No. 54 (D.D.C. Dec. 14, 2017) ...... 21

*Order, *Kirwa v. U.S. Dep't of Def.*, No. 17-cv-1793, ECF No. 37 (D.D.C. Nov. 16, 2017) ...... 21

Order, *Select Specialty Hosp.-Denver, Inc. v. Becerra*, No. 10-cv-1356, ECF No. 114 (D.D.C. Sept. 20, 2021) ............................................................................................................ 18, 20

## INTRODUCTION

Defendants admit, in their response to Plaintiffs' Motion to Enforce this Court's August 25, 2020 Order and Judgment, that "[w]ithout doubt, the Department of Defense has a duty to comply with this Court's final order." Defs.' Mem. in Opp. to Pls.' Post-Judgment Mot. 30, ECF No. 80 ("Defs.' Opp."). That Order contained two unambiguous mandates. First, it enjoined Defendants from withholding an N-426 certification "from any class member based on a failure to complete the Minimum Service Requirements." ECF No. 47 at 2. Second, it ordered Defendants to "certify or deny" an N-426 form "in no case . . . longer than . . . 30 days" after its submission. ECF No. 47 at 2–3.

In opposing Plaintiffs' motion, Defendants do not dispute that they have failed to comply with both of the Court's mandates. Defendants do not contest that military officials have—in violation of the Court's Order—instructed class members that they cannot obtain N-426 certifications until they have satisfied the vacated Minimum Service Requirements. And Defendants freely admit that they have failed to process class members' N-426 forms within 30 days of their submission.

What Defendants do dispute is that Plaintiffs have any recourse to compel Defendants' compliance with the Court's Order. They therefore present Plaintiffs' motion as an attempt to reopen this litigation and seek "a new remedial order." Defs.' Opp. 2. But Plaintiffs do not seek any new remedies—nor need they do so, because they *already* won those remedies upon the issuance of the Court's Order over 14 months ago. Through their current motion, which provides a robust record of persistent and longstanding non-compliance with the Order, Plaintiffs simply ask the Court to enforce those existing remedies.

Plaintiffs' proposal for compelling Defendants' compliance with those existing remedies is limited to three primary measures: ordering Defendants to (1) notify class members of their rights under the August 25, 2020 Order and Judgment ("Order"); (2) establish a centralized point of contact to assist class members experiencing non-compliance with the Order; and (3) track and regularly report class members' N-426 certification requests. Plaintiffs' proposal is patently reasonable—a point underscored by the fact that this Court has *already* ordered nearly identical measures in response to nearly identical non-compliance by the same Defendants in the related litigation of *Kirwa v. United States Department of Defense*, No. 17-cv-1793 (D.D.C.). That these measures helped to ensure compliance in *Kirwa* is further evidence of their efficacy.

Respectfully, this Court should grant Plaintiffs' Motion to Enforce and order Plaintiffs' requested relief.

## ARGUMENT

I. **DEFENDANTS HAVE NOT COMPLIED WITH THIS COURT'S ORDER.**

A. **Defendants Have Continued to Impose the Minimum Service Requirements Vacated by the Order.**

Plaintiffs' motion documents Defendants' extensive and widespread imposition of the Minimum Service Requirements.[1] One prominent example is Defendants' circulation, for months after the Court's Order, of *written guidance* at Fort Jackson, which explicitly instructed service

---

[1] Defendants take issue with Plaintiffs' reliance on "hearsay affidavits from attorneys" to support their "claims that Defendants have continued to impose the vacated Minimum Service Requirements." Defs.' Opp. 20 & n.21. As discussed below, class members themselves attest to the continued enforcement of those requirements. *See infra* p. 6. Moreover, courts have accepted hearsay evidence submitted in support of non-dispositive motions, which "unlike a Rule 56 motion for summary judgment," have "no express requirement that the evidence considered be admissible for purposes of trial." *Davis v. Soc. Serv. Coordinators, Inc.*, No. 10-cv-2372, 2012 WL 3744657, at *7 (E.D. Cal. Aug. 28, 2012). Finally, as also discussed below, Defendants do not dispute any of the facts regarding their imposition of the Minimum Service Requirements set forth in any of the declarations. *See infra* pp. 2–6.

members that they must complete the Minimum Service Requirements before they could obtain their N-426 certifications. *See* Cutler Decl. ¶ 21 & Ex. A, ECF No. 63; Kutovaya Decl. ¶¶ 13–14 & Ex. B, ECF No. 65; Okediran Decl. ¶¶ 6–7 & Ex. A. By their own admission, Defendants were circulating this written guidance to service members as late as May 2021. Frambes Decl. ¶ 10, ECF No. 85; Hogg Decl. ¶ 3, ECF No. 86. Fort Jackson is the Army's largest training base and "trains roughly 50 percent of all soldiers." U.S. Army, *Fort Jackson*, https://home.army.mil/ jackson/index.php (last visited Nov. 1, 2021). Thus, Defendants apparently imposed the Minimum Service Requirements on *more than one thousand* class members while the Court's Order was in effect.[2] Even more significantly, class counsel alerted Defendants to the existence of this guidance as early as October 2020, *see* Pls.' Mem. in Supp. of Mot. to Enforce 8, ECF No. 58 ("Pls.' Mem."), *seven months* prior to when military officials now claim they first become aware of it, *see* Frambes Decl. ¶ 10, ECF No. 85; Hogg Decl. ¶ 3, ECF No. 86.

Another telling example of Defendants' continued imposition of the Minimum Service Requirements is the representation—in July 2021, *eleven months* after the Court's Order—by the legal assistance office at Fort Leonard Wood, another major training base, that military officials across that base were routinely imposing the Minimum Service Requirements and refusing to certify N-426 forms. *See* Pls.' Mem. 11–12 (citing Quail Decl. ¶ 7, ECF No. 62). This representation is further corroborated by the experiences of numerous class members, whose inability to obtain N-426 certifications at this base have repeatedly been brought to Defendants'

---

[2] Defendants' statistics show that in just the five-month period from March through August 2021, 2,102 non-citizens began active duty service. Seggerman Decl. ¶ 3, ECF No. 83. Those statistics also show that from September 2020 through August 2021, an additional 2,355 non-citizens began service as members of the Selected Reserve of the Ready Reserve ("Selected Reserve"), *id.*, and may have therefore shipped to Fort Jackson for basic training during that period, *see e.g.*, Kutovaya Decl. ¶¶ 6, 12, ECF No. 65 (drilled with Selected Reserve unit before shipping to basic training at Fort Jackson).

attention. *See* Pls.' Mem. 11–12 (citing Mayat Decl. ¶¶ 30–34, 38–39 & Exs. 10, 12, ECF No. 59; Kim Decl. ¶¶ 14, 21, 23–24 & Exs. 26, 29, 31–32, ECF No. 60); *see also* Mayat Suppl. Decl. ¶¶ 4, 17, 79 & Exs. 38, 40. Defendants have submitted two declarations from military officials at Fort Leonard Wood, and neither of them disputes Plaintiffs' evidence of persistent non-compliance there. The declaration from the Acting Chief of Client Services attests only to the "standard practice" for assisting service members seeking N-426 certifications *since* September 2021, and does not address such practice prior to that date. Hernandez Decl. ¶¶ 1, 4, ECF No. 88. The declaration from the Chief of Staff for Headquarters of the base attests to being "made aware of alleged deficiencies" on July 22, 2021, Ball Decl. ¶ 3, ECF No. 87, *five months* after class counsel first flagged non-compliance at this base to Defendants' counsel, *see* Pls.' Mem. 11 (citing Mayat Decl. ¶ 30 & Ex. 10, ECF No. 59).

The sheer breadth of non-compliance across many locations and units indicates widespread failure by Defendants to comply with the Court's Order. In addition to evidence of many months of non-compliance at Fort Jackson and Fort Leonard Wood, Plaintiffs have documented the imposition of the Minimum Service Requirements by military officials across other military installations and by various Selected Reserve units. *See, e.g.*, Cutler Suppl. Decl. ¶¶ 33–35 (U.S. Army Reserve unit); Goo Decl. ¶ 14, ECF No. 64 (Fort Sill); Kim Decl. ¶¶ 21, 24 & Exs. 29, 32, ECF No. 60 (Fort Sill; Texas National Guard); Kutovaya Decl. ¶ 9, ECF No. 65 (California National Guard); Li Decl. ¶¶ 10–12, 21 (Fort Eustis; Fort Story); Rinaldi Decl. ¶ 8 & Ex. A, ECF No. 69 (25th Combat Aviation Brigade, which imposed one-year requirement even though class member was only subject to and satisfied 180-day requirement).[3]

---

[3] Defendants dismiss any case of non-compliance occurring in Army National Guard units on the basis that such units are operated by "States, which are not named as defendants." Defs.' Opp. 22 n. 23. But Plaintiffs challenged *Defendants'* policy, which is binding on Army National Guard

Defendants attempt to minimize their non-compliance by arguing that given the size of the class, Plaintiffs have raised a "comparably small number of issues." Defs.' Opp. 18.[4]  Setting aside the fact that aggregate statistics cannot obscure the harm each individual class member suffers from non-compliance, Defendants miss the forest for the trees. As Plaintiffs explained in their opening brief, given the hierarchical structure of the military, even a single case of non-compliance at a particular installation is likely indicative of pervasive non-compliance at that location. Pls.' Mem. 17–18. In some instances, class members attest to their superiors informing them that *their* chains of command have instructed them that service members cannot obtain N-426 certifications until they complete the Minimum Service Requirements. *See* Pls.' Mem. 17 (citing Lingamaneni Decl. ¶ 8, ECF No. 67; Yu Decl. ¶ 8, ECF No. 71). In other instances, class members attest to being directly instructed by those much higher above them in the chain of command that they must first satisfy the Minimum Service Requirements. *See, e.g.*, Li Decl. ¶ 8

---

units, not any State policy. *See* Pls.' Mot. for Preliminary Injunction, Ex. 2, ECF No. 4-3 at 5 (copying Chief of the National Guard Bureau). Therefore, to the extent Defendants suggest Army National Guard units are somehow separate from the United States Army for these purposes, they are wrong. *See* 10 U.S.C. § 10145(b) ("The units and members of the Army National Guard . . . are in the Ready Reserve of the Army."). Moreover, Defendants have already admitted that service members serving in an Army National Guard unit are members of the Selected Reserve and therefore form part of the class. *See* Pls.' Mem. 18 (citing Mayat Decl. ¶ 16 & Ex. 1, ECF No. 59). Nevertheless, Army National Guard units are also perpetuating the fallacy that non-citizens serving in these units are not in the Selected Reserve and are therefore not class members. *See* Kim Decl. ¶ 29 & Ex. 36, ECF No. 60 (describing Illinois National Guard's refusal to provide N-426 certification on this basis).

[4] Most cases of non-compliance class counsel have reported to Defendants' counsel were flagged to class counsel by other *lawyers* representing class members. *See* Pls.' Mem. 27 n.21; *see also* Cutler Suppl. Decl. ¶¶ 3–4. It is therefore reasonable to assume that many more class members, who do not have counsel, are experiencing challenges vindicating their rights under the Order. *See Class v. Norton*, 376 F. Supp. 496, 501 (D. Conn. 1974), *aff'd in part, rev'd in part*, 505 F. 2d 123 (2d Cir. 1974) (noting that class members reporting non-compliance were "fortunate in receiving the assistance of Legal Services counsel; the Court can only speculate about the number of people" who experienced non-compliance).

(instructions from battalion commander that service members must satisfy the Minimum Service Requirements).

Defendants do not actually dispute that military officials have imposed the Minimum Service Requirements contrary to the Court's Order. Instead, they cherry pick and quibble over a few cases. *See* Defs.' Mem. 8–11. Defendants' version of these cases is incorrect or incomplete,[5] but the salient point is that they do not contest that military officers have imposed the Minimum Service Requirements. For example, in four out of the five cases Defendants highlight, Defendants themselves admit that class members attested to being instructed that they must satisfy the Minimum Service Requirements before they could obtain their N-426 certifications. Defs.' Opp. 9–11 (discussing declarations of class members Darya Kutovaya, HemaLatha Lingamaneni, Yiyi Yu, and Jianping Liu). Defendants' rebuttal to this evidence is not that military officials did not issue those instructions, but rather that they subsequently provided each of these class members with N-426 certifications "before they satisfied the vacated Minimum Service Requirements." Defs.' Opp. 8; *see also id.* at 9 & n.9, 10 & n.12, 11 & n.13. But whether these class members eventually received their N-426 certifications prior to satisfying the Minimum Service Requirements—and only *after* class counsel had intervened on their behalf— is not the yardstick against which to judge Defendants' compliance. The Court Order enjoins Defendants "from withholding certified Form N-426s . . . based on a failure to complete the Minimum Service Requirements." ECF No. 47 at 2. It is incontrovertible that Defendants failed

---

[5] As just one example, Defendants claim they have undertaken "[a] close examination" of class member Darya Kutovaya's declaration, Defs.' Opp. 9, but conveniently omit the fact that she received written guidance instructing that she had to complete the Minimum Service Requirements while training at Fort Jackson, *see* Kutovaya Decl. ¶¶ 13–14 & Ex. B, ECF No. 65.

to comply with that command, and that this failure evinces widespread non-compliance with the Court's Order.

**B.      Defendants Have Failed to Process N-426 Forms Within 30 Days of Submission, as Required by the Order.**

Plaintiffs' Motion to Enforce also documents Defendants' repeated failure to process class members' N-426 forms within 30 days of submission. *See* Pls.' Mem. 14–16. Indeed, Defendants expressly admit that class members have failed to receive their N-426 certifications within this 30-day timeline. *See, e.g.*, Defs.' Opp. 19 ("To be sure, Plaintiffs have identified instances where service members . . . experienced delays . . . ."); *see also id*. at 1–2, 25. Despite this admission, Defendants' core contention appears to be that, so long as a delay is "not attributable to hostility to the policy change regarding the Minimum Service Requirements," they are absolved of their failure to comply with this part of the Court's Order. Defs.' Opp. 8; *see also id*. at 23 ("Plaintiffs may not . . . request relief solely in order to expedite the processing of Forms N-426, if the delays do not result from application of the Minimum Service Requirements."). Defendants are wrong.

The text of the Court's Order is unequivocal: "**ORDERED** that defendants shall . . . certify or deny a submitted Form N-426 expeditiously, but *in no case* shall it take longer than the 30 days allowed under DOD's April 24, 2020 update to the N-426 Policy." ECF No. 47, at 2–3 (second emphasis added); *see Glymph v. District of Columbia*, No. 01-cv-1333, 2018 WL 10715454, at *6 (D.D.C. Apr. 17, 2018) ("The starting point for interpreting a court order is the plain meaning of the text." (quoting *Adem v. Bush*, No. 05-cv-723, 2006 WL 1193853, at *4 (D.D.C. Apr. 28, 2006) (citing cases))); *see also United States v. Spallone*, 399 F.3d 415, 424 (2d Cir. 2005) ("Court orders 'must ordinarily be interpreted by examination of only the 'four corners' of the document' . . . ." (quoting *Ford Motor Co. v. Summit Motor Prods., Inc.*, 930

F.2d 277, 286 (3d Cir. 1991)). Thus, in each case where Defendants have failed to process a class member's N-426 form within 30 days of submission, Defendants have violated the express terms of the Order. That is also how Defendants themselves—when it suits them—understand the Order. *See, e.g.* Frambes Decl. ¶ 5, ECF No. 85 (describing email to commanders asking they acknowledge their understanding "that they have 30 days from receipt of a USCIS Form N-426 to sign the form and return the original to the Soldier"); *id.* ¶ 7 (describing discussions with commanders, which "included acknowledgement of the 30-day requirement to act upon the requests"). Indeed, no other interpretation would make sense.[6]

Defendants attempt to justify their failures as "administrative" or "clerical" errors, but numerous class members have been subjected to months-long waits having nothing to do with such errors. *See, e.g.*, Kim Decl. ¶ 21 & Ex. 29, ECF No. 60 (Oyepeju: nine months); Mayat Suppl. Decl. ¶¶ 13, 26, 32, (Enikanoselu: one year; Aregbesola: six months; Ayankoya: five months); Ntambwa Decl. ¶¶ 7, 12 (still waiting after over seven and a half months); Li Decl. ¶¶ 7, 14 (over three months *before* error); Okediran Decl. ¶¶ 9, 15 (over six months); Yi Decl. ¶¶ 12–15, 19, ECF No. 70 (six months *before* error); Zapata Decl. ¶¶ 10, 13, 16, ECF No. 72 (seven months); *see also* Cutler Suppl. Decl. ¶ 3 (attesting to none of ten clients beginning service in

---

[6] Under Defendants' theory, they could effectively subject class members to the Minimum Service Requirements by simply delaying processing of their N-426 forms for months or even years and class members subject to such delays would have no recourse so long as they could not expressly tie such delays to the Requirements. Defendants seek to fudge this point by citing language in the class certification opinion that "the class must be limited to individuals whose inability to obtain an N-426 is being caused by [the Minimum Service Requirements]." Defs.' Opp. 24 (citing *Samma v. U.S. Dep't of Defense*, No. 20-cv-1104, 2020 WL 4501000, at *8 (D.D.C. Aug. 4, 2020). However, that opinion explains that the Court was excluding from the class "individuals who do not yet have an N-426 but who have satisfied the minimum service requirements." *Samma*, 2020 WL 4501000, at *8. It necessarily follows that the class comprises *any* service member who does not have an N-426 certification and who *has not satisfied* the Minimum Service Requirements, and is not limited to individuals whose inability to obtain an N-426 *is being caused* by the Requirements.

2021 receiving an N-426 certification within 30 days, five of whom had to wait four or five months). Moreover, Defendants seem to believe that so long as a class member receives *any* N-426 form back from his chain of command within 30 days—whether it be incomplete, *see* Goo Decl. ¶ 22, ECF No. 64; Li Decl. ¶ 17 & Ex. A; Mayat Suppl. Decl. ¶ 38, or incorrectly completed, *see* Cutler Suppl. Decl. ¶ 8; Lingamaneni Decl. ¶ 10, ECF No. 67; Quail Suppl. Decl. ¶¶ 12, 14 & Ex. A; Rinaldi Decl. ¶¶ 10–12, ECF No. 69; Yi Decl. ¶ 19, ECF No. 70, or certified by the wrong level of officer, *see* Goo Decl. ¶ 17, ECF No. 64—they have discharged their duty under the Order. Thus, Defendants assert that class member Bonchan Goo's *ten-month* wait for a properly certified N-426 form is of no concern since he first received an N-426 form, which was not properly certified, "less than 30 days after the Court issued final judgment in this case." Defs.' Opp. 25.[7] Defendants' interpretation is not consonant with the plain language of the Order, which requires Defendants to "*certify or deny* a submitted Form N-426" within 30 days. ECF No. 47 at 2–3. Surely "certify" means "properly certify," not "hand the class member a piece of paper."[8]

---

[7] Class member Goo was first able to submit his N-426 form for certification in September 2020; he did not receive a proper N-426 certification until July 2021. *See* Pls.' Mem. 15 (citing Mayat Decl. ¶¶ 18–20, 42, 52, 63 & Exs. 1, 12, 14, ECF No. 59; Goo Decl. ¶¶ 10–18, 21–31, 34, ECF No. 64).

[8] In many cases, Defendants have even failed to process a class member's N-426 form within 30 days from the date when class counsel notified Defendants of their non-compliance. *See, e.g.,* Mayat Decl. ¶¶ 8, 24, ECF No. 59 (Kutovaya: over two months); *id*. ¶¶ 18, 63 (Goo: nine months); *id*. ¶¶ 39, 62 (Lingamaneni: over two months); *id*. ¶¶ 43, 68 (Chen: approximately two months); *id*. ¶¶ 54, 72 (Liu: seven weeks); Mayat Suppl. Decl. ¶ 14 (Enikanoselu: over two and a half months); *id*. ¶ 33 (Ayankoya: over 30 days); *id*. ¶ 39 (Aregbesola: over two and a half months); *id*. ¶ 42 (Li: over five weeks); *id*. ¶ 53 (Povolotckii: over three months).

C.      **Defendants Provide No Contrary Evidence of Actual Compliance with the Court's Order.**

Against Plaintiffs' extensive documentation of Defendants' systemic non-compliance with the Court's Order, Defendants fail to summon any evidence to demonstrate *actual* compliance with the Order. Defendants baldly claim that "[s]ince this Court's August 25, 2020 Order, nearly all former class members have been able to obtain a certification of service as honorable on a Form N-426 from his or her chain of command without issue." Defs.' Opp. 18. But Defendants themselves have no way of knowing if this statement is true, given their own admission that the "Army does not maintain centralized statistics as to the number of certifications processed or the status of individual certification requests." Defs.' Opp. 6.

Defendants repeatedly tout the fact that U.S. Citizenship and Immigration Services has received more naturalization applications from service members in 2021 than in 2019 as evidence in support of their compliance with the Court's Order. *See* Defs.' Opp. 1, 6–7, 18. But there is at least one other likely reason for that increase, which has nothing to do with Defendants' compliance with the Order. In 2019, Defendants suspended a policy requiring lawful permanent residents to complete new and onerous background checks before they could ship to basic training, which had effectively halted thousands of non-citizens from beginning their service. *See* Pet. For a Writ of Certiorari at 4–11, *Kuang v. U.S. Dep't of Def.*, No. 19-1194 (U.S. Mar. 30, 2020) (describing how in the months following the adoption of the policy, "LPR accessions plummeted"). Moreover, the mere number of naturalization applications tells the Court nothing about whether class members submitting those applications were subjected to the Minimum Service Requirements or were forced to wait more than 30 days for their N-426 certifications before they eventually applied for naturalization. Only data on how many class members are seeking N-426 certifications and when they are receiving those certifications can

10

actually demonstrate the scope of Defendants' compliance with the Order—and that is precisely why Plaintiffs are seeking such data through their Motion to Enforce. *See infra* pp. 21–23.

Defendants also persist in arguing that class members have "numerous avenues of redress" where they encounter non-compliance and insisting that service members are obligated under various military service regulations to pursue these avenues. Defs.' Opp. 14–15 & n.16. As already explained, those avenues are ineffective. *See* Pls.' Mem. 19–22, 28–31; Stock Decl. ¶¶ 8–23, ECF No. 61. Moreover, this response effectively abdicates Defendants' responsibility for complying with the Court's Order, which enjoins *Defendants* from subjecting class members to the Minimum Service Requirements and orders *Defendants* to process N-426 forms within 30 days. It is therefore irrelevant that service members may have avenues to redress non-compliance that has *already* occurred; Defendants must comply with the Court's Order in the first place.

Unable to rebut Plaintiffs' evidence demonstrating non-compliance with the Order, Defendants ultimately shift to pointing to a series of recent actions. This flurry of activity, after months of inaction, lays waste to Defendants' assertion that they have been in compliance with the Court's Order all along and that Plaintiffs complain only of isolated instances of administrative error. *See, e.g.*, Defs.' Opp. 20 ("[T]he 193d Infantry Brigade at Fort Jackson . . . has made substantial reforms in its operations for processing Forms N-426 since becoming aware of Plaintiffs' allegations earlier in the summer."). In any event, these actions have failed to substantially remediate Defendants' non-compliance, which continues to date.

First, Defendants point to the issuance of several policies, specifically two fragmentary orders ("FRAGO 2" and "FRAGO 3") issued in August 2021. But Defendants previously issued numerous policies—in August 2020, September 2020, October 2020, and June 2021—including

a nearly identical FRAGO ("FRAGO 1"), to no apparent effect. *See* Defs.' Opp. 5–6.[9] Given the abject failure of these prior policies to ensure compliance, it is unclear how issuing further paper policies will bring Defendants in line with the Court's Order. Defendants attempt to distinguish the new policies from the old ones by emphasizing that they instruct commanders to undertake certain actions, including confirming receipt of the policies and disseminating them down their chains of command. Defs.' Opp. 12. But these instructions are not meaningfully different from those in prior FRAGO 1, which instructed "commanders at all levels to ensure that all non-U.S. citizen soldiers and their supervisory chains are provided a copy of [the relevant references] as well as a copy of this FRAGO." St. Clair Decl., Ex. C, ECF No. 82-3 at 4.

Second, Defendants state that they have "undertaken education and remediation efforts at specific installations where Plaintiffs had expressed concerns." Defs.' Opp. 13. But they have undertaken such efforts only at Fort Jackson, Fort Leonard Wood, and Fort Benning, *see* Defs.' Opp. 13–14, despite the fact that Plaintiffs have documented cases of non-compliance at numerous other installations as well as within numerous Selected Reserve units, *see infra* p. 4 (Fort Sill, Fort Eustis, Fort Story, the 25th Combat Aviation Brigade, as well as a U.S. Army Reserve unit and the California and Texas National Guards); *see also* Okediran Decl. ¶¶ 10–13 (U.S. Army Reserve unit); Yi Decl. ¶¶ 12–15, ECF No. 70 (Virginia National Guard); Zapata

---

[9] Defendants also argue that their adoption of these policies in the immediate aftermath of the Order is enough, on its own, to demonstrate their substantial compliance with the Order. *See* Defs.' Opp. 17–18. But the mere existence of policies on paper cannot demonstrate compliance in the face of Defendants' actual practice of imposing the Minimum Service Requirements and failing to process N-426 forms within the required 30-day timeline. As this Circuit has held in a different context, a "'paper' policy cannot insulate a municipality from liability where there is evidence . . . that the municipality was deliberately indifferent to the policy's violation." *Daskalea v. District of Columbia*, 227 F.3d 433, 442 (D.C. Cir. 2000); *see also Woodward v. Corr. Med. Servs. of Ill., Inc*., 368 F.3d 917, 929 (7th Cir. 2004) ("For all intents and purposes, ignoring a policy is the same as having no policy in place in the first place.").

Decl. ¶¶ 9–10, 13 16, ECF No. 72 (U.S. Army Reserve unit). Moreover, Defendants' "efforts" at Fort Leonard Wood and Fort Benning were limited to re-disseminating FRAGO 1 and disseminating FRAGOs 2 and 3. *See* Ball Decl. ¶¶ 3–4, ECF No. 87; Tremblay Decl. ¶ 5, ECF No. 89. As discussed above, FRAGOs 2 and 3 are not meaningfully different from the prior FRAGO 1 already disseminated across each of the Army's installations.[10]

Indeed, Defendants' non-compliance continues to this day. Since August 17, 2021, when Plaintiffs filed their Motion to Enforce, Plaintiffs have brought multiple new cases of non-compliance to Defendants' attention and highlighted numerous ongoing cases of non-compliance. *See* ECF Nos. 77, 78, 79; Mayat Suppl. Decl. ¶¶ 4, 17 & Ex. 38.[11] For example, class member Lichao Li first requested his N-426 certification nearly six months ago and repeatedly followed up on his request at several military installations, including at Fort Eustis and Fort Story. At each military installation, his military superiors instructed that he had to first satisfy the vacated Minimum Service Requirements before he could obtain his N-426 certification. Li Decl. ¶¶ 6–12, 19–21.[12]

---

[10] Defendants claim that they have also undertaken "unit-specific efforts . . . throughout the last year each time Plaintiffs raised an allegation of noncompliance with Defendants," but cite no evidence in support of this assertion. Defs.' Opp. 13 n.15. In fact, the assertion is false. As Plaintiffs have explained, Defendants only rectified a single case of non-compliance from September 2020 to June 2021 and refused to undertake any unit-specific action until *after* Plaintiffs notified them of their intent to file this motion. *See* Pls.' Mem. 17–19.

[11] Defendants take issue with Plaintiffs' filing of Notices regarding these examples of continued non-compliance because "Plaintiffs did not request leave of Court to do so." Defs.' Opp. 19 n.20. While the federal and local rules require all evidence supporting a Motion for Summary Judgment or Motion for Preliminary Injunction to accompany the motion, *see* Fed. R. Civ. P. 56; LCvR 65.1(c), there is no equivalent rule prohibiting the parties from filing supplemental support for other motions and Defendants cite to no authority to justify their reproach.

[12] According to Defendants, "Fort Eustis reports that, since October 2020, average N-426 processing time is 24-48 hours from the time the unit personnel office receives the request for certification to when the Brigade Commander signs it, with the form returned promptly thereafter." Defs.' Opp. 6 (citing Benner Decl. ¶ 3, ECF No. 90). In fact, the declaration to which Defendants cite only attests to such processing times within the *128th Aviation Brigade* at Fort

Remarkably, even after Plaintiffs filed this motion, Defendants' failure to promptly resolve ongoing cases of non-compliance demonstrates their disregard for this Court's Order. For example, class counsel flagged the case of class member Olusegun Enikanoselu to Defendants on July 28, 2021. Kim Decl. ¶ 24 & Ex. 32, ECF No. 60. Class member Enikanoselu first requested his N-426 certification in October 2020 and had therefore been waiting for his certification for *nine months* by the time class counsel became aware of his situation and intervened to assist him. Nevertheless, Defendants failed to provide him with his N-426 certification until October 18, 2021 (the day they filed their opposition to the motion), over *eleven weeks* after class counsel intervened to assist and nearly a year after he first requested his certification. Mayat Suppl. Decl. ¶¶ 7, 13–14.

## II.    PLAINTIFFS SEEK ENFORCEMENT OF THE COURT'S AUGUST 25, 2020 ORDER, NOT A NEW INJUNCTION OR A WRIT OF MANDAMUS.

"Courts of Justice are universally acknowledged to be vested, by their very creation, with power to impose . . . submission to their lawful mandates." *Chambers v. NASCO, Inc.*, 501 U.S. 32, 43 (1991) (quoting *Anderson v. Dunn*, 6 Wheat. 204, 2007 (1821)). It is therefore "undisputed that a Court has the power to enforce its orders, and that in addition, a court has the authority to inquire whether there has been any disobedience of its orders." *Mass. Union of Public Housing Tenants, Inc. v. Pierce*, No. 78-cv-1895, 1983 WL 150, at *4 (D.D.C. Jan. 17, 1984) (citing *Shillitani v. United States*, 384 U.S. 364, 370 (1966)). Moreover, "[t]he exercise of this authority is 'particularly appropriate' when a case returns to a court on a motion to enforce

---

Eustis. Benner Decl. ¶ 3, ECF No. 90. Class member Li did not serve in this brigade. Li Decl. ¶ 9. Moreover, class member Li attests to his inability to *submit* an N-426 for certification while training at Fort Eustis because his company commander instructed service members that they would have to wait to seek an N-426 certification until they shipped to their first duty stations. Li Decl. ¶¶ 10–11; *see also id.* ¶ 12. A short processing time for *submitted* N-426 forms does no good if class members are not allowed to submit the forms in the first place.

the terms of its mandate to an administrative agency." *Flaherty v. Pritzker*, 17 F. Supp. 3d 52, 55 (D.D.C. 2014) (quoting *Int'l Ladies' Garment Workers' Union v. Donovan*, 733 F.2d 920, 922 (D.C. Cir. 1984)).

Defendants construe Plaintiffs' Motion to Enforce as a motion for a mandatory injunction or even a writ of mandamus, seeking "relief not previously sought by the plaintiffs," rather than as one to enforce the Court's underlying Order. Defs.' Opp. 2. But Plaintiffs seek no new relief, only enforcement of the *existing* relief this Court has *already* ordered. To be sure, Plaintiffs seek additional measures, to be ordered by the Court, to address Defendants' non-compliance with that *existing* relief. But that posture does not transform Plaintiffs' motion into one for a new injunction or writ of mandamus.

The D.C. Circuit made this distinction clear in *International Ladies' Garment Workers' Union v. Donovan*, 733 F.2d 920. There, the Secretary of Labor issued a rule contravening an order of the court. The plaintiffs filed a motion to enforce the order, which the district court treated as a motion for a preliminary injunction. The Circuit held that the "District Court was mistaken in recharacterizing the [plaintiffs'] motion as a request for preliminary injunctive relief," when it was actually "a motion to enforce the original mandate." *Id*. at 922. The Court also emphasized the importance of distinguishing between a motion to enforce a previous order and a motion for new injunctive relief, explaining that the lower court's "mischaracterization . . . shifted the focus of the court's inquiry to whether the appellants could establish irreparable injury to their interest." *Id*. By comparison, a motion to enforce "implicates an interest of a very different sort," which is "of course, . . . the interest of the judicial branch in seeing that an unambiguous mandate is not blatantly disregarded by parties to a court proceeding." *Id*.

15

"A court asked to enforce a prior order should grant the motion when a 'prevailing plaintiff demonstrates that a defendant has not complied with a judgment entered against it.'" *WildEarth Guardians v. Bernhardt*, No. 16-cv-1724, 2019 WL 3253685, at *3 (D.D.C. July 19, 2019) (quoting *Heartland Hosp. v. Thompson*, 328 F. Supp. 2d 8, 11 (D.D.C. 2004)). "The key question for this Court, then, is whether Plaintiffs have 'received all relief required' by the Court's earlier order." *Id*. (quoting *Heartland Hosp.*, 328 F. Supp. 2d at 11). Here, Plaintiffs have failed to receive "all relief required" by this Court's August 25, 2020 Order. That Order contained two unambiguous mandates: (1) enjoining Defendants from withholding N-426 certifications "from any class member based on a failure to complete the Minimum Service Requirements," and (2) ordering Defendants to "certify or deny" a submitted N-426 form "in no case longer . . . than . . . 30 days." ECF No. 47 at 2–3. Plaintiffs' motion seeks only to "enforce[e] the terms" of these two mandates. *Int'l Ladies' Garment Workers' Union*, 733 F.2d at 922. As explained above, Defendants have continued to withhold N-426 certifications on the basis that class members have not satisfied the vacated Minimum Service Requirements. They have also failed to certify or deny submitted N-426 forms within 30 days. Because Defendants have clearly failed to comply with this Court's prior mandates and have denied class members the relief afforded by those mandates, this Court should grant Plaintiffs' Motion to Enforce.

## III.   PLAINTIFFS MAY MOVE TO ENFORCE THIS COURT'S ORDER ON BEHALF OF THE CLASS.

Defendants dispute that Plaintiffs, who are certified class representatives, may move to enforce this Court's Order on behalf of the class. They argue, tautologically, that "Plaintiffs may seek only remedies that would redress the injuries that they have been authorized to pursue on behalf of the class." Defs.' Opp. 23. But of course Plaintiffs *are* seeking to redress the very same injuries that led to the Court Order with which Defendants are failing to comply. However, they

are not seeking *new* remedies for those injuries; the Court *already ordered* the necessary remedies in its Order. Plaintiffs now seek to *enforce* Defendants' compliance with those existing remedies. It is incontrovertible that they may do so. *See, e.g.*, *Hammon v. Kelly*, 830 F. Supp. 11 (D.D.C. 1993) (granting motion to enforce consent decree brought by plaintiffs on behalf of the class); *Luevano v. Horner*, No. 79-cv-271, 1988 WL 147603 (D.D.C. June 27, 1998) (same); *see also Int'l Ladies' Garment Workers' Union*, 733 F.2d at 922 (explaining that the "focus of the court's inquiry" in a motion to enforce is not on "injury" but "in seeing that an unambiguous mandate is not blatantly disregarded by parties to a court proceeding.").[13]

## IV.   THE COURT SHOULD ENFORCE ITS ORDER BY ORDERING DEFENDANTS TO UNDERTAKE THE MEASURES REQUESTED BY PLAINTIFFS.[14]

### A.   The Court Has Broad Discretion to Order Specific Actions in Response to a Party's Non-Compliance with a Prior Order.

A "federal court's interest in orderly, expeditious proceedings justifies any reasonable action taken by the court to secure compliance with its orders." *Berger v. Heckler*, 771 F.2d 1556, 1568 (2d Cir. 1985). In particular, "[a] court's powers to enforce its own injunction by issuing additional orders is broad . . . where the enjoined party has not fully complied with the

---

[13] Defendants accuse Plaintiffs of "reopening the litigation," Defs.' Opp. 2, but it is Defendants who are seeking to do so. In a bizarre footnote, Defendants assert that the challenged policy did *not* require service members to "meet the Minimum Service Requirements" but instead "addressed only the certification of *honorable* service" and therefore authorized Defendants to deny N-426 certification to a service member who "had not earned a characterization of service as honorable due to her entry-level status." Defs.' Opp. 26 n.27. The Court has already rejected this very argument. *See Samma v. Dep't of Def.*, 486 F. Supp. 3d. 240, 270 (D.D.C. 2020).

[14] Plaintiffs agree with Defendants' statement that they have already undertaken two of the measures requested by Plaintiffs: (1) filing and serving "a report of their efforts to comply with the Order" and (2) requiring "all O-6 commanders at the Army's basic training bases and other installations where class counsel have identified cases of non-compliance to confirm receipt of the September 3, 2020 Army implementing memorandum and to confirm that all officers below them in their chains of command have read and understood their obligations under the memorandum." Defs.' Opp. 38. Accordingly, Plaintiffs attach a new Proposed Order to their reply, which removes these requested measures.

court's earlier orders." *Kifafi v. Hilton Hotels Ret. Plan*, 79 F. Supp. 3d 93, 100 (D.D.C. 2015)

(quoting *Nat'l Law Ctr. on Homelessness & Poverty v. U.S. Veterans Admin.*, 98 F. Supp. 2d 25,

26–27 (D.D.C. 2000)); *Damus v. Wolf*, No. 18-cv-578, 2020 WL 601629, at *2 (D.D.C. Feb. 7,

2020) ("Along with the contempt power, a court has the authority to issue additional orders to

enforce a prior injunction. This equitable authority is broad[.]"). Accordingly, courts in this

Circuit and others have ordered parties that have not complied with their prior orders to

undertake a broad range of specific actions. *See, e.g.*, Order, *Select Specialty Hosp.-Denver, Inc.*

*v. Becerra*, No. 10-cv-1356, ECF No. 114 (D.D.C. Sept. 20, 2021), Ex. 47 (enjoining agency

from withholding reimbursements to plaintiff hospitals and ordering regular reporting); Order,

*Damus v. Wolf*, No. 18-cv-578, ECF No. 127 (D.D.C. Feb. 7, 2020), Ex. 48 (ordering agency to

train employees, permitting plaintiffs to review training procedures and be present at trainings,

and requiring agency to conduct monthly review of agency decisions); *Nat'l Law Ctr. on*

*Homelessness & Poverty*, 98 F. Supp. 2d 25 (enjoining agency from transferring federal property

without first complying with certain statutory procedures); *Cent. of Georgia R.R. Co. v. United*

*States*, 410 F. Supp. 354 (D.D.C. 1976) (terminating agency proceeding and nullifying agency

orders); *see also Berger*, 771 F.2d 1556 (affirming order that agency promulgate regulations to

implement consent decree); *Spain v. Mountanos*, 690 F.2d 742, 746 (9th Cir. 1982) (affirming

order directing state controller to issue a warrant on State Treasurer for payment of attorney's

fees); *Rodriguez v. Swank*, 496 F.2 1110 (7th Cir. 1974) (affirming order requiring state agency

to pay $100 penalty to applicants whose applications were pending more than 30 days in

violation of underlying order); *Class*, 376 F. Supp. at 501 (ordering state agency that failed to

process applications within 30 days in violation of underlying order to undertake numerous

specific actions, including assigning employees to review records, instituting new procedures for reviewing applications, and submitting monthly reports).

Defendants argue that because the specific measures Plaintiffs seek from the Court to address their non-compliance "would compel the Secretary of Defense . . . to take a specific action," they each "constitute a mandatory injunction," which must be "analyzed as one requesting mandamus." Defs.' Opp. 29. Significantly, Defendants cite to no authority in support of this astounding conflation of the Court's equitable power to enforce its own mandates and the adjudication of a request for mandamus relief.[15] Nor can they. Indeed, of the many cases Plaintiffs cite to demonstrate the diverse array of equitable remedies courts have devised to enforce compliance with their orders, not a single one purports to treat any of those remedies as a mandatory injunction, subject to analysis under the mandamus inquiry.

One notable example is *Class v. Norton*, 376 F. Supp. 496, where the district court granted a motion to enforce its prior orders requiring a state Commissioner to determine the eligibility of applicants for welfare assistance within 30 days of submission of their application for assistance. There, the court ordered the Commissioner undertake a series of specific actions, including (1) assigning workers "to review Department records" to determine eligibility for

---

[15] None of the cases Defendants cite for the proposition that "a mandatory injunction against a federal official is analyzed as one requesting mandamus," Defs.' Opp. 29, concerns a motion to enforce a Court's prior order. The only relevant case Defendants discuss is *Wash. Metro. Area Transit Comm'n v. Reliable Limousine Sers., LLC*, 985 F. Supp. 2d 23, 20 (D.D.C. 2013), which Plaintiffs cited in their opening brief for the well-settled proposition that a district court retains jurisdiction to "preserve the status quo" even during the pendency of an appeal, including by modifying or clarifying its prior injunction. *See* Pls.' Mem. 35. Defendants appear to misinterpret Plaintiffs' reliance on this case as evidence that Plaintiffs seek to modify the Court's Order (although it then proceeds to analyze Plaintiffs' Motion to Enforce as one seeking mandamus relief). Plaintiffs in no way seek to modify the Court's August 25, 2020 Order, but merely seek reasonable measures to ensure compliance with that Order. *Cf. WMATC* (clarifying injunction to *add* order enjoining a third party, "in privity" with one of the defendants, from transporting passengers in a manner violating the underlying injunction).

former applicants; (2) instituting "procedures by which Department records may be reviewed" to determine eligibility for current applicants; (3) issuing "a new directive" containing specific language regarding processing of applications; (4) rescinding Department "directives"; and (5) submitting monthly reports "detailing the processing of . . . applications," including the number of applications submitted, approved, denied, and the number of applications "pending" for "less than 30 days," "30 through 45 days, "45 through 60 days," and "more than 60 days[.]" *Id.* at 501–02. These measures are precisely the kind Plaintiffs seek in their Motion to Enforce. *See also* Order, *Select Specialty Hosp.-Denver, Inc.*, ECF No. 114, Ex. 47 (ordering regular reporting); Order, *Damus*, ECF No. 127, Ex. 48 (requiring agency to conduct monthly review of agency decisions). Importantly, neither the district court nor the Second Circuit, which upheld each of these remedies, *Class*, 505 F.2d 123, treated them as mandatory injunctions or requests for mandamus relief.

Defendants suggest that even were the Court to find that they "are in violation of the injunction," the most it could do would be to require "the Secretary to exercise his discretion and submit a unit-specific plan for ensuring" compliance. Defs.' Opp. 34 (citing to *Cobell v. Norton*, 391 F.3d 251 (D.C. Cir. 2004), which concerned an appeal of a preliminary injunction order, not of an order in response to a motion to enforce). Of course, if this Court can require the Secretary to "submit" a proposed plan, it follows that it can also require the Secretary to *follow* a plan of the Court's devising. The question then boils down to what equitable remedies are appropriate to address Defendants' non-compliance with the Court's Order.

### B. Plaintiffs Seek the Same Measures this Court Ordered in *Kirwa*, which Ensured Defendants' Compliance with a Similar Order.

In filing this motion, Plaintiffs specifically drew on the blueprint of remedies this Court has *already* ordered in the related litigation of *Kirwa*. *See* Wollenberg Decl. ¶¶ 8, 13–14 & Exs.

C, G, H. *Kirwa* challenged the Minimum Service Requirements on behalf of a different class of

non-citizens serving in the military. This Court issued a preliminary injunction, which similarly

(1) enjoined Defendants from withholding N-426 certifications based on the Minimum Service

Requirements and (2) required Defendants to process N-426 forms within two days of

submission. Amended Order, *Kirwa*, ECF No. 28 (Oct. 25, 2017), Wollenberg Decl., Ex. A.

Following Defendants' failure to comply with the preliminary injunction, the *Kirwa* plaintiffs

filed a motion to enforce, Pls.' Mot. to Enforce Court Order, *Kirwa*, ECF No. 35 (Nov. 15,

2017), Wollenberg Decl., Ex. B, in response to which the Court ordered Defendants to

implement the three measures Plaintiffs primarily seek here: (1) notifying class members of their

rights under the Court's order; (2) establishing centralized points of contact to assist class

members experiencing non-compliance; and (3) tracking and regularly reporting class members'

N-426 certification requests. Order, *Kirwa*, ECF No. 37 (Nov. 16, 2017), Wollenberg Decl. Ex.

C (ordering parties to propose class notice and Defendants to report on N-426 certification

requests); Wollenberg Decl. ¶ 12 & Ex. F (describing and exhibiting December 5, 2017 email

from Court to *Kirwa* parties ordering Defendants to provide in the class notice "a point of contact

in case an enlistee has not received a copy of his or her completed/signed Form N-426 within 7

business days of submission"); Order, *Kirwa*, ECF No. 54 (Dec. 14, 2017), Wollenberg Decl.,

Ex. G (ordering class notice); Order, *Kirwa*, EC No. 55 (Dec. 15, 2017), Wollenberg Decl., Ex.

H (ordering bi-weekly reporting on N-426 certification requests).

As class counsel in *Kirwa* attests, these measures were effective in ensuring Defendants'

compliance in *Kirwa*. Class notice "helped to ensure that *Kirwa* class members were aware of

their rights under the Court's" preliminary injunction order and "were able to obtain their N-426

certifications in the manner specified by that Order." Wollenberg Decl. ¶ 26. Moreover, *Kirwa*

class counsel explains that this Court instructed Defendants "to send the notice to all *potential Kirwa* class members" so as to "ensure that . . . service members who entered the class at a later point in time would still be properly informed of their rights." Wollenberg Decl. ¶ 27. Based on this experience, *Kirwa* counsel expressed that not only class notice, but also "dissemination of this class notice on a monthly basis to new *Samma* class members," would similarly ensure Defendants' compliance with the Court's Order in this case. Wollenberg Decl. ¶ 29.

     *Kirwa* class counsel also attests to the utility of establishing centralized points of contact, which "were especially effective in resolving difficulties *Kirwa* class members experienced in requesting their N-426 certifications, including encountering failure by their chains of command to understand and comply with the Court's PI Order." Wollenberg Decl. ¶ 31. In *Kirwa*, class counsel "engaged regularly with the centralized points of contact" who generally "responded to inquiries within a few days and acted as the liaison to other Army officials who were not familiar with the N-426 certification process or the Court's PI Order." *Id*. *Kirwa* counsel concludes that "[w]ithout those centralized points of contact, . . . many *Kirwa* class members would have faced unwarranted and lengthy delays in obtaining their N-426 certifications (and citizenship as a result)." *Id*.

     Finally, *Kirwa* class counsel explains that Defendants' tracking of N-426 certification requests and bi-weekly reporting "were effective in ensuring that Defendants comply with the Court's PI Order," by "having Defendants be regularly accountable to the Court and class counsel for certifying class members' N-426 certifications upon request." Wollenberg Decl. ¶ 40. Defendants claim that the Court came to regret imposing the reporting requirements in *Kirwa*, by selectively quoting from two transcripts dated to 2018. Defs.' Opp. 37–38 (citing transcripts dated January 2018 and October 2018). If that were the case, the Court could have terminated

those requirements at any time, but chose to maintain them until July 2020. *See* Wollenberg

Decl. ¶ 42 & Ex. N.

      In response to Plaintiffs' reliance on the measures that have already proven effective in

*Kirwa*, Defendants do not deny that they implemented these measures or that they were

efficacious. Rather, they focus on *Kirwa*'s procedural history, disputing that the Court ordered

these measures in response to the motion to enforce. Defendants' presentation of the *Kirwa*

procedural history is wrong, *see* Wollenberg Decl. ¶¶ 15–24, but is also beside the point.[16] The

relevant question is whether Plaintiffs have proposed reasonable measures to address

Defendants' non-compliance. Because Plaintiffs propose the same measures this Court has

already ordered and which helped ensure Defendants' compliance with a similar Order, the

answer is a resounding yes.[17]

      At root, Defendants' oppose Plaintiffs' proposed measures because they take umbrage at

the idea that they should have to take anything other than their own "desired approach" to N-426

---

[16] Defendants' representation of the procedural history with respect to the reporting requirements is particularly distorted. Defendants incorrectly claim that they "*voluntarily*" engaged in such reporting as part of an effort "to try and moot out the class." Defs.' Opp. 36–37. As counsel for *Kirwa* plaintiffs' recounts, the efforts to "moot out the class" (*i.e.* to provide relief to all class members) came a year and a half *after* the Court had already ordered Defendants to regularly report on the status of N-426 certification requests. Wollenberg Decl. ¶¶ 18–19, 21–22; *see also* Defs.' Opp. 36–37 (citing to transcripts dating 18 and 19 months *after* the Court's December 2017 Order). Moreover, as *Kirwa* class counsel attests, the parties neither came to an agreement on a process for mooting the class nor worked together to effectuate mooting, resulting in the Court's issuance of a permanent injunction in September 2020. Wollenberg Decl. ¶ 21.

[17] Defendants also argue that the measures ordered in *Kirwa* are not appropriate here because "unlike the limited and defined class in *Kirwa*, the *Samma* class is both larger and indefinite" and so they "cannot moot the class in the same matter [sic] the parties attempted in *Kirwa*." Defs.' Opp. 35–36. Whether or not Defendants can "moot the class" here is irrelevant to the question of what measures the Court should fashion to compel Defendants' compliance with its Order. Nor, as already explained, *see supra* note 16, were the measures the Court ordered in *Kirwa* designed with the "mootability" of the *Kirwa* class in mind, the subject of which did not enter the parties' discussions until a year and a half *after* the Court ordered these measures.

certification. Defs.' Opp. 37. But Defendants do not get to adjudicate their own non-compliance

with the Court's Order. Moreover, Defendants' own recent actions at Fort Jackson demonstrate

that they are perfectly capable of implementing measures far more onerous than what Plaintiffs

propose. The 193d Infantry Brigade at Fort Jackson attests to implementing the following

measures "after determining the current processing procedures were not working effectively":

> (1) establishing a tracker, identifying "all trainees seeking naturalization on the
> basis of military service within 72 hours of arrival," and including the service
> member's name, "the date of arrival at Fort Jackson, the date the N-426 was
> signed, . . . the date the N-426 was sent to the Brigade Commander, and the date it
> was returned to the Soldier;"

> (2) conducting briefings, during which military officials "go line-by-line on the
> N-426 to instruct how to properly fill out the document," "[t]he trainee completes
> the N-426 during the briefing," and military officials collect the N-426 forms;

> (3) providing service members with "an information packet," containing various
> guidance related to naturalization on the basis of military service;

> (4) "personally rout[ing] all N-426 forms to the Brigade Commander for O-6
> signature," following which "the original N-426 is handed directly to the Soldier
> and the Soldier signs for receipt of the document;" and

> (5) maintaining copies of N-426 certifications and acknowledgements of receipt.

Hogg Decl. ¶¶ 5–8, ECF No. 86.[18]

    Indeed, compared to this suite of measures, what Plaintiffs seek is far more limited in

nature.

## CONCLUSION

    For the reasons set forth above, the Court should grant Plaintiffs' Motion to Enforce the

Court's August 25, 2020 Order and Judgment and grant the relief requested in the revised

proposed order (*see supra* note 14) submitted herewith.

---

[18] Defendants do not explain why implementation of these measures is limited to this brigade and
not extended to other brigades at Fort Jackson or to other military installations.

Dated: November 1, 2021

Respectfully submitted,

Jennifer Pasquarella
American Civil Liberties Union Foundation
  of Southern California
1313 West 8th Street
Los Angeles, CA 90017
(213) 977-5236
jpasquarella@aclusocal.org

/s/ *Scarlet Kim*_____
Scarlet Kim (D.D.C. Bar No. NY0329)
Sana Mayat*
Brett Max Kaufman (D.D.C. Bar. No. NY0224)
American Civil Liberties Union Foundation
125 Broad Street, 18th Floor
New York, NY 10004
(212) 549-2500
scarletk@aclu.org
smayat@aclu.org
bkaufman@aclu.org

Arthur B. Spitzer (D.C. Bar No. 235960)
American Civil Liberties Union Foundation
  of the District of Columbia
915 15th Street, NW, 2nd Floor
Washington, DC 20005
(202) 601-4266
aspitzer@acludc.org

*Admitted *pro hac vice*

*Counsel for Plaintiffs*

25